# EXHIBIT 11

# EXHIBIT 11

IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE WESTERN DISTRICT OF MICHIGAN

WINERIES OF THE OLD MISSION

PENINSULA (WOMP) ASSOC., a Michigan

Nonprofit Corporation, et al.,

                Plaintiffs,

  vs.                       Case No. 1:20-cv-01008

                            Hon. Paul L. Maloney

                            Magistrate Ray S. Kent

PENINSULA TOWNSHIP, Michigan

Municipal Corporation,

                Defendant.

_____

The Deposition of JOHN WUNSCH, VOLUME I,

Taken at 420 East Front Street,

Traverse City, Michigan,

Commencing at 4:45 p.m.,

Wednesday, November 3, 2021,

Before Rebecca L. Russo, CSR-2759, RMR, CRR.

governmental interests that the Township set forth, and then I want to talk about the ordinances.

A.   Mmm-hmm.

Q.   The first one is preserving the agricultural industry and providing permanent land for the same.

Do you know what that means?

A.   Yes, in my mind, I have a clear understanding of what I believe that means.

Q.   And what do you believe that means?

A.   In order to keep an agricultural industry viable, there are a number of things that need to be there, and one is, of course, the availability of the land.

A second is the lack of fragmentation of the land.

The third is a lack of extra incursion of human presence that would make it difficult to continue to do the standard things we do, which is spray, mow, things that make noise, things that causes smell.

So one of the things that is being carefully done is to try to preserve land so that it's available.  And another thing that's been done is to try to avoid breaking down the small parcels, which make it very difficult to farm in the traditional sense.

So, in my mind, to my understanding, it's a process of avoiding things like commercial activities that are going to bring in people that are going to complain, avoiding breaking into small parcels and subdividing within the farm areas, which is why we have a preservation program, to avoid that.

Q. Yeah. And so part of this interest number 1 that would include the PDR program that you're a part of, I assume that was to help with this governmental interest, right?

A. Why don't you read that governmental interest for me again, please.

Q. Preserving the agricultural industry and providing permanent land for the same.

A. Mmm-hmm.

Q. So would you agree that the PDR program is directed toward that interest?

A. I'd say yes.

Q. Okay. The second one is maintain the township's character.

A. Mmm-hmm.

Q. What does that mean?

A. The township has had a character of agriculture. The township has had a character of being rural. If you go back to the original master plans in the late,

developed in the late sixties, passed in the early seventies, revised in the late seventies, revised again in the eighties, and the current one, all of them identify rural character as being of prime interest for the residents.

And so keeping the land in farming and staying with what the Township has always decided every time it came up, not adding to commercial zoning so that we would be able to retain a balanced blend with some residents and a primary use and experience of an agricultural area, which means planted crops.

Q.    But again, the PDR program is part of maintaining that interest?

A.    The PDR program is one of the ways.  But by having an ordinance that is very clear about keeping commercialization out, it is very clear about the purpose being for farming.

It doesn't just exist by the PDR.  It exists by the master plan.  It exists by the statements at the beginning of the agricultural section of the ordinance.  It ties into the top purposes of the ordinance, to avoid nuisance, to consider the interests of the residents as well as farmers.

Q.    All right.  The third is providing

economically-feasible public sewer and water systems to serve future populations.

What does that mean.

A.   Well, I think it's a combination of not -- in the south area, where you have high density, you're going to need actual sewer.  As you go north, if you're aware of the topography and don't create too much density, then septics can healthfully, along with individual wells, take care of that.

So if you, if you avoid that overdevelopment, if you avoid bringing in uses that are beyond what their septics and wells can handle, then you serve that interest.

Q.   Okay.  But, I mean, the sewer and water systems end, I think, at McKinley Road, somewhere in that area?

A.   It's in the south end somewhere.  Actually, I think it may go beyond that.  I think it goes to serve the immediate subdivision past that, probably.

Q.   But not very far north.

A.   Correct.

Q.   Okay.  But it doesn't reach the areas where the farms and the wineries are, right?

A.   No.

Q.   Okay.  The last one, and this one's long so bear with me, and I'll read it slow, I apologize:  Establishing

a complete buildout population scenario and permitting the vertical integration of agricultural production without changing the agriculturally-zoned lands of the township to commercial property inconsistent with the use of those respective districts.

