UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WINERIES OF THE OLD MISSION
PENINSULA, *et al.*,

               Plaintiffs,

v.

PENINSULA TOWNSHIP, a Michigan
Municipal Corporation,

               Defendant,

And

PROTECT THE PENINSULA,

               Intervenor-Defendant.

Case No.:  1:20-cv-1008-PLM
Honorable Paul L. Maloney
Magistrate Judge Ray S. Kent

**PENINSULA TOWNSHIP'S
POST-TRIAL BRIEF**

**\*\*ORAL ARGUMENT REQUESTED\*\***

| | |
|---|---|
| Stephen Michael Ragatzki (P81952)<br>Christopher James Gartman (P83286)<br>Joseph Mikhail Infante (P68719)<br>MILLER CANFIELD<br>Attorneys for Plaintiffs<br>99 Monroe Avenue NW, Ste 1200<br>Grand Rapids, MI 49503<br>(616) 776-6351<br>ragatzki@millercanfield.com<br>gartman@millercanfield.com<br>infante@millercanfield.com<br><br>Barry Kaltenbach<br>MILLER CANFIELD<br>Attorneys for Plaintiffs<br>227 Monroe Street, Ste 3600<br>Chicago, IL 60606<br>(312) 460-4200<br>kaltenbach@millercanfield.com | Thomas J. McGraw (P48817)<br>McGRAW MORRIS P.C.<br>Attorneys for  Defendant<br>2075 W. Big Beaver Road, Ste 750<br>Troy, MI 48084<br>(248) 502-4000<br>tmcgraw@mcgrawmorris.com<br><br>Bogomir Rajsic, III (P79191)<br>Tracey R. DeVries (P84286)<br>McGRAW MORRIS P.C.<br>Attorneys for Defendant<br>44 Cesar E. Chavez, SW, Suite 200<br>Grand Rapids, MI  49503<br>(616) 288-3700/Fax (248) 502-4001<br>brajsic@mcgrawmorris.com<br>tdevries@mcgrawmorris.com |
| Scott Robert Eldridge (P66452)<br>MILLER CANFIELD<br>Attorneys for Plaintiffs<br>One E. Michigan Avenue, Ste 900<br>Lansing, MI 48933<br>(517) 487-2070<br>eldridge@millercanfield.com | William K. Fahey (P27745)<br>Christopher Scott Patterson (P74350)<br>John Seamus Brennan (P55431)<br>FAHEY SCHULTZ PLC<br>Attorneys for Defendant<br>4151 Okemos Road<br>Okemos, MI 48864<br>(517) 381-0100<br>wfahey@fsbrlaw.com<br>cpatterson@fsbrlaw.com<br>jbrennan@fsbrlaw.com |

| | Tracy Jane Andrews (P67467) |
| | Holly L. Hillyer (P85318) |
| | TROPOSPHERE LEGAL |
| | Attorneys for Intervenor |
| | 619 Webster Street |
| | Traverse City, MI 48686 |
| | (231) 714-9402 |
| | tjandrews@envlaw.com |
| | holly@envlaw.com |

TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION ............................................................................................................. 1

POST-TRIAL DISCUSSION ........................................................................................... 2

I.    THE REGULATIONS ON COMMERCIAL SPEECH IN THE PTZO WERE VALID UNDER CENTRAL HUDSON, AND EVEN IF THEY WERE NOT, THERE IS NO EVIDENCE OF DAMAGES. ........................................................................................ 2

   A.   The Challenged Sections of the PTZO Address Real Harms and the Provisions were Tailored to Alleviate Those Harms to a Material Degree. ................................................. 2

   B.   Plaintiffs Failed to Present Evidence of Damages at Trial Related to Their Commercial Speech Theory. ......................................................................................................... 21

      1.   Section 6.7.2(19)(b)(1)(v) ............................................................................. 21

      2.   Sections 8.7.3(10)(u)(1)(b) and 8.7.3(10)(u)(5)(h) ...................................... 24

      3.   Sections 8.7.3(12)(i) and 8.7.3(12)(k).......................................................... 28

         a.   Section 8.7.3(12)(i) ................................................................................28

         b.   Section 8.7.3(12)(k)................................................................................29

II.   PLAINTIFF'S FAILED TO ESTABLISH ANY DAMAGES FOR THEIR PRIOR RESTRAINTS THEORY ................................................................................................ 30

III.  PLAINTIFFS FAILED TO ESTABLISH ANY DAMAGES FOR THEIR COMPELLED SPEECH THEORY. ....................................................................................................... 32

IV.   PLAINTIFFS' UNPLEADED "CLOSING TIME" CLAIM RAISED FOR THE FIRST TIME AT TRIAL IS LEGALLY AND FACTUALLY UNSUBSTANTIATED AND SHOULD NOT RESULT IN AN AWARD OF DAMAGES ............................................. 35

V.    PLAINTIFFS' "DAMAGES" EXPERT ERIC LARSON FAILED TO OFFER TESTIMONY REGARDING DAMAGES THAT ARE RECOVERABLE AS A MATTER OF LAW AND HIS TESTIMONY AND REPORT ARE NOT RELIABLE..... 40

   A.   Plaintiffs Offered No Evidence Regarding Lost Net Profits.  Therefore, There Cannot Be an Award of Lost Profits. ............................................................................................ 41

   B.   Mr. Larson Did Not Satisfy the AICPA Requirements to: (1) Plan and Supervise the Project and (2) Obtain and Utilize Relevant Sufficient Data ............................................. 44

      1.   Mr. Larson made no attempt to plan or supervise the performance of the professional services as required by the AICPA. ............................................................... 46

      2.   Mr. Larson also failed to obtain sufficient relevant data to support any economic opinions. ....................................................................................................... 48

   C.   Mr. Larson Conducted an Exercise of Multiplication, Using a Gross Profit Percentage Found on the RMA Website.  In Doing So, He Failed to Follow the Directives of the RMA to Only Utilize RMA Data as a Guideline to Supplement a Separate Financial Analysis. ............................................................................................................... 49

   D.   Even if Mr. Larson Had Offered an Opinion on Alleged Lost Net Profits, the Lack of Any Historic or Projected Financial Documentation or Market Information Would Render Any Such Opinion too Speculative to be Admissible. ............................................ 51

   E.   The Two Reports Provided by Mr. Larson Contained Numerous Mistakes and Differed by Over 60 Million Dollars.  The Attached Schedules Contained Similar Mistakes and Misstatements. ......................................................................................................... 53

VI.   CONCLUSION ......................................................................................................... 55

TABLE OF AUTHORITIES

**Cases**

*Bluegrass Ctr., LLC v. United States Intec, Inc.*, 49 Fed. Appx. 25 (6th Cir, 2002); .................. 40

*Board of Trustees of State Univ. of N. Y. v. Fox*, 492 U.S. 469 (1989) ................................... 5, 20

*Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60; 103 S.Ct. 2875 (1983) ................................... 3

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557; 100 S.Ct. 2343 (1980) ........................................................................................................................... passim

*City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1968) ................................................. 6

*Colonial Refrigerated Trans., Inc. v. Worsham*, 705 F.2d 821 (6th Cir. 1983) .......................... 40

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) ............................................. 44, 47

*Executive Art Studio, Inc. v. Kalamazoo*, 674 F. Supp. 1288 (W.D. Mich. 1987) ..................... 6

*Fla. Bar v. Went for It, Inc.*, 515 U.S. 618; 115 S.Ct. 2371 (1995) ...................................... 4, 5

*Fredonia Farms, LLC v. Enbridge Energy Partners, L.P.*, 1:12-cv-1005, 2014 WL 3573723, at *5 (W.D. Mich., July 18, 2014) (Quist, J.) .................................................................... 51, 52

*Fremont Twp. v. McGarvie,* 164 Mich. App. 611; 417 N.W.2d 560 (1987) ............................... 6

*Getman v. Matthews*, 125 Mich. App. 245; 125 N.W.2d 671 (1983) ...................................... 42

*Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173 (1999) ............................... 5

*Lawton v. Gorman Furniture Corp.*, 90 Mich. App. 258; 282 N.W.2d 797 (1979) ................... 41

*Lorillard Tobacco Co. v. Reilly,* 533 U.S. 525 (2001) ........................................................... 5

*Macenas v. Michiana*, 433 Mich. 380; 446 N.W.2d 102 (1989) ............................................ 6

*Metromedia, Inc. v. City of San Diego*, 453 U.S. 490 (1981) ............................................... 5

*Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, (6th Cir. 2012) ...................... 44, 47

*Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707 (8th Cir. 1979) ................................. 40

*Pagan v. Fruchey*, 492 F.3d 766 (6th Cir. 2007) ................................................................ 4

*Parate v. Isibor*, 868 F.3d 821 (6th Cir. 1989) ..................................................... 37, 38, 40

*Prevost v. Macomb Twp.*, 6 Mich. App. 462; 149 N.W.2d 453 (1967) .................................... 6

*Sanderson v. Village of Greenhills*, 726 F.3d 284 (6th Cir. 1984) .................................... passim

*Semco v. Amcast, Inc.*, 52 F.3d 108 (6th Cir. 1995) ............................................................. 3

*Sorrell v. IMS Health Inc.*, 564 U.S. 552; 131 S.Ct. 2653 (2011) ........................................... 3

*Taylor Acquisitions, LLC v. City of Taylor*, No. 06-10650, 2006 WL 3085394, at *5 (E.D. Mich., Oct. 27, 2006) ............................................................................................................... 38

*United States v. Carter* (Carter I), 669 F.3d 411 (4th Cir. 2012) ............................................. 5

*Va. Pharmacy Bd. v. Va. Citizens Consumer Council*, 425 U.S. 748; 96 S.Ct. 1817 (1976) ......... 3

*Wilkerson v. Johnson*, 699 F.2d 325 (6th Cir. 1983) .............................................. 37, 38, 40

**Statutes**

MCL § 125.3203 ...................................................................................................... 6

**Rules**

Fed. R. Civ. P. 54(c) .............................................................................................. 39

ii

## INTRODUCTION

Trial in this matter was limited to a small sub-set of issues following the Court's resolution of a significant portion of claims at the summary judgment phase. (*See* ECF Nos. 525, 559). In pre-trial briefing, the Defendants jointly identified the issues that were resolved by the Court prior to trial. (*See* ECF No. 581, PageID.22662-22665). This table summarizes the issues that remained at trial[1]:

| Claim or Defense | Trial Issue(s) |
|---|---|
| Dormant Commerce Clause | Damages, Injunctive Relief |
| Due Process | Damages, Injunctive Relief |
| Preemption | Injunctive Relief |
| First Amendment | Merits, Damages, Injunctive Relief |
| Laches | Damages |

Prior to trial, Defendant Peninsula Township (the "Township") and Intervening Defendant Protect the Peninsula ("PTP") jointly submitted a Trial Brief (ECF No. 581) and Proposed Findings of Fact and Conclusions of Law (ECF No. 583). To comply with the Court's request that the parties be "as succinct as [they] can" in post-trial briefing (ECF No. 609, PageID.25260), the Township adopts by reference the proposed Findings of Fact and Conclusions of Law and will labor to directly reference that document to the extent possible.

In this brief, Defendant Peninsula Township will address: (1) the merits of Plaintiffs' remaining First Amendment commercial speech theories, along with how the Plaintiffs failed to prove damages; (2) Plaintiffs' failure to prove damages on their compelled speech and prior

---

[1] While trial lasted ten days, an overwhelming amount of testimony presented by Plaintiffs related to issues that were not live for trial. Plaintiffs were permitted to make an offer of proof regarding large event hosting (e.g., weddings, receptions, etc.) while the Court sustained the Township's objection that Plaintiffs could not recover damages on these issues based on the Court's prior summary judgment rulings. (*See* ECF No. 600, PageID.23090-23103). Plaintiffs' testimony under the guise of this offer of proof took up hours upon hours of trial; this testimony is completely irrelevant and need not be addressed.

restraint theories; (3) Plaintiffs' attempt to pivot to an unpleaded liberty interest claim to support damages related to hours of operation; and (4) the failures of Plaintiffs' damages expert, Eric Larson, to support Plaintiffs' claims with reliable and admissible opinions.

Overall, the Township does not intend for this post-trial brief to constitute a summary of all of the evidence and testimony gathered at trial.  Nor does the Township intend to address every issue that was identified as a distinct trial issue in the Joint Trial Brief.  In keeping with a theme from trial, if an issue is not addressed in this brief, it is not intended as a waiver of any particular point – the Township is not waiving anything but the American flag.  (*See* ECF No. 600, PageID.23083, "I appreciate the fact that you're waiving nothing but the American flag, Mr. Rajsic.").  Rather, the Township intends for this brief to provide a summary of the most critical evidence from trial and how that evidence relates to the most salient-remaining issues.

## POST-TRIAL DISCUSSION

## I.  THE REGULATIONS ON COMMERCIAL SPEECH IN THE PTZO WERE VALID UNDER *CENTRAL HUDSON*, AND EVEN IF THEY WERE NOT, THERE IS NO EVIDENCE OF DAMAGES.

As it relates to Plaintiffs' First Amendment commercial speech theories, after the summary judgment phase, the following five sections of the Peninsula Township Zoning Ordinance were left live for trial, including merits and, if necessary, relief, on the commercial speech theories (*see* ECF No. 559, PageID.21916-21918):

- Section 6.7.2(19)(b)(1)(v) – retail merchandise sales
- Section 8.7.3(10)(u)(1)(b) – intent provision
- Section 8.7.3(10)(u)(5)(h) – no outdoor displays during GAUs
- Section 8.7.3(12)(k) – retail merchandise signs
- Section 8.7.3(12)(i) – signs and advertising

A.  The Challenged Sections of the PTZO Address Real Harms and the Provisions were Tailored to Alleviate Those Harms to a Material Degree.