A.   Say that again.

Q.   Again?

A.   Yes, please.

Q.   All right.  Establishing a complete buildout population scenario and permitting the vertical integration of agricultural production without changing the agriculturally-zoned lands of the township to commercial property inconsistent with the use of those respective districts.

A.   Okay.  Other than being --

Q.   What does that mean?

A.   Okay.  Other than being not exactly clear what they mean by the vertical integration, what it means is if you foresee in the future that you're going to want these areas to be farms, then you're not going to increase density.  If you're going to want to be able to keep having those farms, then you're not going to increase the amount of commercial zoning, which is what the Township has done all along.

So I believe it means minimizing development, minimizing commercial activity, because those are the things that would interfere with being able to retain that agricultural character and viability as an industry.

Q. And which farms are you referring to?

A. Any farms.

Q. Any farm, cherry farmers?

A. Any farms that are focused on agricultural production and not attempting to change their use to a commercial use are going to fit this. Once they're changing their use to a commercial use, it no longer will fit the intent and it will result eventually in the harms that the Township is responsible to avoid.

Q. What's a commercial use?

A. A commercial use would be something that has to do with retail completely unrelated to agricultural. A commercial use would be something that is an event center and something that is there for a different use. That is a not an agricultural use.

So that would be commercialization, event centers, retail of products that are not related to the industry, those things -- and, frankly, restaurants. Restaurants, our restaurants are specifically on commercial land.

WINERIES OF OLD MISSION PENINSULA vs PENINSULA TOWNSHIP          Job 16651
WUNSCH, JOHN 11/03/2021                                          70

CERTIFICATE OF NOTARY

STATE OF MICHIGAN )

                  ) SS

COUNTY OF KENT    )

I, REBECCA L. RUSSO, certify that this deposition was taken before me on the date hereinbefore set forth; that the foregoing questions and answers were recorded by me stenographically and reduced to computer transcription; that this is a true, full and correct transcript of my stenographic notes so taken; and that I am not related to, nor of counsel to, either party nor interested in the event of this cause.

*Rebecca Russo*

REBECCA L. RUSSO, CSR-2759

Notary Public,

Kent County, Michigan.

My Commission expires: 6-3-2023

IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE WESTERN DISTRICT OF MICHIGAN

WINERIES OF THE OLD MISSION

PENINSULA (WOMP) ASSOC., a Michigan

Nonprofit Corporation, et al.,

Plaintiffs,

vs.                          Case No. 1:20-cv-01008

Hon. Paul L. Maloney

Magistrate Ray S. Kent

PENINSULA TOWNSHIP, Michigan

Municipal Corporation,

Defendant.

_____

The Deposition of JOHN WUNSCH, VOLUME II,

Taken at 412 South Union Street,

Traverse City, Michigan,

Commencing at 8:15 a.m.,

Thursday, November 4, 2021,

Before Rebecca L. Russo, CSR-2759, RMR, CRR.

WINERIES OF OLD MISSION PENINSULA vs PENINSULA TOWNSHIP                 Job 16652
WUNSCH, JOHN 11/04/2021                                                      87

documents related to the committee, we could talk
about that, but you can subpoena those.  You can get
them from the Township.

MR. INFANTE:  All right, we have it on the
record.  I guess we'll let the judge sort it out.

BY MR. INFANTE:

Q.   All right, Mr. Wunsch, can you look at Exhibit 2 right
here?  And let's look at 19(v)(ii), it's on the bottom
of page 42.

A.   Okay.

Q.   All right.  And (2)(I) says:  Not less than 85 percent
of all of the agricultural produce sold fresh or
processed shall be grown on Old Mission Peninsula and
a majority shall be grown on the land owned or leased
for the specific farm operation by the same party
owning and operating the specific farm processing
facility.

So we've established that you have a point
of view as to what the governmental -- what the
reasons were for passing that ordinance.  What is your
point of view on that?