2

"The core definition of 'commercial speech' is that speech 'which does no more than propose a commercial transaction.'" *Semco v. Amcast, Inc.*, 52 F.3d 108, 112 (6th Cir. 1995) (quoting *Va. Pharmacy Bd. v. Va. Citizens Consumer Council*, 425 U.S. 748, 762; 96 S.Ct. 1817 (1976)). When the speech constitutes more than merely proposing a commercial transaction, courts generally consider the *Bolger* factors to determine whether the speech is primarily commercial, including whether the communication: (1) is an advertisement; (2) refers to a specific product; and (3) whether the speaker has an economic motivation for the communication. *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66-67; 103 S.Ct. 2875 (1983). The presence of all three factors provides "strong support" for the conclusion that the speech is commercial and subject to *Central Hudson*. *Id.*

If the speech is found to be commercial speech, a government restriction is permissible if "the statute directly advances a substantial government interest and that the measure is drawn to achieve that interest." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 572; 131 S.Ct. 2653 (2011) (internal citations omitted). In *Central Hudson*, the Supreme Court created a four-part test for determining whether a regulation on commercial speech is valid: (1) a court "must determine whether the expression is protected by the First Amendment"—i.e., the regulated speech at issue must "concern lawful activity and not be misleading;" (2) a court assesses "whether the asserted governmental interest is substantial;" (3) if the speech falls under the First Amendment and the governmental interest is substantial, a court next considers "whether the regulation directly advances the governmental interest asserted;" and (4) the reviewing court must determine whether the regulation "is not more extensive than is necessary to serve that interest." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,* 447 U.S. 557; 100 S.Ct. 2343 (1980).

The Court has already determined that Sections 6.7.2(19)(b)(1)(v), 8.7.3(10)(u)(1)(b), 8.7.3(10)(u)(5)(h), 8.7.3(12)(k), and 8.7.3(12)(i) of the PTZO implicate commercial speech, so the first factor of *Central Hudson* is resolved. (*See* ECF No. 559, PageID.21916-21918). The Court further found that the Sections 6.7.2(19)(b)(1)(v), 8.7.3(10)(u)(1)(b), 8.7.3(10)(u)(5)(h), 8.7.3(12)(k), 8.7.3(12)(i) implicate substantial governmental interests. (*Id.* at PageID.21918-21919).

The remaining issues live for trial were whether §§6.7.2(19)(b)(1)(v), 8.7.3(10)(u)(1)(b), 8.7.3(10)(u)(5)(h), 8.7.3(12)(k), 8.7.3(12)(i) advance the Township's interests and whether these limited sections are not overly restrictive. The trial proofs demonstrate that the restrictions on commercial speech in §§ 6.7.2(19)(b)(1)(v), 8.7.3(10)(u)(1)(b), 8.7.3(10)(u)(5)(h), 8.7.3(12)(k), 8.7.3(12)(i) "directly and materially advance" the governmental interests and the regulations are "narrowly drawn." *Fla. Bar v. Went for It, Inc.*, 515 U.S. 618, 625-626; 115 S.Ct. 2371 (1995).

To meet this burden at trial, the Township "must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Id.* at 626 (internal quotation and citations omitted). The Township did so through the proofs submitted at trial.

The Township "must come forward with some quantum of evidence, beyond its own belief in the necessity of the regulation, that the harms it seeks to remedy are concrete and that its regulatory regime advances the stated goals." *Pagan v. Fruchey*, 492 F.3d 766, 771 (6th Cir. 2007) (citation omitted). The Supreme Court in *Went For It* reasoned that:

> [W]e do not read our case law to require that empirical data come to us accompanied by a surfeit of background information. Indeed, in other First Amendment contexts, we have permitted litigants to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether, or even, in a case applying strict scrutiny, to justify restrictions based solely on history, consensus, and simple common sense.

*Went For It*, 515 U.S. at 628 (internal citations omitted).

4

The fourth prong of the test considers the fit between the regulation and government interest.  To establish the fit, the government "may resort to a wide range of sources, such as legislative text and history, empirical evidence, case law, and common sense, as circumstances and context require." *United States v. Carter* (Carter I), 669 F.3d 411, 418 (4th Cir. 2012) (citation omitted).  The Supreme Court rejected the assertion that this test requires a "least restrictive means" analysis. *Lorillard Tobacco Co. v. Reilly,* 533 U.S. 525, 556 (2001) ("We have made it clear that 'the least restrictive means' is not the standard; instead, the case law requires a reasonable 'fit between the legislature's ends and the means chosen to accomplish those ends, . . . a means narrowly tailored to achieve the desired objective.'") (quoting *Went for It,* 515 U.S. at 632 and *Board of Trustees of State Univ. of N. Y. v. Fox*, 492 U.S. 469, 480 (1989)).  *See also Fox*, 492 U.S. at 480 (describing the fourth factor and stating, "[w]hat our decisions require is a fit between the legislature's ends and the means chosen to accomplish those ends, []a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served, that employs not necessarily the least restrictive means but, as we have put it in the other contexts discussed above, a means narrowly tailored to achieve the desired objective") (citations and internal quotation marks omitted); *Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 188 (1999) (summarizing that as to the fourth factor, "[o]n the whole, then, the challenged regulation should indicate that its proponent carefully calculated the costs and benefits associated with the burden on speech imposed by its prohibition") (internal quotation marks omitted); *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 507 (1981) (articulating that under the fourth factor, the regulation must "reach[] no further than necessary to accomplish the given objective").

The fit between the challenged zoning and government interests is most appropriately considered in the context of the zoning ordinance, the community plan it implements, the intent of the district, and of the winery land uses themselves. Zoning ordinances effectuate a community land use plan. MCL § 125.3203 ("[a] zoning ordinance shall be based upon a plan designed to promote the public health, safety, and general welfare, to encourage the use of lands in accordance with their character and adaptability, to limit the improper use of land"); *see also City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 50 (1968) ("essence of zoning" is to make some area of the community available for certain uses "while at the same time preserving the quality of life in the community at large by preventing those [uses] from locating in other areas."). The overarching rule in construing a zoning ordinance is to give effect to its plain text and the legislators' intent. *Macenas v. Michiana*, 433 Mich. 380, 396; 446 N.W.2d 102 (1989); *Fremont Twp. v. McGarvie,* 164 Mich. App. 611, 614; 417 N.W.2d 560 (1987). To give effect to the intent of the drafters of the zoning ordinance, "the entire ordinance must be read together," effectuating ordinances that create "homogeneous use areas by confining each district to a limited number of compatible uses." *Prevost v. Macomb Twp.*, 6 Mich. App. 462, 467; 149 N.W.2d 453 (1967); *Executive Art Studio, Inc. v. Kalamazoo*, 674 F. Supp. 1288 (W.D. Mich. 1987) ("In determining legislative intent, the Court has read the language of the [zoning] ordinance in the context of the problems the statute seeks to address, in this case, land use, parking and traffic problems associated with certain types of commercial as well as noncommercial enterprises.").

At trial, the Township presented evidence that the harms the PTZO addresses are real and that the challenged sections of the PTZO help alleviate them to a material degree. The proofs offered at trial and summarized below include the PTZO, meeting minutes from the Planning

Commission and Township Board, the trial testimony of Dr. Thomas Daniels, and deposition testimony of: (1) former Township Zoning Administrator and Planner, Gordon Hayward; (2) Grant Parsons; (3) John Wunsch; and (4) former Township Supervisor Rob Manigold.

The significant legislative history, inclusive of Planning Commission and Township Board meeting minutes, committee efforts, and the language of the PTZO itself, which were submitted at trial are summarized as follows[2]:

- The Township's governmental interests in the challenged provisions, Sections 6.7.2(19)(b)(1)(v), 8.7.3(10)(u)(1)(b), 8.7.3(10)(u)(5)(h), 8.7.3(12)(k), 8.7.3(12)(i), are five subparts of zoning amendments establishing three winery-related uses permissible in the A-1 District, and are set forth throughout the PTZO.  (ECF No. 583, PageID.22796-22798, Proposed Findings of Fact ##30-45; *see* **Exhibit A**).

Winery-Chateau Amendments to the PTZO:

- The Township crafted the Winery-Chateau special use to further its governmental interests in zoning to protect the health, safety, and general welfare of its inhabitants, particularly by ensuring the compatibility of land uses, promoting agriculture, and preserving farmland in the A-1 District.  (ECF No. 583, PageID.22798-22800, Proposed Findings of Fact ##46-58; *see* **Exhibits Y, Q, R, T, Tx10, U, W, and X**).

- The Township approved SUP #21 for Chateau Chantal under Amendment 79 with limits on accessory uses that the Township would later expand by creating support uses to allow additional opportunities for wineries to promote themselves.  (ECF No. 583, PageID.22800, Proposed Findings of Fact ##59-66; *see* **Exhibits WW, XX, YY, ZZ, AAA, BBB**).

- The Township began considering additional zoning amendments to expand Winery-Chateau accessory uses to include events, meeting facilities, and food service for non-registered guests as early as 1996 and consistently rejected proposals with an insufficient nexus to agricultural production.  (ECF No. 583, PageID.22800-22803, Proposed Findings of Fact ##67-103; *see* **Exhibits MMM, NNN, OOO, PPP, RRR, SSS, TTT, UUU, VVV, WWW, XXX, YYY, ZZZ, Ax4).**

---

[2] To attempt to achieve the goal of a succinct post-trial brief, the Township incorporates by reference Defendants' Joint Proposed Findings of Fact and Conclusions of Law regarding the commercial speech merits analysis, which includes citations to the evidence admitted at trial, primarily the significant legislative history (e.g., planning commission and township board meeting minutes).

- Chateau Chantal sued the Township in an attempt to obtain expanded accessory uses for Winery-Chateaus like events, meeting facilities, and food service for non-registered guests, and the parties entered into a Consent Judgment that became the foundation for Guest Activity Uses in Amendment 141. (ECF No. 583, PageID.22803-22805, Proposed Findings of Fact ##104-114, *see* **Exhibits Bx4, Cx4, Dx4**).

- In 1999, the Township considered and rejected another request from Chateau Chantal for a zoning amendment to expand accessory uses for Winery-Chateaus.  (ECF No. 583, PageID.22805, Proposed Findings of Fact ##115-119; *see* **Exhibit 7xM**).

- Following a request for a zoning amendment to allow "Contract Groups, Contract Events, and Community Events" at Winery-Chateaus, the Township spent nearly three years working to ensure that the zoning amendment that ultimately became Amendment 141 and created Guest Activity Uses sufficiently tied opportunities for additional activities at Winery-Chateaus to agricultural production and farmland preservation.  (ECF No. 583, PageID.22805-22808, Proposed Findings of Fact ##120-146; *see* **Exhibits 10xU, II, JJ, KK, Kx8, LL, MM, NN**).

- The Township continued to revise Amendment 141 to achieve a reasonable balance between allowing additional promotional opportunities for Winery-Chateaus and ensuring that uses in the A-1 District are tied to agricultural production and farmland preservation. (ECF No. 583, PageID.22808-22809, Proposed Findings of Fact ##147-153; *see* **Exhibits OO, PP, QQ**).

- A version of Amendment 141 that was less restrictive than the enacted version Plaintiffs challenge in this lawsuit was determined to be inconsistent with the Township's Master Plan.  (ECF No. 583, PageID.22809, Proposed Findings of Fact ##154-156; *see* **Exhibit RR**).

- The Township approved Amendment 141 only after it had determined that the additional allowed uses would be sufficiently tied to agricultural production and farmland preservation.  (ECF No. 583, PageID.22809-22810, Proposed Findings of Fact ##157-166, *see* **Exhibits TT, UU, VV**).

- The Winery-Chateau provisions that Plaintiffs challenge as regulations of commercial speech were integral parts of Amendment 141, the entirety of which was tailored to balance the Winery-Chateaus' desire for additional promotional opportunities with the Township's substantial governmental interests in zoning and agricultural preservation.  (ECF No. 583, PageID.22810-22811, Proposed Findings of Fact ##167-175, *see* **Exhibit A**).

Remote Winery Tasting Room Amendment:

- The Township crafted the Remote Winery Tasting Room special use to further its governmental interests in zoning to protect the health, safety, and general welfare of its inhabitants, particularly by ensuring the compatibility of land uses, promoting agriculture, preserving farmland, and preventing commercial spot zoning in the A-1 District. (ECF No.

583, PageID.22811-22813, Proposed Findings of Fact ##176-190; *see* **Exhibits Ax10, Ix7, Jx7, Bx10, Cx10**).

- The Township also tailored the sole Remote Winery Tasting Room SUP under Amendment 120 to further its governmental interests in zoning to protect the health, safety, and general welfare of its inhabitants, particularly by addressing the community's concerns about an unprecedented retail use in the A-1 District.  (ECF No. 583, PageID.22813-22815, Proposed Findings of Fact ## 177-211; *see* **Exhibits Dx10, Kx7, Ex10, Fx10, Gx10, Hx10, Ix10**).

- The Remote Winery Tasting Room provisions that Peninsula Cellars challenges were integral subparts of Amendment 120, the entirety of which was tailored to further both the interests of Peninsula Cellars in its unique land use and the Township's substantial governmental interests in zoning to ensure compatible land uses, agricultural promotion, and farmland preservation, and to avoid commercial spot zoning, in the A-1 District. (ECF No. 583, PageID.22815-22816, Proposed Findings of Fact ##212-222; *see* **Exhibit A**).

<u>Farm Processing Facility Use by Right:</u>

- The Township crafted the Farm Processing Facility use by right to further its governmental interests in zoning to protect the health, safety, and general welfare of its inhabitants, particularly by ensuring the compatibility of land uses, promoting agriculture, and preserving farmland in the A-1 District.  (ECF No. 583, PageID.22816-22818, Proposed Findings of Fact ##223-244; *see* **Exhibits KK, Kx8, AA, BB, CC, EE, LL, Lx8, Mx8**).

- The challenged Farm Processing Facility provision was an integral subpart of Amendment 139, the entirety of which was tailored to further both the interests of wineries in having an administratively simple use by right with retail and tasting permissions and the Township's substantial governmental interests in zoning to ensure compatible land uses, agricultural promotion, and farmland preservation in the A-1 District.  (ECF No. 583, PageID.22818-22819, Proposed Findings of Fact ##245-252, *see* **Exhibit A**).