A.   To repeat myself from yesterday, my point of view has
multiple levels.  On the most basic level, when you
begin -- when you have a township that has residents
and has active agricultural, when you have a township

that has stated its intent to keep that agriculture active and has plenty of stated intent in several sections for the well-being and safety of the residents, then when you start having an activity that will increase traffic, that will potentially cause harms in terms of the ability to operate a farm with standard practices, such as spraying and mowing, when you have residents who will be impacted by added traffic and activity, then there is a benefit gleaned in the balance of knowing that more of the intent of the community to keep land in active agriculture will be supported naturally by these guardrails that were put in place in the collaborative process with winery owners to develop these rules.

So it is on the most base level of benefit to balance off the potential added harms and stress upon infrastructure, et cetera.

On the next level, it really is merely a matter of the justification that comes from the ordinance in avoiding harms, in avoiding mixing of residential and other activities.

Q. And again, you're speaking -- this is your point of view?

A. As a person who was involved in creating this, as someone who's been a resident for many decades,

A.    Bachelor of music.

Q.    Thank you.  And where did you get from?

A.    North Carolina School of the Arts, University of North Carolina.

Q.    When did you graduate?

A.    I believe that would be, let's see, '70 -- let's see, '77.

Q.    And do you have any other college degrees?

A.    No, I do not.

Q.    Any other professional licenses?

A.    No.

Q.    Okay.  Now, you said that you were involved in some of the revisions to the winery-chateau ordinance.  What I'd like you to do, can you just quickly -- not quickly, take your time, go through this ordinance, and then if you can tell me which specific sections you were involved with the passing of, we can focus on those.

A.    Okay.  So my involvement primarily has to do with development, the eventual development of the guest use activities, and honestly, my involvement is prior to the drafting of this, because there was an initial attempt by Mr. Begin to move into this kind of activity in the mid-to-late nineties, about 1997, '98, and I became deeply involved at that point in arguing

why that was not appropriate.

Q.    Okay.

A.    This section came as a result later after that was defeated by the Township and then defeated in court when he sued to get that use.  This came to be in around 2004.  The lead negotiator on this was Jim Krupka.  I had conversations with Jim Krupka about this, and I had conversations --

Q.    Sorry, sir, we'll get to those questions.  I just want to know, my question is which ones were you involved in, and then we can dive into those.

A.    Okay.  My involvement in this is not going to be on the level of the farm processing.  My involvement on this is going to be somewhat more than the winery-chateau original ordinance, where I was purely observational.  But my involvement will be in the section of the guest use activities.

Q.    So if we look at Exhibit 3, we're looking at, so Section 10(u) and below, is that correct?

A.    Yes.

Q.    Okay.  And your involvement on the other portions, which are 10(a) through (t), I think we said, is purely observational?

A.    At the time of this drafting, correct, purely observational.

looked to rectify that situation.  The fact it's on a five-acre did not need to be rectified, because its ability to do that was tied to a 150-acre.  So you're, again, avoiding small, just five-acre or ten-acre operations starting from the jump.

BY MR. MEIHN:

Q.   Okay.  When you look at the -- and, also, am I correct that at the time that we're dealing with -- and I'm bunching time together, and it may be longer, but you have the referendum, you have the creation of the committee for the farm processing amendment that was created.  Was the PDR at that time also coming due --

A.   Yes.

Q.   -- or expiring?

A.   Yes.  The PDR was ready to be renewed.

Q.   Now, from your perspective and sitting on the committees and working things through and making, as a committee, the proposal on the farm processing amendment to the planning commission and ultimately to the board, what were the interests that were expressed by the group of four that this amendment was trying to do as it relates to the items that were awarded?  What were you looking at?

            MR. INFANTE:  Objection, foundation.

A.   Well, as I've spoken of before in this deposition, we

were looking to ensure that for the ultimate -- not the ultimate, the inevitable increase in use of infrastructure, traffic, et cetera, that there would be a balance of continuing to have a reason to keep more land in agriculture.  By doing that, we're addressing the interests of maintaining the character of the township.

We were addressing with size of the buildings, and things like that, the intent of the township to keep an open vista, our open view sheds, our rural character.