While the legislative history of 40+ years of committees, zoning ordinance amendments, land use applications, and land-use approvals lay out on their own – and indeed does all the lifting necessary to meet the requirements of *Central Hudson* – how the PTZO addresses real harms and was tailored to prevent those harms, the trial testimony of Dr. Thomas Daniels, PTP's land use planning expert, offers further support.[3]

---

[3] Dr. Daniels' expert report and *curriculum vitae* was admitted into substantive evidence at trial.  (Exhibit H-1).

Dr. Daniels reviewed the Township Master Plan (Exhibit G) and noted based on that foundational document from a zoning perspective the emphasis that the Township places on preserving agriculture, maintaining rural culture, and working to minimize effects on infrastructure:

> Q:    And you looked at the Peninsula Township master plan?
> A:    I did.
> Q:    Does anything -- Did anything stick out at you as relevant to your opinion in this case?
> A:    Yes. It's very clear that the Township puts a lot of emphasis on maintaining productive agricultural land, on agricultural preservation, protection of rural character and the spectacular scenery that the Township provides, as well as wanting to minimize the expansion of community facilities.
> Q:    What do you mean by "minimize the expansion of community facilities"?
> A:    Well, if you -- if you look at the location of public or central sewer and water, it stops at McKinley Road on M37 Center Road, at the very southern portion of the Township. So the vast majority of the Township does not have access to central sewer and water. Central sewer and water is essential if you are going to have intensive land development.

(ECF No. 604, PageID.23880).  Similar to the Master Plan, the Township's Future Land Use Map identifies that the Township land-use goal is to keep land in agriculture:

> Q:    What does the Future Land Use Map reflect about Peninsula Township, the Master Plan Future Land Use Map?
> A:    Future Land Use Map is an indication of how the community would want land uses to change over time. And again, it's the basis for the Township zoning ordinance.
> Q:    And what is the future land use plan of Peninsula Township? And I would refer you to Page 48 of the same document. Nope. Yep. What does the future land use map of Peninsula Township indicate about the Township's land use goals and policies?
> MR. INFANTE: What page?
> MS. ANDREWS: 48.
> THE WITNESS: That they want to see the majority of the Township in agricultural use.

(*Id.* at PageID.23882-23883).

Dr. Daniels noted that the A-1 District represents approximately 2/3rds of the acreage in the Township – roughly 12,000 acres of 17,000 acres.  (*Id.* at PageID.23884).  The governmental

interests the PTZO identifies for the A-1 District are agricultural production, "that's the primary use in the agricultural district.  It's the production of crops and livestock that are useful to humans." (*Id.* at PageID.23887).

> Q:    Does the Peninsula Township master plan identify its governmental interests?
> A:    Yes, it does.
> Q:    And relative to the issues you studied, the agricultural zoning, what did you identify in summary in the master plan?
> A:    Promoting the agricultural industry over the long term. Preserving agricultural land, maintaining rural character, and also managing public infrastructure.
> Q:    And what is the overall purpose of the Peninsula Township zoning ordinance?
> A:    Well, again, the overall purpose is protecting the public health, safety and welfare.

(*Id.* at PageID.23888).

Dr. Daniels testified regarding how the winery land uses relate to agriculture:

- Winery-Chateaus: "Well, the purpose of the district is to promote agricultural production. So the winery chateau has to have 75 percent of its at least 50 acres in agricultural production, so that adds to agricultural production. The opportunity to have overnight guests is a way to enhance the revenue stream of the winery chateau. And the winery chateau can also provide food services to those overnight guests as well. So it's promoting the agricultural production of the area and the Township." (*Id.* at PageID.23898).

- Remote Winery Tasting Rooms: "I think in a couple of ways. One, again, it's an opportunity for the owner of the 150 acres to have a tasting room, so there's, you know, an obvious revenue stream from operating the remote tasting room. There's another revenue stream from being able to sell logo'd merchandise and wine-related merchandise as well. And at the same time, you're keeping at least 75 percent -- excuse me, 50 percent of the 150 acres in active production. So you're maintaining the rural character." (*Id.* at PageID.23900).

- Farm Processing Facilities: "By offering the farm processing facility as a use by right, it's meant to encourage agricultural production. And by requiring 85 percent of what is being processed and sold, to be grown on Old Mission Peninsula that promotes the production of agricultural commodities on Old Mission Peninsula. In addition, by offering the opportunity for the sale of logo merchandise and wine-related goods, it provides another income stream, revenue stream for the owner of the farm processing facility." (*Id.* at PageID.23908).

11

For each of the ordinance sections live for trial under *Central Hudson*, Dr. Daniels offered unrebutted testimony regarding how the ordinance sections relate to the purpose of the A-1 District and how the harms the Township are trying to prevent are materially reduced by the ordinance sections:

Section 8.7.3(12)(i)

Q:    What does Section 8.7.3(12)(i) allow?
A:    Retail sale of nonfood items which promote the winery or peninsula agriculture. And has the logo of the winery permanently affixed to the item.
Q:    How does -- does this subsection relate to the purpose of the A-1 agricultural district?
A:    It's, again, an opportunity for the operator of the tasting room to promote their logo, their brand. And that relates to agricultural production in general.

                    *        *        *

Q:    What are the harms Township is trying to prevent or this provision is trying to prevent?
A:    It's trying to prevent a remote tasting room from becoming a commercial convenience store.

(ECF No. 604, PageID.23901-23902, 23904).

Section 8.7.3(12)(k)

Q:    Can you refer to Section 8.7.3(12)(k). I believe it's just below that. What does this section allow?
A:    It allows the owner of the tasting room to have a sign out front advertising their wine and tasting room.
Q:    What is this section doing in the zoning ordinance?
A:    It's saying that there's no outdoor signs for what any of the food or nonfood items that are allowed for sale in the tasting room.

                    *        *        *

Q:    Dr. Daniels, what interest, if any, does this section relate to with respect to the agricultural production interest in the zoning ordinance for the A-1 District?
A:    That the owner of the tasting room can promote the wine that is available at the tasting room.

12

Q:      Does this section relate to -- How does this section relate to the agricultural production purpose of the remote tasting room itself?

A:      By saying that if you are going to have signs, they basically relate to the wine that's available inside at the tasting room.

Q:      What are the, if any, concerns that a zoning ordinance – that this section appears to be trying to prevent or alleviate?

*       *       *

A:      Again, if you're advertising items other than food or nonfood items, that is not really in keeping with the rural character of the area.

(ECF No. 604, PageID.23904-23906).

Section 6.7.2(19)(b)(i)(v)

Q:      Okay. And so how -- What is the relationship between this particular section, the retail sales merchandise sales, non-wine sales and the purposes of the A-1 District?

A:      This section allows for an additional revenue stream to promote agriculture in the A-1 District, and it also enables the owner of the processing facility to promote the brand of the winery, which hopefully would lead to an additional revenue stream.

Q:      What is the -- How does promoting the brand of the winery support the A-1 District agricultural production?

A:      Well, it's -- with any kind of branding, you're trying to get, you know, loyalty from your visitors and hopefully they'll sign up for not just, you know, buying bottles of wine or -- but also join, you know, wine clubs, that sort of thing.

Q:      What harm, if any, is this section – would this section address related to the A-1 District?

*       *       *

A:      The concern about the processing facility, especially the retail portion of the processing facility being limited in size, so it does not become the dominant commercial use of the property.

Q:      And specifically the retail merchandise sales provision?

A:      That's correct.

Q:      You indicated the size of the retail area. I'm talking about the provision that allows limited retail sales. Does allowing limited retail sales address any concern in the Township?

A:      The concern that the facility would not turn into a convenience store, a commercial convenience store.

(ECF No. 604, PageID.23909-23910).

13

Section 8.7.3(10)(u)(1)(b)

Q:    What is the relationship between the guest activity use amendment to the winery chateau land use and the purposes of the A-1 agricultural district?

A:    Well, the purpose of the A-1 agricultural district is to encourage agricultural production. And the opportunity to have guest activities for which fees being paid is a revenue stream for the winery chateau. And also the requirement of, if any wine is served at guest activity, the 85 percent of the grapes that go into that wine have to be grown on Old Mission Peninsula. It's another way to support and promote agricultural production on the peninsula.

(ECF No. 604, PageID.23913)

Q:    8.7.3(10)(u)(1)(b).

A:    Yes.

Q:    In general, what does this section do or provide in general?

A:    It provides the intent of the guest activity uses, which are stated here to help in the promotion of Peninsula agriculture by identifying peninsula produced food or beverages. And providing peninsula agriculture brochures or maps and including tours through the winery or other peninsula agricultural locations.

Q:    How does this section relate to the purposes of the A-1 agricultural district?

A:    Well, by promoting agriculture at -- through guest activities at a winery chateau, it's an opportunity for the owner of the winery chateau to showcase the winery chateau. So that is a way to promote the agricultural production on the peninsula, and if additional information is provided about agriculture on the peninsula as a whole, that also plays into promoting agriculture production on the peninsula. So, it's basically a way of trying to encourage your guests at your guest activity to, you know, buy your brand and to buy agricultural products grown on the peninsula.

Q:    What harm does this provision to alleviate or work to alleviate?

*    *    *

A:    Again, it's trying to strike a balance between allowing additional uses at the winery chateau, the guest activity uses.  And tying those to agriculture so that you're not just going to be, you know, operating, for example, you know, a restaurant.

(ECF No. 604, PageID.23914-23915).

Section 8.7.3(10)(u)(5)(h)

14

Q:     So let's look at Section 8.7.3(10)(u)(5)(h). Are you with me?
A:     I am.
Q:     What does this section do?
A:     It says no outdoor displays of merchandise, equipment or signs are allowed related to guest activities.
Q:     What is your understanding of what this section practically means?
A:     Practically it means maintaining the rural character by not potentially cluttering the landscape.
Q:     Does this section -- How does this section relate to the purposes of the A-1 District?
A:     The purpose of the A-1 District is to promote agriculture and this is not, you know, showing necessarily merchandise, equipment or signs that relate to the guest activity use or guest activity event.
Q:     What is the -- Does this section have any relationship to the interest in A-1 related to compatibility?
A:     Yes. So this, you know, keeps the, again, the rural character. Keeps the guest activity uses as much as possible compatible with adjacent and surrounding land uses.
Q:     And what harm is this section aiming to alleviate or working to alleviate?
MR. INFANTE: Same objection.
THE COURT: Noted.
THE WITNESS: Basically visual clutter that's not needed, really, in the agricultural zone. So maintaining rural character.

(*Id.* at PageID.23917-23918).

The interests and purposes of the A-1 District are consistent with practices for agricultural zoning in other areas.   (*Id.* at PageID.23890).   The Township has a robust farm preservation program – one of the nation's leaders:

Q:     And in your report you identify Peninsula Township in the scale of Michigan local government farm preservation programs, correct?
A:     Yes, I did. And it certainly looks like a leader among the local farmland preservation programs in Michigan. Peninsula Township also has a national reputation for their program.
       The other thing I looked at is the contiguity of the preserved land. And Peninsula Township has done a good job of getting contiguous blocks of preserved farmland.
Q:     And --
A:     The other -- The other thing I think is important to mention is that there have been three millage approvals to fund the farmland preservation program in Peninsula Township, most recently in 2022.

15

(*Id.* at PageID.23895).

Finally, while the issue is no longer live for trial, Dr. Daniels testified regarding the effect of weddings on the A-1 District:

Q:      You looked at the potential impact to the Township interests -- or I'm sorry. You considered the intent of the A-1 District throughout your testimony today, right?

Is the Township's prohibition or non allowance of weddings for hire as an authorized use in the A-1 District and authorized land use, is that -- how does that relate to the purposes of the A-1 District?

A:      The purposes of the A-1 District are agricultural production and also related to promoting farmland preservation as well. As well as, in general, you know, protecting the public health, safety and welfare.

Q:      So how does limiting weddings for hire, private weddings for hire in A-1, relate to the A-1 interests?

A:      Okay. If you were to allow weddings in the A-1 District, what that would do, especially if you're going to allow them at wineries, specifically at wineries, what you're doing is you're changing, really, the landscape of the Township.

So for example, and it would have a very notable impact on the farmland preservation program, so this is sort of basic land economics, but you determine land value by net returns divided by capitalization rate. So let's say your -- at your winery your net returns are a thousand dollars an acre, and your capitalization rate, let's say is five percent, which is, you know, roughly, somewhere around the, you know, the tenure treasury right now.

And so with that formula, the value of your – an acre of your land is $20,000. But all of the sudden, now you're allowed to do weddings and your land value goes up, because instead of a thousand dollars an acre net, now you're making $2,000 an acre net, the cap rate stays the same at 5 percent, and now your land is worth $40,000 an acre. Okay.

What does that do? That creates a wider difference between the market value of your agricultural land and your restricted agricultural value, so that is going to increase substantially the value of conservation easements or development rights that the Township would have to pay to preserve agricultural land.

And that would be contrary to what the goals of the Township master plan are, and certainly the intent of the agricultural zone as well. So it goes against some very strong government interests.

The other thing is that if you suddenly allow weddings, that's really a violation of the Michigan Zoning Enabling Act, because your agri -- your zone is supposed to be consistent with your master plan, and that would no longer be the case.

16

In addition, if you're allowing weddings, you know, at literally all of the wineries, you can expect to have more traffic, and that's just a matter of common sense.

(ECF No. 604, PageID.23919-23921).

In addition to the live testimony at trial, Defendants submitted deposition designations from key witnesses demonstrating that the harms the PTZO is working to prevent are real and how the ordinance sections help to alleviate those harms to a material degree.

For example, Gordon Hayward, the Township's former Zoning Administrator and Planner, testified at length regarding how allowing certain limited uses (e.g., the sale of logo'd merchandise) allows wineries to market themselves but limits commercial uses (e.g., retail sales unrelated to agriculture) in the A-1 District. (*See* Deposition Designations of G. Hayward). For example, Mr. Hayward testified that the Township's governmental interests are harmed by the sale of non-logo'd merchandise because it degrades the agricultural industry and that, over time, through that degradation, the agricultural industry will tend toward commercial uses. (*Id.* at Page 27:10 – 28:23). As Mr. Hayward testified: "The ordinances are designed to be as specific and as clarifying as possible by identifying specific things which illustrate where that line is. And if you're promoting agriculture in the agricultural production area, then it's okay. If you're not, then you're in the wrong zone." (*Id.* at Page 30:4-9).