We were attempting to address the interest of keeping incompatible uses separate, such as, you know, a commercial area is not an area that you have residents.  That's for commercial.  Our agricultural area is an area that you don't want to have incursion of commercial and bringing of extensive numbers of individuals in for ancillary retail and other things.

The basic welfare of your residents, the compatibility and functionality of your agriculture, and the appropriate respect to the intent of the ordinance to have zones for appropriate use and to not juxtapose inappropriate uses.

BY MR. MEIHN:

Q.   And the PDR ordinance was, in part, to further the

about it?

Q.   You weren't involved in negotiating or creating that ordinance?

A.   No.

Q.   Do you recall who was -- or do you know who was?

A.   I understand, I knew at the time that Dave Kroupa was the applicant who wanted to have this use, and Dave and Joan Kroupa, his wife, bought it to the Township, and that's as much as I know.

Q.   And Dave Kroupa, to your knowledge, did he own a winery?

A.   At the time he applied for that, to my knowledge, he had already set up his winery under food processing on his 150-acre farm.  I cannot swear to the timing.  I know that he ended up with a remote use to sell what he produced in that winery, and my recollection is he'd already set that up.

Q.   And he on behalf of himself or on behalf of, to your knowledge, on behalf of himself or on behalf of all of the wineries, brought the remote tasting concerns and issues to the Township, which then ultimately resulted in the amendment to the ordinance?

A.   To my knowledge, I do not know of him working with the rest of industry, so I would not have the knowledge to answer that question.  What I'm aware of is this is

A.   The initial creation was --

Q.   Let me just stop for a moment.

MR. MEIHN:  I'm referring to Exhibit 3, Madam Court Reporter.

BY MR. MEIHN:

Q.   And to you, also.

A.   Okay.  So, no, I was not involved in the creation of that, I was observational.

Q.   And do you know who was involved in that creation?

A.   Bob Begin was the lead person involved in that creation.  I would assume he had support from Ed O'Keefe, because Ed O'Keefe very shortly switched from his original food processing to a winery-chateau.

So those are the first two.  I was well aware and watched, listened to Bob speak about it, and Ed O'Keefe had been the founder of the industry out here, and one could assume that he was involved, also.

Q.   All right.  So, to your knowledge, this is a second amendment to the ordinance that a winery owner had brought to the Township seeking additional things that can be done on their property, correct?

A.   The initial ordinance, to my knowledge, that was being used by Ed O'Keefe was food processing, so it did come after food processing.  Food processing was not allegedly established particularly for wines, it was

established for processing fruit.  So in terms of that being the first form, this was the second form.

Q.   And again, just my point is that it was Bob and possibly Ed --

A.   Yes.

Q.   -- who came to the Township seeking these ideas?

A.   Yes.  This was Bob's vision, this was his dream.

MR. INFANTE:  Objection, foundation.

BY MR. MEIHN:

Q.   And how do you know that it was Bob's vision and Bob's dream?

A.   I have -- I was there when Bob was presenting and talking about it.  He had always said that this is his vision.  It was widely known in the community that this was his vision.  He's written stories about it that I've read.  So on that basis -- and I know from the record that Bob Begin was on the planning commission when they started discussing and resigned the planning commission so he could apply to have one and be clean.

Q.   And the process of what I would call Exhibit 3's approval went through the planning commission ultimately after Bob had resigned, correct?

A.   Yes.

Q.   All right.  And then it went to the board, to your

WINERIES OF OLD MISSION PENINSULA vs PENINSULA TOWNSHIP          Job 16652
WUNSCH, JOHN 11/04/2021                                                            201

CERTIFICATE OF NOTARY

STATE OF MICHIGAN )

                  ) SS

COUNTY OF KENT    )

I, REBECCA L. RUSSO, certify that this deposition was taken before me on the date hereinbefore set forth; that the foregoing questions and answers were recorded by me stenographically and reduced to computer transcription; that this is a true, full and correct transcript of my stenographic notes so taken; and that I am not related to, nor of counsel to, either party nor interested in the event of this cause.

*Rebecca Russo*

REBECCA L. RUSSO, CSR-2759

Notary Public,

Kent County, Michigan.

My Commission expires: 6-3-2023