Overall, as Mr. Hayward testified, the Township engaged long-standing and reasonable efforts to carefully tailor the zoning ordinances such that they would support agriculture and agricultural production, while keeping principally commercial uses out of the A-1 District. This would ensure that farmland remained available, would prevent land fragmentation, and would reduce potential use conflicts between farmers and visitors to the agricultural district. (*See id.* at Pages 96-107).

Plaintiffs produced no evidence at trial that rebutted the Township and PTP's *Central Hudson* proofs. Plaintiffs elected to not call a land use planning expert at trial. Instead, Plaintiffs called Gary McDowell, who was received as an expert in rural development, agricultural preservation, and agricultural tourism. (ECF No. 609, PageID.25220, 25223).[4] While Mr. McDowell was called as rebuttal witness to Dr. Daniels, Mr. McDowell had no opinions regarding any section of the PTZO. (*Id.* at PageID.25244).

Nevertheless, Mr. McDowell's testimony was strikingly beneficial to the Township's *Central Hudson* analysis – in particular the effectiveness of the Township's tailoring of the ordinance sections involved. Mr. McDowell agreed that allowing certain limited promotional activities in tasting rooms can be considered agritourism, but not every business that could possibly create supplemental income for a farmer belongs on agricultural land:

> Q:  Okay. So the public comes and tastes and buys wine right where it's being produced on the farm and that's agritourism?
> A:  Yes.
> Q:  Would you agree that promotional activities in tasting rooms can be considered agritourism, like having live music or trivia nights inside your tasting room to get people in the door?
> A:  Yes.
> Q:  But not every business that could possibly create supplemental income for a farmer belongs on agricultural land, right?
> A:  Not -- You say not every type of business?
> Q:  Right.
> A:  What has to be --
> Q:  You would want the business to be related to agriculture?
> A:  Yes, it does. It has to be. It's right in the GAAMPS, 50 percent of the product has to be produced on the farm.

(*Id.* at PageID.25247-25248). The Township's decades-long efforts to tie the uses for Winery-Chateaus, Remote Winery Tasting Rooms, and Farm Processing Facilities to agriculture (e.g., to

---

[4] Plaintiffs also called Terri Quimby who offered testimony regarding Michigan's Liquor Control Code.

alleviate the harms to a material degree) is critical; Mr. McDowell agrees these "activities" need

to be connected to agricultural production:

> Q:    So would you agree, then, that to help support farmers these kinds of supplemental activities have to be connected to agricultural production in some way?
> A:    Yes, they do.
>
> *        *        *
>
> Q:    Just because an activity takes place on agricultural land, that doesn't make it an agricultural activity, right?
> A:    It has to be a way that the consumer can be introduced to a farm product, that connection can be made between that contact between the farmer and the consumer.

(*Id.* at PageID.25249).

Mr. McDowell's testimony supports that the operation of a tasting room on its own is on-

farm marketing that is helpful to farmers and that having a thousand people per day during peak

season come to a winery is beneficial to a grape grower.  (*Id.* at PageID.25252-25253).  Making

wine from grapes and selling the wine adds value to the crop.  (*Id*. at PageID.25253).  Mr.

McDowell was agreed – and appeared surprised that such a thing was possible – that allowing a

tasting room off-site of the farm (e.g., a remote wine tasting room) was helpful to farmers:

> Q:    And would you agree that allowing a grape grower to have a tasting room off the site of their farm, away from their farm, in a more convenient place to access their customers, helps that farmer?
> A:    If it's possible, I think it would help them. But I don't think we're getting -- I don't think that's – there are some with the acreage and stuff you can have one borders maybe. I'm not even sure. It's just -- No, I'm not an expert on that, but I think it probably would be, but I don't think it's realistic or applicable or possible.

(*Id.* at PageID.25253-25254).

Mr. McDowell further agreed that:

- It is helpful to the wineries to allow them to sell branded apparel and merchandise, such as wine glasses and other things related to wine in the tasting room because it adds a new revenue stream and helps the wineries promote their brand.  (*Id.* at PageID.25254-25255).
- Allowing a winery to have a bed and breakfast on site is a unique way to connect with customers and adds an additional revenue stream.  (*Id.* at PageID.25255).
- Allowing a winery to have facilities to host small, intimate events (e.g., meetings, yoga retreats, etc.) is beneficial because it allows for direct sales.  The same is true for cooking classes and wine and food pairing dinners, tours and private tastings for small groups of people.  (*Id.* at PageID.25255-25256).

In total, the proofs submitted at trial substantiated that the harms the challenged zoning ordinance sections addressed – §§6.7.2(19)(b)(1)(v),  8.7.3(10)(u)(1)(b),  8.7.3(10)(u)(5)(h), 8.7.3(12)(k), 8.7.3(12)(i) – are real and those ordinance sections help to alleviate those harms to a material degree.  The evidence included an extensive legislative history – government records stretching back decades that document the harms and the efforts the Township undertook to tailor the PTZO to meet the substantial governmental interests of agricultural zoning, farmland preservation, etc., for each individual enactment.  This legislative history, together with the Township's Master Plan (and Future Land Use Map) outlined the community interests and harms the sections were enacted to balance and advance. *See Fox*, 492 U.S. at 480 (describing the fourth factor and stating, "[w]hat our decisions require is a fit between the legislature's ends and  the means chosen to accomplish those ends, []a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served, that employs not necessarily the least restrictive means but, as we have put it in the other contexts discussed above, a means narrowly tailored to achieve the desired objective") (citations and internal quotation marks omitted) (emphasis added).

Through trial testimony and depositions designations, the Township presented testimony from the architects of the involved ordinance sections along with Township representatives about the harms and tailoring, including the Township's longtime planner, Mr. Hayward.  PTP also

20

presented the testimony of preeminent land use planning expert, Dr. Daniels, regarding the harms the PTZO addressed and how the ordinance sections address those harms (e.g., tailoring). Overall, the evidence at trial demonstrates that the PTZO authorized certain accessory uses without eliminating the all-important nexus to agriculture that is so deeply rooted in the tradition and history of the Township.  All of this with the goal of ensuring that the winery uses do not overtake or override the agricultural purpose of the A-1 District.

B.    Plaintiffs Failed to Present Evidence of Damages at Trial Related to Their Commercial Speech Theory.

Even if the sections of the PTZO subject to the continued *Central Hudson* analysis are found to affect commercial speech, Plaintiffs' trial testimony does not support that they were damaged by any of the involved PTZO provisions.

1.   **Section 6.7.2(19)(b)(1)(v)**

Section 6.7.2(19)(b)(1)(v) regulates the sale of logo merchandise for Farm Processing Facilities. Plaintiffs allege this section unconstitutionally restricts their ability to engage in commercial speech and Plaintiffs have suffered lost profits. The challenged section states:

Logo merchandise may be sold provided:

1. The logo merchandise is directly related to the consumption and use of the fresh and/or processed agricultural produce sold at retail;
2. The logo is prominently displayed and permanently affixed to the merchandise;
3. Specifically allowed are: a) gift boxes/packaging containing the approved products for the specific farm operation; b) Wine Glasses; c) Corkscrews; d) Cherry Pitter; and e) Apple Peeler; and
4. Specifically not allowed are unrelated ancillary merchandise such as: a) Clothing; b) Coffee Cups; c) Bumper Stickers.

Two Lads

Two Lads' tasting room includes a "multi-functional space" that flexes as a retail space for the winery.  (*Id*. at PageID.24879-24860).  Chris Baldyga testified that Two Lads does not sell all

21

the types of merchandise it wants to, nor does it sell the volume of merchandise that it wants to. (ECF No. 608, PageID.24929-24930).  Mr. Baldyga testified Two Lads sells a limited inventory of logo'd merchandise and is seeking the ability to sell "nicer pieces" such as a $50 Merino wool t-shirt displaying Two Lads' logo or a "sub-brand" of Two Lads (i.e., a t-shirt identifying a specific wine product sold by Two Lads).  (*Id*. at PageID.24933-24934, 24965).

Currently Two Lads sells the following items in its tasting room: "books", "cork screws", "stoppers", "glass cleaners", "stemware", "decanters", "ball caps", and "t-shirts".  (*Id*. at PageID.24925-24929).  Mr. Baldyga testified he believes some merchandise sold at Two Lads is prohibited by the PTZO, but he later testified that he had reason to believe the prohibition would not be enforced by the Township Supervisor.  (*Id.* at PageID.24930-24931).  Two Lads also sells retail items online through its website; while Mr. Baldyga testified he does not know if apparel is sold on the website, he admitted that Two Lads is not prohibited from selling apparel online. No testimony was provided regarding Two Lads' ability to sell non-logo'd merchandise, in fact, Mr. Baldyga testified that selling logo'd merchandise is meant to and does promote Two Lads products and that it is a good form of advertising for Two Lads because "walking advertisements" are a "no brainer".  (*Id*. at PageID.24929-24930, 24963).

Black Star

At trial, no testimony was provided regarding what merchandize Black Star wants to sell that it cannot **currently** sell. Mr. Lutes provided testimony relating to Black Star's prior status as a tasting room location and his understanding that as a tasting room Black Star was prohibited from selling merchandise.  (ECF No. 602, PageID.23518).  As a Farm Processing Facility however, Mr. Lutes testified that Black Star began selling logo'd merchandise with a direct connection to "wine, wine enjoyment, wine use" which included "glassware", "corkscrews", and

"corkstoppers".  (*Id.* at PageID.23518).  Mr. Lutes testified that initially Black Star did not sell

logo'd t-shirts and/or sweatshirts because he did not believe the Township "wanted us to sell t-

shirts or hats at all" but that "changed a little bit".  (*Id.* at PageID.23519).  Mr. Lutes testified that

he believed the Township wanted to work with the wineries:

> [A]nd at that time I think there were six of us on the peninsula that were operating
> wineries, and you know they wanted to try and work with us, they were trying to
> hear what it was that we were conveying in terms of changing interests, and so
> things would shift a little bit. And it was at one of those points where, you know,
> they said okay, you can start selling, you know, a few t-shirts or a few hats, but
> again, we don't want to see it become a t-shirt shack or a, you know, I think there
> was some concern that for some reason the Wineries would become a big retail
> store of other things.

(*Id.*)

Sheri Fenton testified she has knowledge regarding merchandise sold at Black Star's

location on Old Mission Peninsula.  (*Id.* at PageID.23492).  Ms. Fenton testified Black Star's

tasting room includes a retail area where Black Star sells branded merchandise including shirts,

sweatshirts, hats, tumbler mugs and wine glasses.  (*Id.* at 23492-23493).  Neither Ms. Fenton nor

Mr. Lutes testified regarding Black Star's ability to sell non-logo'd merchandise.  Ms. Fenton and

Mr. Lutes both testified that selling Black Star branded merchandise promotes the Black Star

brand, which is a good thing for the winery.  (*Id.* at PageID.23493, 23578). Mr. Lutes testified that

Black Star's limited inventory is the result of limited space, stating "we would sell more of it if we

had a little bit more space to do so."  (*Id.* at PageID.23520).  Mr. Lutes testified that Black Star

does not sell much logo'd merchandise online but admitted that nothing prevents Black Star from

doing so.

Tabone[5]

---

[5] The Township is not conceding that Tabone is a Farm Processing Facility as Tabone's land use
approvals support that it is a Food Processing Plant operating pursuant to a Special Use Permit.
Tabone never obtained a Farm Processing Facility Permit. In order to obtain a Farm Processing

Tabone claims it wants to sell more merchandise and believes this section of the PTZO prevents it from doing so. (ECF No. 603, PageID.23654). Tabone would like to be able to promote his merchandise sales stating, currently, Tabone only promotes merchandise "on the down low" for fear of enforcement from the Township. (*Id*. at PageID.23653). Tabone also seeks the ability to promote and advertise its merchandise sales through "social media, internet presence and more floor space" which would allow Tabone to sell more merchandise. (*Id*. at PageID.23655).

Mr. Tabone did not provide any testimony regarding specific merchandise that Tabone does not currently sell but is seeking the ability to sell. Mr. Tabone testified that Tabone currently sells "stem and stemless logo glassware", "t-shirts and hats", "sweatshirts" and "trail mugs" (*Id*. at PageID.23652, 23694).

There is no subsection of § 6.7.2(19)(b)(1)(v) that prevents Tabone from promoting or advertising its merchandise. (*Id*. at PageID.23696). Tabone is not aware of a prohibition on selling online. (*Id*.). Tabone currently promotes and advertises its merchandise in the tasting room and by way of an online presence through its website and social media accounts. (*Id*. at PageID.23694-23695). Moreover, the only thing stopping Tabone from selling more merchandise online is Tabone itself: "Well, I guess we are stopping ourselves so as not to, you know, be more on the radar or fear of enforcement, you know, by the Township." (*Id*. at PageID.23696). Tabone has never received any enforcement from the Township regarding its sale of merchandise. (*Id*. at PageID.23698).

### 2. Sections 8.7.3(10)(u)(1)(b) and 8.7.3(10)(u)(5)(h)

---

Facility Permit, Tabone was required to obtain a dimensional variance from the ZBA. While Tabone initially sought a variance from the ZBA in 2016, it withdrew the request and has been operating since without any further challenge and the ZBA never ruled on the variance request.

Not all Winery-Chateau Plaintiffs are even in the running for compensatory money damages. The Court concluded in its summary judgment opinion that Section 8.7.3(10)(u) has not been applied to Bonobo, Chateau Grand Traverse, Brys, Hawthorne, and Bowers. (ECF No. 559, PageID.21903). Only their facial challenges remain. Because Section 8.7.3(10)(u) has not been applied to Bonobo, Chateau Grand Traverse, Brys, Hawthorne, or Bowers, those Plaintiffs have no basis to recover compensatory monetary damages.

Even then, the two remaining Winery-Chateau Plaintiffs, Mari and Chantal, failed to prove damages.

Section 8.7.3(10)(u)(1)(b) regulates promotion of Old Mission Peninsula agriculture during Guest Activity Uses:

> [g]uest Activity Uses are intended to help in the promotion of Peninsula agriculture by: a) identifying 'Peninsula Produced' food or beverage for consumption by the attendees; b) providing 'Peninsula Agriculture' promotional brochures, maps and awards; and/or c) including tours through the winery and/or other Peninsula agriculture locations.

Section 8.7.3(10)(u)(5)(h) regulates outdoor displays and states: "[n]o outdoor displays of merchandise, equipment or signs are allowed."

Chateau Chantal

At trial, Chantal offered no testimony that § 8.7.3(10)(u)(1)(b), specifically the promotion of peninsula agriculture during Guest Activity Uses, caused Chantal to suffer any damages. Chantal's wine is a "peninsula produced" beverage that Chantal promotes at events. Unsurprisingly, Chantal does not disagree with promoting the products it produces at events it hosts. (ECF No. 607, PageID.24628). Chantal wants to promote its products at events it hosts – including pitching wine club to attendees, which is a "big factor" in Chantal's tasting room success. (*Id*. at PageID.24481). During Guest Activity Uses, Chantal's staff is instructed to interact with

25

the attendees, introduce Chantal's wine and products, and promote Chantal's wine club.  (*Id*. at PageID.24597).

When customers visit the winery, Chantal's goal is to sell more wine to that person.  (ECF No. 606, PageID.24489). While the PTZO clearly indicates that providing tours is optional, Chantal claims it is required to give tours to attendees of Guest Activity Uses.  How that is problematic is perplexing because during tours Chantal has an opportunity to promote their products.  (*Id*. at PageID.24493).  During a winery activity, and even more so during tours, Chantal has an opportunity to have a captive audience, which provides a better marketing opportunity.  (*Id*. at PageID.24492-24493).

Chantal offered no testimony that showed § 8.7.3(10)(u)(5)(h) caused it any lost profits. Chantal's merchandise is located in the winery so that guests coming into the tasting room will walk past the merchandise.  (ECF No. 607, PageID.24615).  Ms. Dalese provided no testimony regarding Chantal's ability to have outdoor merchandise displays, equipment or signs. Moreover, Chantal is not claiming lost profits from lost merchandise sales.

<u>Villa Mari</u>

At trial, Mari offered no testimony that show §8.7.3(10)(u)(1)(b) caused it any lost profits. Promoting Northern Michigan agriculture is something Mari wants to do at their winery – in fact, it was why Mari was formed. At trial, Alex Lagina testified:

> [w]e got into this business because we believed Michigan could show -- could create and sell world class wines that were competitive with any other region on the planet, and we believed in Old Mission Peninsula agriculture, we believed in northern Michigan agriculture, we believed in, you know, the whole state really, and we wanted to show that.

(ECF No. 601, PageID.23296).

26

Mari wants to identify "Peninsula Produced" food or beverages for consumption during Guest Activity Uses.  Mr. Lagina considers the wine Mari produces to be a peninsula related product – one Mari identifies and promotes to attendees at a Guest Activity Use.  (ECF No. 602, PageID.23374; ECF No. 601, PageID.23261).  Guest uses that Mari hosts are promotional and educational activities designed to bring customers in and help Mari sell more products.  (*Id.* at PageID.23261).  Mari promotes its products at wine and food seminars, meetings of 501(c)(3) groups, and meetings of agricultural groups.  (ECF No. 602, PageID.23373-23374).  Mari promotes its products by identifying its wine to attendees and educating attendees regarding the food and wine served to them.  (*Id.*).  Mr. Lagina testified, "we want the guests to have a good time, but we also want them to leave having purchased our wine or signed up for our wine club." (ECF No. 601, PageID.23265).

Mari is proud to promote Old Mission Peninsula AVA and advertises this on its wine bottles. (*Id.* at PageID.23346).  Mari also chooses to promote Old Mission Appellation wine on vineyard maps in its tasting room. (*Id.* at PageID.23359-23360).

Tours offered during Guest Activity Uses provide an opportunity to Mari to sell its products to attendees and promote its winery.  (ECF No.602, PageID.23374).  During a tour, Mari promotes its products and pitches its wine club to attendees.  (*Id.*).  Moreover, after a tour, attendees visit the tasting room, which allows Mari to sell additional products and continue to promote its winery. (*Id.*)

At trial, no testimony was provided that proved §8.7.3(10)(u)(5)(h) caused Mari lost profits. Mari's tasting room has a designated retail merchandise area with a few other merchandise displays set up throughout its space. (ECF No. 601, PageID.23359). Mr. Lagina provided no

testimony regarding Mari's ability to have outdoor merchandise displays, equipment or signs. Moreover, Mari is not claiming lost profits from lost merchandise sales.

### 3. Sections 8.7.3(12)(i) and 8.7.3(12)(k)

Peninsula Cellars alleges Sections 8.7.3(12)(i) and (k) unconstitutionally restrict its ability to engage in commercial speech.  As a result, Peninsula Cellars claims it has suffered lost profits. Section 8.7.3(12)(i) regulates logo merchandise and states:

> (i) Retail sale of non-food items which promote the winery or Peninsula agriculture and has the logo of the winery permanently affixed to the item by silk screening, embroidery, monogramming, decals or other means of permanence. Such logo shall be a least twice as large as any other advertising on the item. No generic or non-logo items may be sold. Promotional items allowed may include corkscrews, wine glasses, gift boxes, t-shirts, bumper stickers, etc.

Section 8.7.3(12)(k) regulates promotional signs and states: "[s]igns and other advertising may not promote, list or in any way identify any of the food or non-food items allowed for sale in the tasting room."

### a. Section 8.7.3(12)(i)

As a Remote Winery Tasting Room, any non-food item that Peninsula Cellars sells is branded with Peninsula Cellars' logo.  Selling logo'd merchandise helps Peninsula Cellars market its winery; if someone is wearing a Peninsula Cellar's t-shirt, they become a brand ambassador and create an opportunity to promote the winery.  (*Id.* at PageID.24399, 24423). John Kroupa testified Peninsula Cellars prefers to sell branded merchandise in its tasting room:

> Q:    And it's good for Peninsula Cellars to sell branded items, correct?
> A:    Yes.
> Q:    You would prefer if you had a corkscrew to sell in the tasting room, Peninsula Cellars would prefer to sell a corkscrew that was branded as Peninsula Cellars with your logo on it versus one that's unbranded, right?
> A:    Correct.

(*Id.* at PageID.24431).

28

However, Mr. Kroupa claims there is some merchandise Peninsula Cellars wants to sell but has not because of their SUP and the PTZO.  Specifically, Mr. Kroupa testified that Peninsula Cellars wants to sell items that are not branded with Peninsula Cellars logo:

> Q:    What types of things would you like to sell that are not logo'd?
> A:    Some of the things come back to what the guest sees us using. Like, for instance, we have the wine -- like if you spill wine, we have a particular item that you can spray on someone's clothes to clean it up. We have vacuum pumps that you can save your wine longer if you pump the oxygen out of the bottle for instance.

(*Id*. at PageID.24400).  Mr. Kroupa testified that additional non-logo items Peninsula Cellars would like to sell are hand towels and plaques with "different sayings that are catchy". (*Id*. at PageID.24432).

Later Mr. Kroupa testified Peninsula Cellars already sells wall art to its customers. And retail items like the wine spray or vacuum pump are products he would prefer to sell with a Peninsula Cellars logo branded on them.  (*Id*. at PageID.24432).  Because Peninsula Cellars already sells wall art and it would prefer to sell additional items with a logo on them – something permitted under the PTZO, Peninsula Cellars has suffered no damages because of § 8.7.3(12)(i).

### b.  Section 8.7.3(12)(k)

Peninsula Cellars wants to advertise its products without fear of the Township coming in and enforcing the letter of the ordinance.  (*Id*. at PageID.24446).  But Peninsula Cellars already advertises items for sale in its tasting room and identifies the purchase price.  (*Id*. at PageID.24424-24424).  Mr. Kroupa testified Peninsula Cellars engages in marketing efforts as well:

> [y]es, we participate in social media efforts and a limited exposure to print media. We have kind of the rack cards that get distributed to the local hotels, so that when people come into town and they're looking for stuff to do, we buy an ad in the TV or, you know, when you check into a hotel and the television is on the base channel, we'll have a little advertisement on the that so people will see it in their hotel room, things like that.

29

(*Id*. at PageID.24360).

Peninsula Cellars has not been the subject of enforcement from the Township for logo'd merchandise or advertisements. Mr. Kroupa recalled a Peninsula Cellars advertisement which depicted a live performance event at the tasting room.  (*Id*. at PageID.24369-24371).  In response to the advertisement, Peninsula Cellars received a letter from the Township advising Peninsula Cellars' SUP did not allow "events featuring performances".  (*Id*. at PageID.24370-24371).  The letter was unrelated to Sections 8.7.3(12)(i) or (k).

## II. PLAINTIFF'S FAILED TO ESTABLISH ANY DAMAGES FOR THEIR PRIOR RESTRAINTS THEORY.

Before trial the Court granted summary judgment to Plaintiffs on their prior restraint theory challenging Sections 8.7.3(10)(u)(2)(b) and 8.7.3(10)(u)(2)(c).  (ECF No. 559, PageID.21901). These sections of the PTZO relate only to Winery-Chateaus and address meetings of 501(c)(3) non-profit groups within Grand Traverse County (Section 8.7.3(10)(u)(2)(b)) and meetings of agricultural related groups (Section 8.7.3(10)(u)(2)(c)).

The Court concluded that neither of these sections apply to the Farm Processing Facilities or Remote Wine Tasting Room.  The Court also concluded in its summary judgment opinion that Section 8.7.3(10)(u) in its entirety has not been applied to Bonobo, Chateau Grand Traverse, Brys, Hawthorne, and Bowers Harbor.  (ECF No. 559, PageID.21903).  Because Section 8.7.3(10)(u) has not been applied to Bonobo, Chateau Grand Traverse, Brys, Hawthorne, or Bowers Harbor, those Plaintiffs have no basis to recover compensatory monetary damages.

Therefore, the only Plaintiffs that could potentially be entitled to recover compensatory damages under this section are Mari and Chantal. At trial, Mari and Chantal needed to adduce evidence or testimony that the Zoning Administrator exercised discretion under these sections to

prevent it from hosting a meeting of a 501(c)(3) non-profit or an agricultural related group. Plaintiffs failed to present any evidence of this.

<u>Chateau Chantal</u>

Chantal has never submitted a request to host a 501(c)(3) non-profit or an agriculture-related group.  (ECF No. 606, PageID.24518).  Ms. Dalese testified Chantal has little success with non-profits and agriculture-related groups stating:

> We have not had a lot of the success offering what we do in terms of the dinner and the food and wine education to nonprofits or agricultural-related groups. As I mentioned before, from time to time we'll donate the space for such groups so they can enjoy the agricultural setting, but for the most part, those two groups are not folks that have a large bank account to be spending on events.

(*Id.*)

<u>Villa Mari</u>

Mari provided no evidence or testimony that the Zoning Administrator exercised discretion and prevented Mari from hosting a meeting of a 501(c)(3) non-profit or an agricultural related group.  Mr. Lagina testified to one instance where Mari sought permission to hold a charity event at the winery to taste wine in support of "Big Brothers Big Sisters".  (ECF No. 601, PageID.23301). Mr. Lagina testified that he was contacted by the Township's Enforcement Officer who advised that "holding the event without prior approval will be a violation of the zoning ordinance and the condition of approved SUP for Mari." (*Id.*).  The referenced "prior approval" was regarding Mari's unsubmitted tonnage reports that allow it to host Guest Activity Uses, not the organization or the event itself.[6]  Mr. Lagina stated: "I think in this case, we needed to submit our tonnage report to Dave though we did meet the requirement for the, you know, the actual growing of grapes."  (*Id.*

---

[6] Section 8.7.3(10)(u)(7) regulates documentation that a Winery-Chateau shall provide showing that the winery has grown or purchased grapes grown in Peninsula Township equal to 1.25 tons of grapes for each person allowed to participate in Guest Activity Uses.

at PageID.23302).   Moreover, Section 8.7.3(10)(u)(2)(b) does not require prior notice to the Township.

Mr. Lagina provided testimony regarding an invoice for an organization called the "National Writer Series". (*Id*. at PageID.23270). Mr. Lagina testified he was not sure if the organization was a 501(c)(3) stating that "they might be".  (*Id*.).   The invoice referenced an employee discount and Mr. Lagina explained the reasoning for that was:

> [w]hen the writer series approached us and said we want to do this event for our group, we were not sure what the Township's opinion was going to be. We didn't know if that's okay, if that's not okay. But we were fairly confident that the owner could host this group in his own facility, and so that's why this says care of my parents. That was kind of our way saying we want to support this organization, we don't want to do anything wrong, so that's why we are -- that's why this particular invoice that you're looking at exists.

(*Id*. at PageID.23272).

No evidence was presented showing that Mari asked the Township what their opinion was, nor was any evidence presented showing that the Township exercised any discretion over this. The organization attended a tour and tasting, bought 282 glasses of wine in the tasting room and 96 bottles of 2016 pinot grigio.  (*Id*. at PageID.23270-23271).

## III.    PLAINTIFFS FAILED TO ESTABLISH ANY DAMAGES FOR THEIR COMPELLED SPEECH THEORY.

The Court granted summary judgment to Plaintiffs on their compelled speech theory challenging §§ 8.7.3(10)(u)(1)(b) and 8.7.3(10)(u)(5)(a) of the PTZO.   (ECF 559, PageID.21910- 21912).  As with the prior restraints analysis, these ordinance sections relate only to Winery-Chateaus.  Section 8.7.3(10)(u)(1)(b) is part of the "Intent" of Section 8.7.3(10)(u), Guest Activity Uses; it was not an operative section to guides any conduct.   Section 8.7.3(10)(u)(5)(a) provides:

All Guest Activity Uses shall include Agricultural Production Promotion as part of the activity as follows:
   i. Identify "Peninsula Produced" food or beverage that is consumed by the attendees;
   ii. Provide "Peninsula Agriculture" promotional materials;
   iii. Include tours through the winery and/or other Peninsula agricultural locations.

The Court determined these sections compel speech by requiring a Winery-Chateau to promote agriculture at all Guest Activity Uses. Even if either or both Sections 8.7.3(10)(u)(1)(b) or 8.7.3(10)(u)(5)(a) unconstitutionally compel, the question of damages remains. The Court concluded that neither of these sections apply to the Farm Processing Facilities or Remote Wine Tasting Room. The Court also concluded in its summary judgment opinion that Section 8.7.3(10)(u) in its entirety has not been applied to Bonobo, Chateau Grand Traverse, Brys, Hawthorne, and Bowers Harbor. (ECF No. 559, PageID.21903). Because Section 8.7.3(10)(u) has not been applied to Bonobo, Chateau Grand Traverse, Brys, Hawthorne, or Bowers Harbor, those Plaintiffs have no basis to recover compensatory monetary damages.

Therefore, the only Plaintiffs that could potentially be entitled to recover compensatory damages under this section are Mari and Chantal. At trial, Mari and Chantal needed to adduce evidence that they were compelled to convey a message or content that they disagreed with. Plaintiffs failed to present any evidence of this. Instead, the testimony at trial demonstrated that neither Chantal or Mari disagrees with the identification or promotion of their own products.

<u>Chateau Chantal</u>

Ms. Dalese testified that she does not disagree with promoting Chantal's products at events it hosts. (ECF No. 607, PageID.24628).

Q:   Let's talk briefly about cooking classes. Is the idea similar with -- just to kind of speed through this a little bit – the idea similar cooking classes as it is at the wine and food seminars, to educate the attendees on Chateau

Chantal's products, and also to hope to get them to buy some of Chateau
Chantal's products?

A:    That is the idea.

Q:    I don't think I'm going too far out on a limb here, but you're fond of
promoting Chateau Chantal products, right?

A:    Certainly.

Q:    You don't disagree with promoting Chateau Chantal's products at one of
your own events, right?

A:    Right.

(*Id*).

Ms. Dalese testified she wants to promote Chantal's products at events – including pitching
wine club to attendees, which is a "big factor" of Chantal's tasting room success. (ECF No. 606,
at PageID.24481).

Ms. Dalese testified that Chantal is required to give a tour to attendees of food and wine
seminars.  (*Id*. at PageID.24486).  Ms. Dalese testified that if an attendee of a seminar doesn't
want a tour "we will kindly ask them to join us for the tour." (*Id*.).  Ms. Dalese testified that the
attendees do not always "react well" to tours if they would rather not attend but provided no
testimony or evidence showing Chantal is harmed by this.  (*Id*. at PageID.24487).  Tours are an
opportunity for Chantal to sell additional products because tours provide an opportunity to have a
captive audience, which provides a better marketing opportunity. (*Id*. at PageID. 24493).

Villa Mari

Mr. Lagina testified that he considers a wine and food seminar promotional.  (ECF No.
602, PageID.23373).  Mari's goal in having promotional activities is to sell wine.  (*Id*. at
PageID.23423).  During wine and food seminars, Mari is "pitching its products to the guests in
attendance at that wine and food seminar." (*Id*.).  During the wine and food seminar, Mari is
"educating the attendees regarding the food and wine that's beings served." (*Id*.).  Moreover, Mari
wants to promote its wine and other products sold on site during the seminars. (*Id*.).  During tours,

Mari promotes its product and engages the customers to return to the tasting room to purchase additional products and promote its winery.  (*Id*. at PageID.23374).  Mr. Lagina testified that Mari's staff teaches attendees about "what makes Mari wine and Mari vineyard special." (ECF No. 601, PageID.23279).  In addition to promoting its wine, Mari wants its staff to push wine club sign ups at events and instructs them to do so:

> Q:    Was your staff promoting Mari wine?
> A:    Yes.
> Q:    Looks like they were pretty successful in having this group purchase Mari wine?
> A:    Yes.
> Q:    You assume, I know we don't see wine club sign ups here, you assume your staff was pushing the wine club sign ups?
> A:    That's what they are supposed to be doing, yes.

(*Id*. at PageID.23279).

## IV.    PLAINTIFFS' UNPLEADED "CLOSING TIME" CLAIM RAISED FOR THE FIRST TIME AT TRIAL IS LEGALLY AND FACTUALLY UNSUBSTANTIATED AND SHOULD NOT RESULT IN AN AWARD OF DAMAGES.

During trial Defendants objected to testimony regarding Plaintiffs' claim for lost profits related to closing time as this issue was not live for trial.  In response, Plaintiffs argued for the first time in more than three years of litigation that "[t]hese wineries have a constitutional right to engage in their businesses under life and liberty, there is a business right to operate, which is a constitutional right which cannot be taken away by the government by enforcement of ordinances that do not exist."  (ECF No. 601, PageID.23312).  Plaintiffs argue that the Township "enforces" a 9:30pm closing time that is not contained in the PTZO.  Accordingly, Plaintiffs contend they are entitled to damages in the form of profits they claim they would have made by staying open until a preferred closing time of 11:00pm.  (*See* Exhibit 194).

In the lead-up to trial, Plaintiffs argued the deposition testimony of former Township Supervisor Rob Manigold proved that this alleged 9:30pm closing time "was unconstitutionally

vague in violation of the Due Process Clause and that the closing time was enforced against all Plaintiffs." (ECF No. 580, PageID.22613). In their trial brief, Plaintiffs argued that the Court should enjoin the Township from "enforcing a 9:30 p.m. closing time" against the Winery-Chateaus because it "only applied to 'Guest Activity Uses' which has [sic] been ruled vague in violation of the Due Process Clause" and against the Farm Processing and Remote Winery Tasting Room Plaintiffs because "there are no closing time restrictions contained in the Farm Processing Facility Ordinance, Section 6.7.2(19), or the Remote Winery Tasting Room Ordinance, Section 8.7.3(12)." (*Id.* at PageID.22625, 22633).

This changed at trial. In support of Plaintiffs' new liberty interest theory, Plaintiffs cited to *Sanderson v. Village of Greenhills*, 726 F.3d 284 (6th Cir. 1984). Plaintiffs' counsel argued at trial that *Sanderson* "is a due process case where the Sixth Circuit determined that a business had a Constitutional right to engage in a business without governmental interference. So, due process enforcing an ordinance that wasn't on the books." (ECF No. 601, PageID.23313). Plaintiffs' counsel argued that this was not a change in theory but was instead still "void for vagueness. That is the claim, void for vagueness. It's not a new theory. What the Township is saying really doesn't -- the deprivation of life or liberty is what gets us to damages." (*Id.* at PageID.23318). Despite Plaintiffs' arguments, this is a new theory.

While the Court overruled Defendants' objections, the Township writes separately to address the merits of the *Sanderson* argument. *Sanderson* and other Sixth Circuit precedent in the same vein does not support Plaintiffs' position. Contrary to Plaintiffs' position, in *Sanderson*, the Sixth Circuit reasoned that:

> Although the defendants, and the court below, are quite correct in asserting that there can be no *unfettered* freedom to engage in a business which may be properly regulated pursuant to a municipality's general police power, such an assertion does

not resolve the issue of whether the clear freedom, or liberty, to engage in even a potentially regulated business was *properly* circumscribed in this case.

*Sanderson*, 726 F.2d at 286-287. The plaintiff in *Sanderson* met resistance from the city counsel after opening a poolroom. *Id.* at 285. City officials told the plaintiff he must apply for a license under a local ordinance requiring approval for "amusement devices," even though it was not clear whether the planned pool tables were within the scope of the ordinance. *Id.* The plaintiff opened the business and approximately three hours later the police chief entered the establishment and ordered it to be shut down. *Id.* One city council member noted the poolroom would never receive the appropriate license; the plaintiff was given the choice of "voluntarily" closing the business and applying for the unobtainable license or incurring a criminal penalty for violating the ordinance. *Id.* The Sixth Circuit concluded that allegations of this nature (e.g., where a municipality acted without the basis of an ordinance and solely upon "unmotivated and unreasonable" opinions of that business to shut the business down) was sufficient to state a due process claim. *Id.* at 287. In a similar vein, in *Wilkerson v. Johnson*, 699 F.2d 325 (6th Cir. 1983), the Sixth Circuit held that the plaintiff had a liberty interest in obtaining a barber license. Notably though, in *Wilkerson*, the plaintiff was completely prevented from engaging in his sought-after profession entirely. *Id.* at 327.

Finally, in *Parate v. Isibor*, 868 F.3d 821 (6th Cir. 1989), the Sixth Circuit had the opportunity to clarify the application of a substantive due process claim when a plaintiff is not denied the opportunity to engage in his chosen profession entirely such as in *Wilkerson* and *Sanderson*. The Sixth Circuit reasoned:

> On appeal, Parate argues that the district court erred by concluding that Parate has no substantive due process right in the pursuit of his chosen occupation. To support this contention, Parate relies on *Wilkerson*, 699 F.2d 325. In that case the plaintiff applicants were denied an opportunity to enter the barbering profession by operation of state law. *See id.* at 326–27. *Wilkerson*, however, did not involve the

37

<u>application of rules and regulations to individuals presently engaged in their chosen profession</u>. *See id.* at 327. *Wilkerson* precluded individuals from *entering a profession*, and thus, may be distinguished from the present appeal, which involves the regulation of an individual's conduct while *engaged in the profession*. In addition, the *Wilkerson* plaintiff applicants could not practice as barbers anywhere in the state. *See id.* By contrast, Parate has only been discharged from one state university.

(italics included in original, remaining emphasis added); *see also Taylor Acquisitions, LLC v. City of Taylor*, No. 06-10650, 2006 WL 3085394, at *5 (E.D. Mich., Oct. 27, 2006) (holding that the denial of site plans did not interfere with developer's right to pursue an occupation, but rather only interfered with the right to develop a specific property).

Here, as in *Parate*, Plaintiffs have not been prevented from engaging in their chosen "profession" of operating wineries. Rather, at most, the claims relate to how late a winery may stay open – they otherwise continue operate as they have for years. At most, the hours of operation are a single stick in a larger bundle of rights. Unlike *Sanderson* where the police chief arrived at the plaintiff's place of business and physically shut it down, Plaintiffs have offered no evidence that anyone ever marched down to their winery and forced operations to cease in the tasting room or put chains on the door. Similarly, unlike the plaintiff in *Wilkerson*, Plaintiffs were not prevented from operating their businesses anywhere in Michigan by operation of state law.

Moreover, Plaintiffs never offered any evidence of enforcement of *any* kind related to closing time. At trial Plaintiffs offered no evidence that the Township ever actually enforced a 9:30pm closing time. Instead, Plaintiffs testified they never maintained regular business hours as late as 9:30pm; many of them close much earlier. (*See, e.g.*, ECF No. 600, PageID.23134-23135; ECF No. 601, PageID.23319, 23355; ECF 602, PageID.23571). Some of Plaintiffs representatives testified at trial that various Township officials (albeit without any corresponding evidence that these individuals were responsible for administering the zoning ordinance) told them the wineries

38

should close at various times before 9:30pm.  Others testified that they heard through the grapevine that they should close by 9:30pm.  But there was no evidence presented at trial that any Plaintiff received a letter from the Township, violation notice, or even any communication that instructed a winery to close by 9:30pm.  There were no citations issued, fines levied, civil infractions initiated, or any other conceivable penalty related to the hours the wineries were open.

*Sanderson* is wholly inapplicable and there should be no award of damages for this new liberty interest theory that was asserted for the first time at trial.

Even if Plaintiffs' theory held water from a legal perspective, Plaintiffs should not be permitted to pivot to a new liability theory on the second day of trial; this substantially prejudiced Defendants.  Plaintiffs asserted at trial that they could not have amended their Complaint earlier in the litigation because they did not learn of the "final firm concession" regarding closing time until Defendants filed their trial brief on April 23, 2024.  (ECF No. 601, PageID.23318).  The record thoroughly contradicts Plaintiffs' position – Plaintiffs have been proclaiming this issue has been conceded for years:

- On December 30, 2021, Plaintiffs argued: "Hours of operation is a similar issue.  The Township now admits that there is no explicit closing time for wineries contained within the Ordinances. (Ex. 1, 178-179).  Instead, the Township believes that a closing time of 9:30pm is inferred even though this language is nowhere to be found in the Ordinance". (ECF No. 136, PageID.4751).

- On April 18, 2023, Plaintiffs argued that: "While Section 8.7.3(10)(u)(5)(b) is the only Winery Ordinance section regulating hours and only applies to Guest Activity Uses, the Township enforces a 9:30pm closing time on all Wineries and all winery businesses." (ECF No. 334, PageID.12031).

- Most recently, on October 6, 2023, Plaintiffs again argue: "As for hours of operation, PTP and the Township have conceded in this lawsuit that the Ordinances do not contain closing times for any of the wineries and the only hours restriction is for guest activities."  (ECF No. 469, PageID.16975).

Plaintiffs further argue that springing this issue on Defendants at trial is permissible because Fed. R. Civ. P. 54(c) permits the Court to "grant the relief to which a party is entitled,

even if the party has not demanded the relief in the pleading." (ECF No. 601, PageID.23313).  In support of this, Plaintiffs cite to *Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707 (8th Cir. 1979), *Bluegrass Ctr., LLC v. United States Intec, Inc.*, 49 Fed. Appx. 25 (6th Cir, 2002); and *Colonial Refrigerated Trans., Inc. v. Worsham*, 705 F.2d 821 (6th Cir. 1983).  Contrary to Plaintiffs' position, and unlike the cases cited, Plaintiffs did not plead sufficient facts in their Complaint to support a due process claim grounded in the alleged arbitrary deprivation of a liberty interest regarding the right to operate their business.  Plaintiffs' entire operative Complaint deals with a due process claim alleging that the PTZO Guest Activity Use scheme was vague and chilled their First Amendment rights.  This claim is of an entirely different nature than a claim that they were confused regarding how late they could stay open or that the Township was stopping them from engaging in their sought-after profession (e.g., *Sanderson*, *Wilkerson*, and *Parate*, *supra*).

Unlike *Bluegrass*, 49 Fed. Appx. at 31, where the plaintiff "alleged and argued each of the factual elements of promissory estoppel throughout the case" and, therefore, the defendants were on notice of the claim, or *Colonial Refrigerated*, 705 F.2d at 824, where the complaint stated allegations that supported a claim of implied indemnity or indemnity by operation of law in addition to a contractual indemnification claim, there was nothing in the Complaint or record before trial that supported Plaintiffs' theory that the PTZO violated Plaintiffs' alleged liberty interest in engaging in their sought-after profession.

Plaintiffs should not be permitted to assert this new legal theory at this late stage of the game.

**V.  PLAINTIFFS' "DAMAGES" EXPERT ERIC LARSON FAILED TO OFFER TESTIMONY REGARDING DAMAGES THAT ARE RECOVERABLE AS A MATTER OF LAW AND HIS TESTIMONY AND REPORT ARE NOT RELIABLE.**

As discussed at length above, Plaintiffs failed to offer testimony in support of their damages claims at trial.  For the alleged amount of their damages, Plaintiffs relied entirely on the report prepared by their damages expert, Eric Larson.  Mr. Larson's report and trial testimony is riddled with errors, improper assumptions, and is completely unsupported by financial documentation. Through Mr. Larson's testimony the following is clearly established:

- Mr. Larson never attempted to calculate lost *net* profits on any aspect of Plaintiffs' businesses, which is required to request an award of lost profits under Michigan law.
  - o  Mr. Larson did not plan or supervise any aspect of requesting, formulating or obtaining any underlying current or historic financial data from the wineries, in violation of the AICPA standards – standards to which his work as an expert should comply.
  - o  Mr. Larson never obtained or reviewed any current or historic financial or operational information whatsoever with respect to any of Plaintiffs' wineries in violation of the AICPA standards.  He did not even seek or obtain a simple profit and loss statement or a tax return for any of Plaintiffs wineries.

- Mr. Larson did not conduct any financial or damage analysis. Mr. Larson utilized unsupported financial numbers provided to him by Plaintiffs' counsel and multiplied them by a random gross profit percentage found on the Risk Management Association website. He even violated the protocol of the RMA.

- Plaintiffs failed to support any claim for lost profits with the evidence required under Michigan law, rendering their damage request speculative, at best.

- Mr. Larson's two reports differed by over $40 million and contained countless admitted mistakes.  Plaintiffs never provided evidence of a final damages number.

Plaintiffs are entitled to no damages.

    A.  <u>Plaintiffs Offered No Evidence Regarding Lost *Net* Profits.  Therefore, There Cannot Be an Award of Lost Profits.</u>

For more than forty years, the Michigan courts have held that damages for lost profits are limited to lost *net profits*, rather than lost *gross profits*.  See, *e.g., Lawton v. Gorman Furniture Corp.*, 90 Mich. App. 258, 267; 282 N.W.2d 797 (1979). In 1983, the Michigan Court of Appeals tersely explained: "Damages for lost profits must be based on the loss of net, rather than gross,

profits." *Getman v. Matthews*, 125 Mich. App. 245, 250; 125 N.W.2d 671 (1983).  The Court of

Appeals in *Getman* explained:

> There is one final aspect in which the court's instructions as to damages were erroneous. The court failed to define the term "lost profits", neglecting to distinguish between "gross profits" and "net profits". Damages for lost profits must be based on the loss of net, rather than gross, profits. *Lawton v Gorman Furniture Corp,* 90 Mich. App. 258; 282 N.W.2d 797 (1979). Since counsel for the Mathewses had emphatically argued for an award of "gross profits" during closing arguments, the court's failure to clarify the meaning of the term "profits" could well have left the jury with a false impression of the proper method for computing damages. Standing alone, the court's failure to properly define "profits" was an error comparable to that found reversible in *Bluemlein, supra.*

*Getman*, 125 Mich. App. at 250.

Plaintiffs' damages theory is predicated completely on a claim for lost "gross profits" with

no attempt or evidence regarding their lost ***net*** profits.   Throughout his testimony, Plaintiffs

economic expert testified that he made no attempt to calculate lost net profits:

> Q:    There's not a question here, I'll clear it up. So if you look at net profit, RMA gives a net profit percentage, doesn't it?
> A:    Net profit or net income, probably something to that effect. Bottom line of P&L if we're talking the same thing, yes.
> Q:    But in this case, you did not use that number and apply it in this case, correct?
> A:    That's correct.

(ECF No. 609, PageID.25097)

> Q:    I just want to make sure what you didn't do. You did not calculate lost profits, correct?
> A:    This schedule is not a lost profits calculation.
> Q:    You don't have any schedule that calculates lost profits regarding prices of grapes, correct?
> A:    I do not.

(*Id*. at Page ID.25166)

> Q:    Right. So and we can go back to the other one. And if you actually wanted to determine lost profits, you would see what they would pay for something they got off peninsula and how much they would sell it for versus what they got on peninsula how much they would buy it

> and sell it for and you would get a potential net profits, right?
> A:    Yes.
> Q:    But we did not do that in this case, correct?
> A:    Not with this, that's correct.

(*Id.* at PageID.25174-25175).

> Q:    So in addition to the mistakes on Schedule 5, we have no idea, looking at Schedule 5, what net profits could be with respect to merchandise sales, correct?
> A:    Net income is what you're referring to?
> Q:    Yes, net income. Net profit.
> A:    That's correct.

(*Id.* at PageID.25184).  Mr. Larson did not investigate, evaluate, or have an opinion regarding net profits in this case:

> Q:    All right. So if the RMA provides an operating expense and a net profit number, you did not look at that, correct?
> A:    I looked at it, but it's not part of my calculation.
> Q:    You didn't use it?
> A:    That's correct.
> Q:    You have no opinion whatsoever in this case as to what lost net profits are, correct?
> A:    Lost net income, I do not.

(*Id.* at PageID.25148-25149).

Mr. Larson testified that the RMA Guidelines, on which he based his entire opinion, actually contain a percentage not only for gross profit, but also net profit. Mr. Larson, however, chose to ignore the net profit percentage and provided no expert opinion on net profit, choosing instead to base his opinion on the significantly higher gross profit percentage. (*Id.* at PageID.25097).

Finally, the difference between alleged gross and net profit is significant. Mr. Larson testified that he did not perform a lost net profits calculation, but if he had used the RMA figures upon he based his report and testimony to perform such a calculation, the net profit number would be 1/13 of the gross profit calculation:

Q:    So if we applied that number, the five percent instead of the gross profit number, the number you come up with would be 1/13th of what we show there, correct?

A:    That's correct.

Q:    But you didn't do that in this case and that's not part of your report, correct?

A:    That's correct.

(*Id.* at Page ID.25162).

Having failed to offer any evidence whatsoever regarding alleged lost ***net*** profit, there is

no evidence in the record to support Plaintiffs' claims for lost profits.

B.    Mr. Larson Did Not Satisfy the AICPA Requirements to: (1) Plan and Supervise the Project and (2) Obtain and Utilize Relevant Sufficient Data.

A district court's task in assessing evidence proffered under Rule 702 is to determine whether the evidence "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). One key consideration is "whether the reasoning or methodology underlying the testimony is scientifically valid." *Id.* at 592-93. The inquiry is "a flexible one," and "[t]he focus . . . must be solely on principles and methodology, not on the conclusions they generate." *Id.* at 594-95. An expert who presents testimony must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

Although there is no "definitive checklist or test" for meeting this standard, *Daubert* set forth a number of factors that typically "bear on the inquiry." 509 U.S. at 593. These include whether the theory or technique in question "can be (and has been) tested," whether it "has been subjected to peer review and publication," whether it has a "known or potential rate of error," and whether the theory or technique enjoys "general acceptance" in the "relevant scientific community." *Id.* at 593-94 (internal quotation marks omitted). **Red flags that caution against certifying an expert include reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity.** *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 177 (6th Cir. 2009). In addition, if a purported expert's opinion was prepared solely for litigation, that may also be considered as a basis for exclusion. *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 434 (6th Cir. 2007).

*Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527(6th Cir. 2012) (emphasis added).

Mr. Larson admitted that his work in this case was required to meet the standards set forth by the AICPA Statement on Standards for Forensic Services.  (ECF No. 609, PageID.25118).  The AICPA Statement on Standards for Forensic Services provides:

> 6. The general standards of the profession are contained in the "General Standards Rule" (ET sec. 1.300.001 and 2.300.001) and apply to all services performed by a member, including forensic services. They are as follows:
> - *Professional competence.* Undertake only those professional services that the member or the member's firm can reasonably expect to be completed with professional competence.
> - *Due professional care.* Exercise due professional care in the performance of professional services.
> - ***Planning and supervision.* Adequately plan and supervise the performance of professional services.**
> - ***Sufficient relevant data.* Obtain sufficient relevant data to afford a reasonable basis for conclusions or recommendations in relation to any professional services performed.**

(**Exhibit 10xZ**, AICPA Statement on Standards for Forensic Services, Page 3 (bold emphasis added)).

Mr. Larson's work was very limited in this case.  He created a **blank** template for what he deemed a "damage matrix."  He provided the blank document to Plaintiffs' counsel.  Plaintiffs' counsel then returned the completed document, with numbers inserted by Plaintiffs' counsel.  Mr. Larson then took Plaintiffs' counsel's numbers from the "damage matrix" and multiplied them by "gross profit" percentage from the RMA, regarding random restaurants.  (ECF No. 609, PageID.25152-25153).

He did nothing more than simple multiplication utilizing the random RMA number:

> Q:    The only study you did was you took the damage matrix, multiplied it by the RMA data and got the gross profit, right?
> A:    The revenues multiplied by the RMA data gives you the profit amount, that's correct.
> Q:    And that's the only study you did?
> A:    As far as gathering that additional third-party data, that's correct.

(*Id.*).

1.  **Mr. Larson made no attempt to plan or supervise the performance of the professional services as required by the AICPA.**

Plaintiffs' counsel told Mr. Larson that Plaintiffs' counsel had obtained the numbers for the damage matrix from the wineries.   This is not verified through any e-mail chain or in any other manner.   Mr. Larson has no idea of who from the wineries provided any of the numbers in the matrix.   Mr. Larson did not obtain any documents from any wineries that would have supported the vast majority of the numbers in the damage matrix.   Mr. Larson admitted that he accepted Plaintiffs' counsel's word that the numbers were accurate.   Yet he did absolutely nothing to verify the accuracy of the numbers.

> Q:    **. . . . So with respect to the wineries, the gathering of this information and participating in this damage matrix, to the extent they did, you did not instruct on, participate or supervise in that, correct?**
> A:    **That's correct.**
> Q:    And you mentioned you relied on counsel, because the damage matrix came back to you from counsel, correct?
> A:    Yes.

(ECF No. 609, Page ID.25134-25135) (emphasis added).

> Q:    So instead, you just sent a damage matrix, not knowing who was going to participate, it's not one of your associates, so you don't know who's going to participate in gathering this information or how, and you haven't told them what to gather, correct?
> A:    I did not have direct contact with those individuals, correct.
> Q:    So you took the information that came back to you -- eventually this damage matrix came back to you from counsel, correct?
> A:    Yes.
> Q:    And you took that information from them and you considered this damage matrix to be the, quote/unquote, backbone of your report, correct?
> A:    That's a fair statement.

(*Id.* at Page ID.25123-25124).

> Q:    You asked plaintiffs' counsel if he thought these numbers in the damage matrix, regarding typical hourly sales were good, and he assured you that they were, correct?
> A:    What do you mean by "good"?

Q:    If these numbers were accurate?
A:    Yes.
Q:    Okay. And he assured you that they were?
A:    That was my understanding, yes.

(*Id.* at Page ID.25143)

Within his trial testimony, Mr. Larson confirmed: (1) he was in control of the project but did not provide counsel or Plaintiffs any instructions on what information to gather for the "damage matrix" (*id.* at PageID.25122-25123); (2) he did not send them a request for documents that he wanted (*id.*); (3) he did not ask for or review any financial statements (*id.* at PageID.25123); (4) that the compilation of documents, and who is compiling those documents, is very important to the project but did not go himself, send an associate, or even appoint a representative at each winery to gather any documents (*id.* at PageID.25123-25125); (5) that he just sent a blank "damage matrix" and has no idea who participated in compiling the information (yet he considered it the "backbone" of his report) (*id.* at PageID.25125); and (6) the only proffered evidence regarding the validity of the numbers in the damage matrix is that Plaintiffs' counsel assured him that the numbers were accurate (*id.* at Page ID.25143-25144).

Mr. Larson's failure to participate in the planning or supervision of the project including the compilation of data, and his blind reliance of the representations of Plaintiffs' counsel, with no attempt at verification, is a clear violation of the AICPA standards.  In addition, the failure to request from Plaintiffs, or obtain from Plaintiffs, any current, historic or future projected financials, is simply an abject failure to conduct a proper financial analysis.  One would have to assume that the only purpose of Mr. Larson's report was to produce a large damages number, with zero evidentiary support, just as an attempt to scare the Township into settling.   Regardless, the failure to comply with the AICPA standards renders Mr. Larson's "expert testimony" not credible, and inadmissible under *Daubert*.  *See Rubbermaid*, *supra*.

47

**2. Mr. Larson also failed to obtain sufficient relevant data to support any economic opinions.**

Mr. Larson testified that he did not participate in gathering documents from the wineries. He also testified that he had no documents to support the vast majority of entries on the damage matrix. Finally, Mr. Larson testified that he obtained no current or historic financial documents whatsoever from the wineries, not even Profit and Loss statements, tax returns, or any other documents that could support a request for money damages. Finally, as mentioned above, he blindly relied on Plaintiffs' counsel's representation that the data included in the damage matrix was accurate.

| | |
|---|---|
| Q: | Okay. You did not review any tax records for any wineries, correct? |
| A: | That's correct. |
| Q: | You did not review any profit and loss reports for any wineries, correct? |
| A: | That's correct. |
| Q: | For the record, a profit and loss report is where you see things such as gross profit? |
| A: | Correct. |
| Q: | Cost of goods sold? |
| A: | Yes. |
| Q: | Operating expenses? |
| A: | Yes. |
| Q: | Net profit? |
| A: | Yes. |

(ECF No. 609, Page ID.25100).

For the next thirty minutes of his testimony, Mr. Larson admitted that he had not requested or reviewed any financial information from the wineries. He admitted, nearly verbatim, to the following: (1) he has no experience in wine making or commercial farming; (2) he did not conduct and market analysis or feasibility study; (3) he did not perform any business valuation and did no independent research, reviewed no balance sheets or general ledgers, no payroll reports, no capital asset or depreciation schedules, no business plans, projections, budgets or financial forecasts; (4) he reviewed no employee information whatsoever and has no idea of the number of employees

now or number needed for expansion of business; (5) he has no information regarding winery facilities or parking; (6) he no idea if Plaintiffs  leased or owned their properties; (7) has no debt or loan information; (8) has no information regarding local market for weddings or events, and made no calls to similar businesses; (7) never reviewed ordinances or minutes of the Township or correspondence between Plaintiffs and Township; (8) has no information of the statewide or nationwide market for grape pricing; (9) has no USDA or Tobacco, Tax and Trade information filed by the wineries; (10) has no winery applications for PPP loans; (11) did not look at any winery websites; (12) he did not perform any analysis of wedding/event venues, and he never recommended that the wineries obtain any market analysis or feasibility study.    (*Id.* at PageID.25101-25118).

Mr. Larson gathered exactly zero financial documentation from any of the Plaintiffs.  He has no idea of their past financial history or future financial projections.  He has no idea of their past or future marketing or business plans.  In addition to failing to participate, plan or supervise the project of obtaining data to support his opinion, Mr. Larson obtained zero relevant data to support his opinions.  This is a clear violation of the AICPA standards and renders his "expert" testimony inadmissible.

C.    Mr. Larson Conducted an Exercise of Multiplication, Using a Gross Profit Percentage Found  on the RMA Website.  In Doing So, He Failed to Follow the Directives of the RMA to Only Utilize RMA Data as a Guideline to Supplement a Separate Financial Analysis.

Q:    The only study you did was you took the damage matrix, multiplied it by the RMA data and got the gross profit, right?
A:    The revenues multiplied by the RMA data gives you the profit amount, that's correct.
Q:    And that's the only study you did?
A:    As far as gathering that additional third-party data, that's correct.

(ECF No. 609, PageID.25152-25123).

Instead of gathering historical and projected data from the eleven Plaintiffs (or other local wineries on Old Mission Peninsula, the Leelanau Peninsula, and/or in Sutton's Bay), Mr. Larson utilized random data provided by RMA, which is in turn data provided by unknown restaurants at unknown locations in the United States.  Mr. Larson had no idea where RMA obtained this data:

> Q:  It could be from a -- I don't know, let's see, it could be from a Red Lobster in Anchorage or a Chi Chi's in Phoenix, right?
> A:  It could be.
> Q:  You just have no idea.
> A:  That's correct.

(*Id.* at PageID.25128).

> Q:  Wouldn't you want to do any other study to see if this supports the 60 percent loss you came up with, with respect to the wineries?
> A:  I thought using RMA was a reasonable approach here.
> Q:  But no other study?
> A:  That's correct.
> Q:  And so you used RMA for Schedule 3. You did the same RMA calculations for Schedule 6 and 7, correct?
> A:  Yes, essentially.
> Q:  Those are the only studies you did to come up with each of those three schedules?
> A:  That's third-party data, that's correct.

(*Id.* at PageID.25155-25156).

It is incomprehensible that an economic expert would fail to obtain any historic financial information from the eleven wineries that he is representing, and instead utilize random numbers from unknown establishments in unknown climates across the country.  RMA itself advises against this.  (*See* **Exhibit 10xB**).  RMA's "Annual Statement Studies" recommends under a section entitled "Recommended for Use as General Guidelines" that the data should only be used as "general guidelines and not as absolute industry norms" and further provides that, "you should use the figures only as general guidelines and as a supplement to the other methods of financial analysis." (*Id.* at page 3).

50

Mr. Larson testified that he did not conduct any other financial analysis.  He did not even ask the wineries for their historic or projected financial information.  He did not do a study on any local wedding or large event venues.  He could have done these studies and compared them to the random guidelines provided by the RMA.  He did not, however, conduct any other analyses and, in failing to do so, acted contrary to the advice of the RMA.  Basing his entire analysis on the RMA guidelines, and then ignoring the instructions on how to utilize the RMA guidelines, renders his opinion not simply suspect, but inadmissible.

> D. Even if Mr. Larson Had Offered an Opinion on Alleged Lost Net Profits, the Lack of Any Historic or Projected Financial Documentation or Market Information Would Render Any Such Opinion too Speculative to be Admissible.

> Michigan allows lost profits for new businesses as long as they may be established with "reasonable certainty." *Fera v. Vill. Plaza, Inc.,* 396 Mich. 639, 644, 242 N.W.2d 372, 374 (1976). **Although Michigan courts have not explicitly listed the types of evidence that may be used to demonstrate lost profits for a new business, courts in other states have examined expert reports, market analyses, comparisons to similar businesses operating under similar market conditions, and economic and financial data.** 11 Corbin on Contracts § 56.17 (2012). *See also Andrew v. Power Mktg. Direct, Inc.,* 978 N.E.2d 974, 992 (Ohio Ct. App. 2012); *Mrozek v. Intra Fin. Corp.,* 281 Wis. 2d 448, 478, 699 N.W.2d 54, 68 (Wis. 2005); *Kaech v. Lewis Cnty. Pub. Util. Dist. No. 1,* 106 Wash. App. 260, 277, 23 P.3d 529, 539 (Wash. Ct. App. 2001). In general, a new business may recover lost profits "[w]here estimates of lost profits are based on objective facts or data and there are firm reasons to expect a business to yield a profit." 22 Am. Jur. 2d Damages § 459."

*Fredonia Farms, LLC v. Enbridge Energy Partners, L.P.*, 1:12-cv-1005, 2014 WL 3573723, at *5 (W.D. Mich., July 18, 2014) (Quist, J.) (emphasis added).  Here, Plaintiffs made no effort to utilize any objective facts or data to support any claim for lost profits.

Plaintiffs' representatives testified that they had not been in the event/wedding business because it was not allowed.  Plaintiffs' representatives and Mr. Larson also testified that they did no market or feasibility studies because such events and weddings were not allowed.  Because the

wineries had not engaged in these businesses in the past, they would need information such as that set forth in *Fredonia Farms* in order to establish any future lost profits:  market analyses, feasibility studies, evidence of sufficient financials, comparison to similar businesses in similar market conditions, and other financial/market studies.  Mr. Larson testified that none of this relevant information was requested or made available to him in this case, and that he had no opinion on this information, or on the current, historic or future marketing/business plans or financial situation of any Plaintiff:

> Q:   Okay. So other than what the weddings -- or what the wineries did, you have not reviewed any market or feasibility studies for weddings, large events or small events in northern Michigan, correct?
> A:   That's correct.
> Q:   You reviewed no financial numbers for any comparable facilities in the Traverse City area, correct? Meaning wineries, large events, small events?
> A:   Just so I'm clear, the financial data of these comparable entities, is that what you're asking about?
> Q:   Of any comparable entities, whether it be other wineries, or other large event or small events or wedding venues?
> A:   Sure. Did I review financial information of those entities?
> Q:   Yes.
> A:   No, I did not.
> Q:   And we already know you didn't review the financial information of any of your own clients, the wineries in this case. You did not review the financial information of Black Star Suttons Bay in this case, correct?
> A:   That's correct.

(ECF No. 609, PageID.25104-25105).

Mr. Larson responded to a long line of questioning regarding the lack of any evidence regarding the wineries' historic financial information, facilities, future business plans, market studies, feasibility studies, and other documents and information that could be relevant to an economic analysis.  *See* Section IV.B., *supra*.  This line of questioning was taken directly from the *Fredonia Farms* and similar cases.  As seen in the testimony cited in this brief, Mr. Larson's

general response was: no, he did not request and was not provided any such information.  He did not even bother to call any existing local wedding or event venue to ask general questions.

Even if Plaintiffs had offered an opinion regarding net profit, instead of gross profit, any such opinion is rendered speculative at best, due to the abject failure to provide any relevant evidence required to establish future lost profits.

E. <u>The Two Reports Provided by Mr. Larson Contained Numerous Mistakes and Differed by Over 60 Million Dollars.  The Attached Schedules Contained Similar Mistakes and Misstatements.</u>

In Mr. Larson's first report, he opined that there were $203 million in damages, based on gross profit figures.  In his second report, a week after his discovery deposition, the total damages number was reduced to $135 million.  (ECF No. 609, PageID.25094).  Even after this reduction, there were countless mistakes within the second report that remained.

For example, the alleged damages for hours of operation for Mari was double what Mr. Larsen intended.  He assumed that all wineries were open and would be damaged 365 days per year.  There were additional countless millions of dollars in alleged damages that Mr. Larson admittedly did not intend to include in his report.  At the end of his testimony, Mr. Larson never provided an actual dollar figure regarding the alleged damages.  In response to what the final alleged lost profits would be, Larson stated that he "would have to take the numbers we talked about with counsel on direct this morning and do the math." (*Id.* at PageID.25148).  He then admitted that he has never done the math and gave no opinion on the final number of actual damages. (*Id.* at Page ID.25148).  Without such testimony in evidence, there is no support for a lost profits claim.  Also, Larson made no attempt whatsoever to provide an opinion as to what damages related to what legal claim.  His report and testimony are simply a wish list of damages without attempting to correlate to any particular damages claim that was live for trial.

Finally, Mr. Larson admitted to the numerous mistakes and problems that apply to all of his Schedules.  Here are but a few examples with respect to each Schedule that was attached to his reports:

- Schedule 1 – Grape Prices
    - Despite being titled "lost profits," Mr. Larson admitted that this was not a lost profits analysis.  (*Id.* at PageID.25164-25166).
    - It attempted to show higher cost of grapes, but cost of majority of grapes on Old Mission Peninsula was actually equal or lower to grapes off Peninsula. (*Id.* at PageID.25174).
    - Larson admitted that you would need to determine effect on cost of making wine, then eventual sales prices of wine, in order to determine if there were any lost profits.  That was never done in this case.  (*Id.* at PageID.25174-25175).

- Schedule 3 – Hours of Operation
    - Wineries already have the right to stay open until 9:30pm and do not.  The "preferred 11pm closing time" has zero evidentiary support or credibility.
    - Plaintiffs have admitted that staffing is already difficult and provided zero evidence that they could staff an additional shift. (*Id.* at PageID.25101-25102).
    - The "Typical Hourly Sales" was not actually average hourly sales.  ---The figure was obtained from taking 2 hours on random Friday and Saturday evenings.   Mr. Larson admitted that he could have requested financial information to get average hourly sales, but did not.   (*Id.* at PageID.25146-25147)
    - Mr. Larson has no idea why Plaintiffs' counsel only provided him with numbers for a couple hours on random Friday and Saturdays.  (*Id.* at PageID.25136; 25146-25147).
    - Different wineries provided limited data for different days of the week/year. (*Id.* at PageID.25136-25138).
    - Alleged Mari damages were accidentally doubled.  (*Id.* at PageID.25132).
    - Mr. Larson assumed wineries were open 365 days and calculated accordingly, although many were closed 5-7 days and others were closed all winter.  (*Id.* at PageID.25067;25135-25138; 25177).
    - Just a portion of the mistakes results in an overcalculation of damages by at least 275.5 days on Schedule 3 alone.  (*Id.* at PageID.25177-25178).

- Schedule 5 – Merchandise Sales
    - Mr. Larson admitted that his data on this schedule was not accurate.  --He never provided an updated number.  (*Id.* at PageID.25181-25182).
    - Estimates $85,000.00 per year in lost gross profit, but could not answer how he calculated this figure.  (*Id.* at PageID.25183).
    - Mr. Larson does not know and did not provide alleged lost net profit.  (*Id.* at PageID.25184).

- Schedule 7 – Large Events
    - Calculated alleged gross profit only.  (*Id.* at PageID.25162).
    - Based on guesses.  No evidence whatsoever was admitted regarding market, demand, feasibility, pricing.  (*Id.* at PageID.25112-25113).
    - No determination of market demand, summer or winter. (*Id.* at PageID.25105; 25111-25114).
    - No determination of feasibility, economically or otherwise.  (*Id.* at PageID.25104; 25110-15112).
    - No accounting for actual days open or winter shutdowns.  (*Id.* at PageID.25067; 25135-25138; 25177).
    - No accounting for large or small events that were actually held as tastings.  (*Id.* at PageID.25157).
    - He has no idea what sales would be for food or the wine produced at the winery.  (*Id.* at PageID.25117).

## VI.    CONCLUSION

Plaintiffs failed to carry their burden at trial on the remaining *Central Hudson* factors.  Additionally, Plaintiffs established no damages for any of their remaining constitutional claims – instead, the evidence clearly demonstrated the sheer volume of events and activities the wineries can (and do) host while catering to thousands of customers on a daily and yearly basis.  Finally, Plaintiffs' damages expert wholly failed to provide evidence in support of any amount of recoverable damages at trial.  Plaintiffs are not entitled to any legal or equitable relief.

Defendant Peninsula Township respectfully requests this Court enter judgment in its favor.

Respectfully Submitted,

McGRAW MORRIS, P.C.
Attorneys for Defendant Peninsula Township

Dated:  August 29, 2024

BY:    */s/      Bogomir Rajsic, III*
Bogomir Rajsic, III (P79191)            Thomas J. McGraw (P48817)
Tracey R. DeVries (P84286)              2075 W. Big Beaver Rd., Suite 750
44 Cesar E. Chavez Ave. SW, Ste 200     Troy, MI 48084
Grand Rapids, MI  49503                 (248) 502-4000
(616) 288-3700                          tmcgraw@mcgrawmorris.com
brajsic@mcgrawmorris.com