1          IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF MICHIGAN
2                   SOUTHERN DIVISION

3

4    WINERIES OF THE OLD MISSION
     PENINSULA ASSOC. (WOMP), a Michigan
5    nonprofit corporation; BOWERS HARBOR
     VINEYARD & WINERY, INC., a Michigan
6    corporation; CHATEAU GRAND TRAVERSE,
     LTD., a Michigan corporation; CHATEAU
7    OPERATIONS, LTD., a Michigan corporation;
     GRAPE HARBOR, INC., a Michigan
8    corporation; MONTAGUE DEVELOPMENT, LLC, a
     Michigan limited liability company; OV THE
9    FARM, LLC, a Michigan limited liability
     company; TABONE VINEYARDS, LLC, a Michigan
10   limited liability company; TWO LADS, LLC, a
     Michigan limited liability company; VILLI
11   MARI, LLC, a Michigan limited liability
     company; WINERY AT BLACK STAR FARMS, LLC,
12   a Michigan limited liability company,

13            Plaintiffs,

14   v                              Case No:  1:20-cv-1008

15   PENINSULA TOWNSHIP, a Michigan
     municipal corporation,
16
              Defendant,
17
     and
18
     PROTECT THE PENINSULA, a Michigan
19   municipal corporation,

20            Intervenor-Defendant.
     _____/
21

22                  CLOSING STATEMENTS

23         BEFORE THE HONORABLE PAUL L. MALONEY
                United States District Judge
24
                  Kalamazoo, Michigan
25               Monday, October 28, 2024

```
 1      APPEARANCES:

 2      For the Plaintiff:  MR. JOSEPH M. INFANTE
                            MR. STEPHEN MICHAEL RAGATZKI
 3                          MR. CHRISTOPHER J. GARTMAN
                            Miller, Canfield, Paddock
 4                          99 Monroe Avenue, N.W., Suite 1200
                            Grand Rapids, Michigan 49503

 5

 6                          MR. BARRY KALTENBACH
                            Miller, Canfield, Paddock
 7                          227 Monroe Street, Suite 3600
                            Chicago, Illinois 60606

 8

 9      For the Defendant:  MR. BOGOMIR RAJSIC III
                            MR. THOMAS J. McGRAW
10                          McGraw Morris, P.C.
                            44 Cesar E. Chavez, S.W., Suite 200
11                          Grand Rapids, Michigan 49503

12

        For the Intervenor- MS. HOLLY L. HILLYER
13      Defendant:          Troposphere Legal, PLC
                            420 East Front Street
14                          Traverse City, Michigan 49686

15

        REPORTED BY:        Lauret J. Henry, CSR-6469, RPR
16                          Federal Official Court Reporter
                            410 West Michigan, Suite 137
17                          Kalamazoo, MI 49007
                            (269) 720-9529

18

19

20

21

22

23

24

25
```

```
1     Kalamazoo, MI

2     October 28, 2024

3     9:30 a.m.

4                        RECORD

5          THE COURT:  This is File Number 20-1008, Wineries of

6     Old Mission Peninsula versus Peninsula Township and Protect

7     the Peninsula.  The record should reflect that Attorneys

8     Infante, Ragatzki, Kaltenbach, and Gartman represent the

9     plaintiffs.  Attorneys Rajsic and McGraw represent Peninsula

10    Township.  Attorney Holly Hillyer represents Protect the

11    Peninsula.

12         The Court conducted a nonjury trial in this matter

13    several months ago.  There was a request to have the

14    transcripts prepared before the filing of post-trial briefs.

15    That has all been accomplished, and the Court's here to hear

16    this morning the -- take final argument on the case.

17         So with that introduction, Mr. Infante, on behalf of

18    plaintiffs, go ahead, sir.

19         MR. INFANTE:  Thank you.  Good morning, your Honor.

20    Joe Infante on behalf of plaintiffs.

21         Yes, it has been -- I think my last line of my opening

22    was that it was a long road to trial.  We have -- it's been

23    four years and seven days exactly from the time that we filed

24    the complaint in this case.  There have been approximately

25    600 -- over 600 documents filed in this case.  We were set to
```

1    go to trial approximately two years ago, a little more than

2    two years ago, and PTP's intervention set us back about a

3    year.

4        But we had a trial over 10 days in April and May.  That

5    trial was interesting for what happened during trial.  The

6    witnesses that happened.  So the wineries -- we presented 12

7    fact witnesses at trial.  These were winery representatives,

8    one from each and two from Black Star.  We had four witnesses

9    by deposition designation.  Those were Township officials, the

10   planner, the former attorney, former supervisor, and the

11   former zoning administrator.  Three expert witnesses, one Eric

12   Larson on damage, one Teri Quimby, a former commissioner from

13   Liquor Control Commission, Gary McDowell, the former executive

14   director of the Michigan Department of Agriculture.

15       But PTP came in this case and set us back two years, but

16   then when it came time for trial, neither PTP nor Peninsula

17   Township called a single live fact witness.  You didn't hear

18   from a single member of PTP.  You didn't hear from a single

19   Township official live at trial.

20       They did submit three witnesses by deposition

21   designation.  One of those was a Township official, the former

22   planner, and two PTP members, John Wunsch, Grant Parsons.

23   That testimony, that testimony was on the issue of Central

24   Hudson factors.  It was not on -- wasn't to rebut any of the

25   testimony of the wineries, about their wineries, the effect of

1    the ordinances, how they acted, enforcement, it wasn't on

2    those issues at all.  On that, the winery evidence was

3    unrebutted.

4        Those winery witnesses who appeared live at trial, they

5    were credible.  They told this Court about their businesses,

6    how they operate.  They looked this Court in the eye, and they

7    explained to the Court, you know, how their businesses

8    operate, their need to have additional activities and

9    value-added agriculture, the harm that has been done to them.

10       The defendants, I shouldn't say the defendants, PTP

11   called one witness at trial, Dr. Daniels, who was a land use

12   planning expert from Pennsylvania.  He was evasive in his

13   testimony.  He was argumentative in his testimony.  He snapped

14   at one point, and this Court struck that from the record.  He

15   didn't look your Honor in the eye.  He looked down for most of

16   his testimony.  He wasn't credible, and we'll get into his

17   testimony.

18       Because of the Court's pretrial rulings, summary judgment

19   findings, there really were three issues left for trial.  One,

20   whether the winery ordinances violate the wineries' commercial

21   speech rights; whether those winery ordinances caused the

22   winery to suffer damages, not just on commercial speech but

23   because of some of this Court's pretrial rulings, essentially

24   the causation element in this case, and then the last is the

25   issue of the damages that the wineries are entitled to and

1   what other relief they're entitled to by way of injunctive

2   relief.

3        I plan to discuss these each in turn this morning.  On

4   commercial speech, so at the summary judgment phase, this

5   Court did not seem convinced that everything the wineries want

6   to do here or seek to do was commercial speech, but now after

7   10 days of trial, 12 unrebutted winery witnesses, it should be

8   abundantly clear that what these wineries do and what they

9   want to do at their wineries is commercial speech.  It is

10  intended to promote, advertise, and market the sale of the

11  wines that these wineries make from grapes that they grow.  We

12  believe this easily meets the Bolger factors.  One, they

13  advertise the wine for sale, and I'll go through the evidence.

14  They refer specifically to wine produced by these wineries,

15  which are for sale.  Again, the evidence was that these

16  wineries can only sell wine that they make from grapes, well,

17  grapes either they grow or they source, and that the wineries

18  and their staff are economically motivated to advertise the

19  sale of their products.

20       Obviously the wineries are economically motivated because

21  they're in the business of making and selling wine.  But you

22  heard testimony from these winery representatives that their

23  staff is incentivized also to push the sale of wine and sell

24  wine.  They're incentivized to get customers at activities and

25  through the tasting room to sign up for their wine club, which

1    is a subscription service, and their staff earns bonuses when

2    they get people to sign up.

3        During my opening statement, I advised the Court that

4    there are certain things that we would prove at trial, certain

5    evidence this Court would hear.  These bullet points here,

6    these are actually copy and pasted from my opening, because we

7    did this.  We proved each of these.  We proved that

8    promotional activities always include advertising promotion of

9    these wineries' wines.

10        The best form of promotion and advertising for their

11    businesses occurs when they have a captive audience at their

12    winery through these group activities.  Promotions and

13    educational materials have a greater effect on customers and

14    activities than general tasting room visitors, just

15    through-the-door visitors.  Wine club sales are higher --

16    sorry, wine sales are higher during promotional activities.

17    Wine club signups are higher during promotional activities.

18    Group reservations, these, you know, the groups that come in,

19    these, for whatever reason, these provide the wineries with a

20    target-rich environment.

21        Now, this all went in unrebutted.  The Township didn't

22    have a witness; PTP didn't have a witness on any of these

23    issues here.  And even through cross examination, Peninsula

24    Township proved this themselves through their cross

25    examination.  I remember sitting here listening to questions

1    by Mr. Rajsic, he asked Mr. Oosterhouse, I think it was the

2    first or second day of trial, he said, quote, "Groups that

3    come in for tastings, you pitch your products to those groups,

4    right?" He answered, "Yes." He asked Mr. Lagina about the

5    reasons for having musicians at Villa Mari, and he said --

6    this is what the question was:  That's what the goal of

7    enticing people in the door to taste your wine and sell them

8    wine, and Mr. Lagina answered, yes, that's the reason we do

9    these things.

10           Peninsula Township counsel asked some variation of this

11   product pitch question about 25 times.  I went through the

12   transcript and counted it.  About 25 times they asked the

13   wineries about how they pitch their products and that they

14   pitch their products during group activities.  Pitching

15   products, that's just advertising and marketing.  It's trying

16   to sell wine.

17           It's unrebutted that sales through a winery tasting room

18   are the wineries' best form of marketing and advertising.

19   Just for your Honor's reference, ECF 618, that's our

20   post-trial brief.  We consolidated a lot of testimony in our

21   post-trial brief, so this is -- when it says ECF 618, I'm

22   citing multiple pages of the trial brief.  Or post-trial

23   brief.

24           It's unrebutted the wineries are able to more effectively

25   deliver their advertising message in person at their tasting

1    room, and in-person marketing and advertising occurs at the

2    tasting room.  For example, Spencer Stegenga from Bowers

3    Harbor, he testified that for Bowers Harbor their marketing

4    message is, quote, "Welcome to our family farm and family

5    home."  And he testified that this message is most effectively

6    given in person at their winery at their tasting room when

7    they have groups come in.

8        It's unrebutted that the wineries market their business

9    through their wine clubs, which are a subscription service.

10   They get deliveries three to four times a year I believe was

11   the average testimony there.  These wine clubs create brand

12   ambassadors for the wineries and that wine club members

13   purchase more wine than nonwine club members.

14       You heard testimony how important these wine clubs are

15   because they get them through the slow season.  They actually

16   scheduled the deliveries for wine clubs so that they can get

17   that income during the slow season, which in northern Michigan

18   is typically in the winter.

19       Nearly all the wine club signups occur in person, and the

20   winery staff are trained and incentivized to get people to

21   sign up for the wine club.  Bill Maier from Hawthorne, he

22   testified that 99 percent of their wine club members signed up

23   in person at the tasting room.  For Brys, Patrick Brys, he

24   testified that that number is 95 percent.  They testified they

25   need to get people into their tasting room to get them to sign

1    up for these wine clubs.

2         It's unrebutted that events at wineries help the wineries

3    sell more wine, plant more grapes, and keep their land and

4    agriculture.  The purpose of the wineries hosting events, that

5    purpose is to sell more wine.  That is the sole purpose.  The

6    testimony was the sole purpose of having events is to sell

7    wine, advertise wine, market wine.  And the wineries sell more

8    wine and get more wine club signups on days when they host

9    these events.

10        Alex Lagina, he testified about a 5K race that they had

11   at their winery just before trial, and it was on a Sunday.  He

12   testified that the sale of wine on that day was double from

13   the prior Sunday one week before.

14        You also saw Mr. Lagina, that he provided the Court with

15   some invoices for some group events that they had, and one was

16   for a writer series and one was for I think it was a mining

17   company or a mining group.  And he testified that at those

18   events, we saw the invoices, that Villa Mari sold hundreds of

19   glasses of wine and bottles of wine -- not hundreds of

20   bottles, but many bottles of wine at those events, and those

21   were fantastic days for Villa Mari because they had that group

22   come in during their slow season.

23        It's unrebutted that events are a better marketing

24   opportunity for these wineries than regular tasting room

25   operations.  Events are hands-on marketing experiences for the

1    wineries they are promoting, the wines they make and sell.

2    Again, getting even to the cross examination by Mr. Rajsic, he

3    confirms that at these events the wineries are pitching their

4    products.

5        It's unrebutted that hosting events would allow the

6    wineries to bring in more customers again during their slow

7    season.  Service, marketing, promotion by a winery at, say, a

8    501(c)(3) event, which some of the wineries are allowed to

9    have under the ordinance, they testified that the same

10   service, marketing, and promotion occurs at things like

11   birthday parties, family reunions, wedding rehearsals, or

12   corporate meetings.  It doesn't matter to the wineries the

13   reason for the group to come in or who the group is.  They're

14   still going to promote and pitch their products.

15       Winery events are essentially product demonstrations.

16   Again, Spencer Stegenga, he testified that product

17   demonstrations are what we do at Bowers Harbor.

18       At events, wineries and their staff provide customers

19   with tasting notes, food pairing recommendations, they solicit

20   wine sales, they solicit wine club signups, and they engage in

21   product demonstrations.  You heard several of the wineries

22   talk about the five Ss and that they walk customers through

23   the 5s:  See, swirl, smell, sip, savor.  They walk them

24   through those.  That's a product demonstration.

25       Todd Oosterhouse testified that, quote, "Intent of events

1    is to get those people at the event to buy more bottles."

2    Alex Lagina testified, quote, "For the people that are at the

3    promotional activity, the purpose is to sell them wine."

4         It's unrebutted the wineries need to host these events to

5    keep their land in agriculture and support their efforts to

6    preserve agriculture in Peninsula Township.  Without added

7    avenues to sell their wines, some of these wineries are

8    considering selling their land for housing developments.  The

9    ordinances themselves are inhibiting the wineries from

10   investing in more farm land and more grapevines.

11        You heard testimony I know from Patrick Brys and I

12   believe from Eddie O'Keefe, they have hundreds of thousands,

13   if not millions of dollars, of wine sitting in warehouses,

14   sitting in inventory that they need to find a place to sell

15   that.  They need more customers coming through their door so

16   they can sell them that wine.

17        Hawthorne, Bill Maier testified that Hawthorne's, quote,

18   "Plan B is to subdivide the property for residential

19   development."  Chris Baldyga explained that he's already

20   talked to a residential developer or a housing developer about

21   what he can do with his farmland if his business does not

22   become profitable.  And Mari, Alex Lagina, he testified that

23   their ability to invest in more agriculture is dependent on

24   them being able to have these promotional activities.  His

25   father, Marty Lagina, he testified Marty Lagina owns about 500

1    acres of agricultural land in Peninsula Township, and some of

2    that was earmarked for more grapevines or another winery, and

3    instead they started subdividing that land for housing.

4        Because these ordinances restrict commercial speech,

5    Peninsula Township had the burden of proof on the Central

6    Hudson test.  They had to identify a substantial governmental

7    interest.  They had to show how these regulations directly

8    advanced that governmental interest in a material way, and

9    they had to show the regulations are not more extensive than

10   necessary to serve that purpose.  Peninsula Township didn't

11   meet this test.

12       On substantial governmental interest, Peninsula Township

13   alleged that the interest is the preservation of agriculture.

14   In a nutshell, the preservation of agriculture.  Supervisor

15   Manigold, he testified that this means, quote, "Keeping farms

16   profitable so they don't become houses and subdivisions."

17       Post-trial the Township and PTP have argued that there's

18   this general health, safety, and welfare interest.  The

19   purpose behind the winery ordinances.  Now, this is unstated

20   in their brief what this means.  Now, the Township did make

21   this same argument in our first summary judgment hearing.

22   They cited to Section 2.1 of the winery ordinances to say that

23   they have this health, safety, and welfare purpose.  Your

24   Honor in response said, that's boilerplate.  But even on this,

25   there's no evidence that these ordinances do promote health,

1    safety, and welfare.  Supervisor Manigold, he testified that

2    none of the ordinances address a health, safety, or welfare

3    issue.

4         The defendants didn't admit any evidence here, right?

5    Pretrial, Peninsula Township alleged that there's a whole host

6    of these harms and these horrible things that would happen:

7    Noise, traffic, and decreased agriculture.  They didn't call

8    any trial witnesses on these allegations.  They relied mostly

9    on attorney argument and then these meeting minutes.  They

10   subnoticed this Court a whole host of meeting minutes, but

11   that doesn't meet their burden to show that these harms are

12   real.  And I'll discuss those meeting minutes in a minute, but

13   you didn't have a Township official sitting here before you

14   and discussing, you know, why these harms are actually real.

15   You didn't have any evidence that they're actually real.

16        The township supervisor, Mr. Manigold -- sorry, I should

17   say the former supervisor as of about two years ago just to be

18   accurate.  I apologize.  He was the supervisor, though, for

19   about 30 years, I believe, in Peninsula Township.  He

20   testified that the winery ordinances do not further the

21   governmental interest of preserving agriculture.  That's the

22   testimony before this Court.

23        There's no record evidence of any studies, empirical

24   data, or professional literature that Peninsula Township

25   considered at the time that they passed these ordinances

1    showing that they, you know, the interest of preserving

2    agriculture, one, that it's actually advanced by the

3    ordinances, but two, that that harm is real, that preservation

4    of agriculture, the land in Peninsula Township, needed

5    preservation.  There's no evidence that it actually needs

6    preservation.  At most, there's evidence that they want

7    preservation but not that it actually, you know, if they don't

8    have these ordinances, it won't be preserved.  All they have

9    is these historical meeting minutes.  And Peninsula Township

10   claims that these meeting minutes do, you know, all the

11   lifting necessary to meet Central Hudson with the assistance

12   of Dr. Daniels, who wasn't their witness.

13        But if these meeting minutes were so important, why

14   didn't Dr. Daniels look at them?  He testified he didn't

15   review a single meeting minute.  No planning commission

16   meeting minutes, no town board meeting minutes.  If they're so

17   crucial to the case, if they do all the, quote, "lifting

18   necessary," then why did the only live witness by the

19   defendants not look at them?  Well, that's because PTP's

20   counsel didn't tell them to.  He testified that he only looked

21   at whatever PTP's counsel told him to review.

22        And I'll note for the Court, pretrial you, in one of your

23   summary judgment -- sorry, it was a motion in limine ruling,

24   you said that the defendants couldn't just put in front of you

25   a whole host of meeting minutes and ask the Court to find

1      evidence in those meeting minutes.  That's what they did.

2      They just submitted meeting minutes without explanation, and

3      they rely on attorney argument after the fact to interpret

4      those meeting minutes.

5          I'll note if you look at their post-trial briefing,

6      there's no quotes from those meeting minutes.  They have a

7      whole bunch of bullet points, but all it is is attorney

8      argument of what those meeting minutes mean, what they

9      interpret them to mean.

10         They were required to come forward with some quantum of

11     evidence of both the governmental interest and that the

12     ordinances advanced that to a material degree.  The minutes,

13     at most, contain speculation.  At most.  And the Aptive

14     (phonetic) case said speculation of fears is woefully

15     insufficient to meet the burden.

16         These statements are also hearsay.  We objected at trial

17     to the admission of these meeting minutes because they

18     contained hearsay.  They're out-of-court statements.

19     Mr. McGraw said they're not being offered for the truth of the

20     matter asserted.  That's at ECF 608.  If they're not being

21     offered for the truth of the matter asserted, then why do we

22     even have the meeting minutes?  What's the point of them?  If

23     they're so important, why are they not admitting them as being

24     truthful?  Because they just contain hearsay.  They should be

25     inadmissible.

1        The last factor under Central Hudson is the least

2    restricted means or narrow tailoring, depending on the court

3    case you're reading, how they're addressing the Central Hudson

4    test.  But Supervisor Manigold, he testified that Peninsula

5    Township did not consider any less restrictive means when it

6    passed these ordinances.  You haven't seen any evidence of any

7    less restrictive means.  Peninsula Township didn't admit into

8    evidence any draft ordinances, any drafts they considered

9    before they ended up with the final ordinance.  That's not in

10   the record.  You have to assume it just doesn't exist.

11       Dr. Daniels, he testified that he wasn't giving an

12   opinion on this issue.  That wasn't something that he was

13   going to address.  But Gary McDowell, the former executive

14   director of MDARD, he did testify that there are less

15   restrictive means.  The farm market GAAMPs he said are

16   absolutely -- they absolutely help farmers preserve

17   agricultural land.  He said agriculture in Michigan is

18   preserved when farms are allowed the engage in value-added

19   agriculture such as on-farm events and promotions and that

20   agriculture is preserved when the farmers have fewer

21   restrictions rather than more restrictions.

22       Dr. Daniels, he really wasn't competent to testify on the

23   Central Hudson factors.  Again, the Township claims the

24   meeting minutes are the most important piece of evidence, but

25   he didn't review any of them.  They claim that the meeting

1     minutes show that they meet the Central Hudson factors.  But

2     Daniels didn't review any of those minutes.  What he did is he

3     really just read the ordinances, and he testified about what

4     they generally mean, and then he interpreted the ordinances.

5     But statutory interpretation, that's the role of the Court.

6     That's not the role of Dr. Daniels here.  He's a land use

7     planning expert from Pennsylvania.  That's not his role here.

8          What he did, he talked to two members of PTP, Barb Wunsch

9     and John Wunsch.  He reviewed the Township's master plan, the

10    recent master plan.  I'll note that Exhibit G is the 2011

11    master plan.  That's the exhibit that the defendants put into

12    evidence.  That was actually from 2011, which is after these

13    ordinances were enacted.

14         Very interesting thing on Dr. Daniels is the Township

15    spent seven pages of their post-trial brief block quoting

16    Daniels.  He wasn't even their witness.  But the bottom line

17    of Daniels is he testified really what the ordinances

18    prohibit, but he didn't testify that those prohibitions

19    further a substantial governmental interest related to a harm

20    that's actual and real.  Really what he testified is he just

21    would like these to be in place because it meets, you know,

22    his favored way to preserve agriculture, which is a purchase

23    development rights ordinance.

24         The next issue for trial was this issue of causation.

25    Defendants had some pretrial concessions that are important on

this issue.  One on the restriction of hours.  Defendants concede that these winery ordinances do not contain any restriction on the tasting room hours for these wineries.  The other is on the issue of weddings.  That quote there, that's from Christina Deeren.  She's the former zoning administrator. She testified that winery chateaus do not need approval from Peninsula Township to have weddings, to have family reunions, to have entertainment.

The farm processing section 6.7.2(19)(a), that's an intent provision of the ordinance.  That's what Peninsula Township has been using for farm processing wineries to prohibit them from having social events for hire, weddings, wedding receptions, and restaurants.  Now, in their pretrial brief, the defendants concede that intent provisions are not operative law.  They testified, there's testimony that they were enforcing this intent provision as if it was operative law.

The same goes with the remote winery tasting room ordinance, which only applies to Peninsula Cellars.  That ordinance, nowhere in there does it say that Peninsula Cellars or remote tasting rooms cannot have events, cannot have weddings, cannot have entertainment.

That section is silent, but Peninsula Township enforces that anyway.  And the point of it is really Peninsula Township concedes that they're just sort of making it up.  They're just

1    enforcing laws that are not actually on the books to serve,

2    really, their wants.

3        Manigold and Deeren, their testimony, PTP argues that

4    these admissions cannot be used against PTP because they

5    weren't in the case yet when they were deposed.  This issue

6    came up at trial, your Honor may remember, regarding Greg

7    Meihn, who is the Township attorney.  We used his deposition

8    transcript to lay the foundation, and PTP objected because

9    they weren't there.  And your Honor asked counsel for PTP, did

10   you ask to redepose Mr. Meihn, and they answered yes.  And

11   then you overruled their objection.  Same thing here.  They

12   could have redeposed Mr. Manigold.  They could have redeposed

13   Ms. Deeren.  They chose not to.  They made a strategic

14   decision not to redepose these people and instead try to argue

15   at trial that testimony can't be used against them.

16       Notably, defendants have a joint defense agreement.  That

17   joint defense agreement was in place before these depositions.

18   Again, that testimony is unrebutted.  They didn't have a

19   witness on these issues on, you know, what -- how the Township

20   enforced the ordinances and the Central Hudson factors.

21       The Township did enforce the ordinances.  Peninsula

22   Township officials, this is mostly Ms. Deeren, Mr. Manigold,

23   and I think Mr. Hayward, they testified that they were either

24   actively enforcing or would enforce each challenged section of

25   the winery ordinances.  That citation is to our post-trial

brief, and it's about five pages of a table showing all of the

enforcement and all the testimony of their enforcement.

And this was despite Peninsula Township being advised by

their own attorney that the ordinances were unconstitutional

or preempted in several ways.  That advice happened a year

before we filed this lawsuit.  I think it was August of 2019.

He advised Peninsula Township that their ordinances were

unconstitutional and/or preempted, and they continued to

enforce them.  I asked Supervisor Manigold at his deposition,

why, and the testimony is, I know that sounds crazy, but

that's the way it is out there.  The way it is out there in

Peninsula Township is they enforce restrictions and enforce

ordinances that don't exist and that are unconstitutional, and

they do it knowingly.

The wineries themselves presented evidence at trial of

enforcement against them.  Some examples, and I guess again

cite to our brief, Bonobo couldn't have a painting event.

Mari was told couldn't have weddings.  Brys wanted to have a

political fundraiser for Governor Whitmer's campaign, and

Peninsula Township said they couldn't do it.  Black Star,

there was an event that Supervisor Manigold was a part of, and

he threatened them, if you hold that event, quote, "I will

find you and shut you down."  For Two Lads, they were forced

to cancel a barbecue and a summer solstice event.  This goes

back to that social event for hire issue.  They were told they

1     couldn't have these because they were social events for hire.

2     But that's an intent provision.

3         Peninsula Cellars, they got in trouble for having a guy

4     with an acoustic guitar and bluetooth speaker.  They also got

5     a $300 fine during COVID for having those little plastic

6     igloos that keep people safe so you can eat outside.  They got

7     in trouble for that.  They got a $300 fine for that.  Even

8     Supervisor Manigold told John Kroupa, oh, this isn't right,

9     you shouldn't have that.  They appealed it, and the town board

10    upheld the $300 fine and told John Kroupa from Peninsula

11    Cellars he was wrong for these igloos.  I think he said he

12    needed a permit, needed a building permit to have them.  A

13    land use permit, I believe.

14        Chateau Grand Traverse, you heard Eddie O'Keefe.  He

15    testified that he wanted to have a fundraiser for a beloved

16    school teacher.  She was dying of cancer.  And the Township

17    told him, if you have more than 75 people there, we'll know it

18    and you're going to get a violation.

19        Bowers Harbor, we submitted I think three or four pages

20    of a spreadsheet that Peninsula Township kept of all of the

21    enforcement actions against Bowers Harbor.  And at one point

22    Spencer Stegenga was told if he had a certain event, they

23    would put padlocks on his doors.

24        Chateau Chantal was told that it couldn't sell wine that

25    it made from grapes it sourced from Argentina.  This gets to

1    that Commerce Clause issue.

2         Tabone and Hawthorne, they're a little different because

3    they're the newer wineries, but Bill Maier from Hawthorne, he

4    testified that he also works at Bowers Harbor and he saw what

5    Peninsula Township did to Bowers Harbor and how difficult they

6    were on Bowers Harbor, and that is how he ran Hawthorne in

7    response to that.

8         Mario Tabone, the newest winery out there, Tabone

9    Vineyards, he testified that he saw what happened with Two

10   Lads in social events for hire.  He's also a farm processing

11   winery, and so he acted accordingly with what the Township did

12   to them.

13        The wineries presented evidence on the vagueness of the

14   ordinances.  Winery representatives provided evidence that

15   they got lack of clarity.  There was confusion of what these

16   ordinances meant.  They couldn't get clarity.  Exhibit 43,

17   this is an email that Todd Oosterhouse sent to Dave Sanger,

18   Greg Meihn, and I believe it's Christina Deeren at the

19   Township.  And in that email he said, please define for me the

20   terms guest activity, entertainment, and accessory use, and

21   they wouldn't do it for him.  He never got a response.  He

22   also asked in the email, he said, provide for me every time

23   over the past three years Peninsula Township had defined or

24   interpreted those three terms.  They refused to give him a

25   response.

1          You also heard testimony from the winery representatives

2     that if they did get an interpretation or they did get a

3     definition from the Township throughout the years, that that

4     definition or interpretation would only last as long as that

5     official was in office.  Because there was a revolving door of

6     planners.  I think there was five planners I think was the

7     testimony.  There were a number of zoning administrators.

8     Town board changed over time.  Every time a new official came

9     in, they started all over again with a new interpretation.

10         Supervisor Manigold, he testified that he thought the

11    winery ordinances were vague and we should throw out the whole

12    thing.

13         We presented evidence that Peninsula Township enforced

14    the closing time on these wineries.  Supervisor Manigold

15    testified that he believed that a 9:30 p.m. closing time was,

16    quote, "for everybody."  If you read that portion of his

17    transcript the questions are, but this is only in the chateau

18    ordinance, but you're enforcing it against everybody.  He

19    says, yes, this is for everybody.  And the questioning is, but

20    this is only for guest activities.  He says he thinks it's

21    implied for everything, for the tasting room, and, quote,

22    "That's what I'm enforcing."  Yet he told Black Star that they

23    needed to close at 6 p.m.  That was testimony from Lee Lutes.

24         Again, the point of all of this is that Peninsula

25    Township is just making it up as they went along and changing

1    it as they saw fit.

2         You heard substantial evidence of the effect the

3    vagueness of these ordinances had on these wineries.  They

4    said, we weren't able to know what we could and couldn't do.

5    This is from Todd Oosterhouse.  And the wineries didn't know

6    what to plan for the next month or the next year, and that's

7    really where this got them is because these wineries, you

8    know, they need to be able to plan months or years in advance

9    to know what they can and can't do.  You know, they got to

10   plan their wines.  They got to plan, you know, additional

11   planting.  They have to plan if they can have an event or not

12   an event.  Weddings are usually, you know, those are planned

13   or booked years in advance, but they couldn't do that sort of

14   planning because they never knew what was allowed.

15        This really affected, that last bullet point, that's Mari

16   Vineyard, Alex Lagina, he testified, I've gone back and forth

17   reading the ordinance as to whether or not weddings are or are

18   not allowed.  He testified there was a point in time where he

19   thought, yeah, you know what, weddings are allowed.  He

20   actually interpreted it like Christina Deeren did at her

21   deposition, that weddings are allowed.  And so he advised his

22   staff to start booking some weddings, and they booked them.

23   But then that changed.  The Township came back and said, no,

24   you can't have weddings.  He had to cancel a wedding.  I think

25   he had to move a wedding to a different piece of property so

1    that he didn't, you know, ruin the bride's day.  But that had

2    a toll, you know, a large toll on these wineries.

3         Mario Tabone on this issue of tours, I know Mr. Rajsic

4    asked a lot of questions of the wineries, said, well, of

5    course you're allowed to have tours.  Tours are an important

6    part of your winery.  But Mr. Tabone, he testified that he was

7    fearful of having tours or promoting tours, because he didn't

8    know if that would be considered an event and he'd get a

9    violation.

10        All this led to the wineries suffering damages.  So the

11   wineries presented unrebutted evidence across five categories

12   of damages.  We had the expert testimony of Eric Larson, an

13   accountant and business valuator out of Grand Rapids.

14   Peninsula Township did not present its own damages expert.  It

15   made the strategic decision not to have its own expert.

16   Instead it relied on attorney argument.  But several courts

17   have held that attorney argument is no substitute for

18   evidence, especially when you are dealing with expert

19   testimony.  They didn't have any rebuttal witnesses to counter

20   any of the winery evidence, any factual evidence on the

21   damages they suffered.

22        Commerce Clause.  So we presented documentary and

23   testimonial evidence that they suffered damages for the

24   Commerce Clause violation.  This is the requirement that farm

25   processing wineries use 85 percent grapes from Peninsula

1    Township, that winery chateaus can only serve 85 percent local

2    fruit at their guest activities, and that a winery chateau is

3    required to buy 1.25 tons of grapes from some farmer in

4    Peninsula Township for every guest they'll have the following

5    year.  You held those unconstitutional in ECF 162 three years

6    ago, I believe.

7        The farm processing wineries testified they were required

8    to buy local fruit, and they did.  They bought local fruit in

9    order to qualify for guest activities.  This is the chateaus.

10   There's testimony there's not enough local fruit to serve

11   their needs.  There's testimony that Peninsula Township fruit

12   was more expensive than other fruit.

13       Now, it's important to know that the Commerce Clause

14   damages do relate to the guest activity damages because of the

15   requirements to use local fruit at guest activities.  It's not

16   just the damages of the increased cost there because the

17   wineries needed to buy that fruit.  You know, Brys, Patrick

18   Brys, he testified that they grow enough grapes on their

19   property, I think they have 155 acres, that they didn't need

20   to buy grapes from anybody else, and that they did buy grapes

21   that actually would go to waste because they didn't have the

22   ability to process that many grapes.  But this meant they

23   couldn't have guest activities because they couldn't qualify

24   because they were forced unconstitutionally to buy grapes from

25   somebody else.  This was that Governor Whitmer event.  He said

they couldn't have it, the Township said you couldn't have it

because you haven't shown us your grape -- your tonnage

report, so you bought grapes from somebody else.  So that

really sort of goes both ways where it's a Commerce Clause

violation, which led to damages under the guest activities

section.

Peninsula Township doesn't address the Commerce Clause

damages in their brief whatsoever.  I believe it's been

conceded.

Damages for merchandise restrictions.  This relates to

four of the wineries, Tabone, Black Star, Two Lads, and

Peninsula Cellars.  You know, the Township alleges that these

wineries were not harmed because they sold some merchandise,

but that's the point.  The point was they sold some.  You

heard testimony from Lee Lutes that Rob Manigold told them

they could sell a few T-shirts or a few hats.  They were told

to keep it limited.  Chris Baldyga, he testified that he

wasn't able to have as much inventory as he might want to or

have as nice stuff.  You know, he wanted nicer, you know, I

think it was zip-ups, nicer merchandise to sell to people, but

he didn't buy that.  He didn't invest in that inventory

because he didn't know if he was actually allowed to sell that

inventory.  And those wineries testified they could have sold

more if they could have done it more openly.

The wineries presented evidence, documentary and

testimonial, of damages from confusion at the vague
ordinances.  This evidence included customer requests for
events, their capacity, the licensing that they had showing
they could do these things.  The average size of the events
they wanted to have.  The price they would charge.  This
evidence was based on, for someone like Black Star who has a
winery in Suttons Bay, they use whatever pricing they have at
that location to inform what they would charge in Peninsula
Township.

Some of the wineries testified they went around and
looked, say, what the Jolly Pumpkin, a local brewery that's
allowed to have events, what they charge, or the Boathouse,
local restaurant, what they charge.  Some of them testified
that they leaned on what they charge for the few events
they're allowed to have.  All that evidence was here.

We had hundreds and hundreds of pages of customer
requests.  Exhibit 131, that's an exhibit from an Excel
spreadsheet from Chateau Chantal.  It had 722 event inquiries
between 2018 and 2020.  Exhibit 170 is 161 pages of event
inquiries for Mari.  The testimony is that these were only a
fraction of the requests and inquiries that these wineries
get.

Patrick Brys testified that they were getting so many
requests they eventually put a page on their website to stop
people requesting, and they put a sign in their tasting room

1      to stop people from requesting having events and activities

2      there.

3           The Township didn't offer any rebuttal evidence to this.

4      There is no rebuttal.  Instead what the Township asked these

5      witnesses were, well, you didn't do a feasibility study, did

6      you?  You had no feasibility study.  I remember he asked --

7      Mr. Rajsic asked Chris Baldyga about his feasibility study,

8      what would you do if there was inclement weather?  And

9      Mr. Baldyga responded, I don't know because I haven't had the

10     chance to look into that.  I don't have any contracts for

11     this.  I've never been allowed to do it.  And Mr. Rajsic

12     pressed him on that, and eventually your Honor put a stop to

13     it.  You said, I think the bottom line of the witness's

14     testimony is he wants the ability to do it.  Make a business

15     decision as to whether he wants to or not.

16          That's exactly it.  These wineries want to be able to

17     make a business decision of how they run their businesses, run

18     wineries without the Township interfering in that.

19          The wineries presented evidence of damages for guest

20     activities and prior restraint.  The Township claims that some

21     of these wineries cannot recover damages because the Court

22     declared that these ordinances had not been applied to them

23     for their as-applied challenge, but in that same opinion you

24     said it doesn't apply to the facial challenge.  You've already

25     ruled these ordinances are facially unconstitutional, being

1    vague and being a prior restraint, so the wineries are

2    entitled to damages for that.

3        But we also put in evidence substantial evidence at trial

4    that these ordinances were enforced against these wineries.

5    You had the testimony from Manigold and Deeren that said they

6    were enforcing these ordinances against the wineries.  You had

7    confusion by the Township in emails about what was and was not

8    allowed to occur.  You had denial of events for not being

9    agriculturally related.  You had denial of events because they

10   didn't qualify for guest activities because they didn't buy

11   enough grapes.  That's just the Commerce Clause problem

12   working its way into a First Amendment problem.

13       Brys couldn't have Governor Whitmer have a fundraiser

14   because they didn't buy enough grapes.  That's just the

15   Commerce Clause problem.

16       You had a multipage spreadsheet related to Bowers Harbor

17   showing three or four pages of enforcement action against

18   Bowers Harbor preventing it from doing certain things and

19   threatening to padlock its doors.  All that testimony was

20   unrebutted.

21       The wineries presented evidence of the closing time

22   damages, so each winery testified, again documentary and

23   testimonial, of their preferred closing time, their typical

24   evening sales hours.  Each winery witness testified that this

25   information was accurate.

1          THE COURT:  I did not hear a lot of testimony that

2     some of the wineries even contemplated going beyond 9:30.

3          MR. INFANTE:  I think they said their preferred

4     closing time would be 11.  I think the testimony you're

5     referring to is the question of why didn't you stay open late,

6     later than 9:30, and the wineries testified that that was a

7     shift problem for them.  Because they had -- it would have

8     been a split shift.  They would have had to do a shift and a

9     half.  Typically they opened at 11 a.m. or noon, and so

10    staying open until 6 or 7 p.m. was one whole shift.  But if

11    they were going to stay open until 11:00 p.m., or 9:30 p.m.,

12    sorry, 9:30 p.m., that would be a half a shift, and they

13    couldn't get employees to come out on the peninsula for half a

14    shift.  They couldn't staff it.  That's the testimony you

15    heard.  But the testimony also was, if we could stay open

16    until 11, our preferred closing time, we could have done two I

17    think it's six-and-a-half or seven-hour shifts.  They could

18    have done two full shifts when you have the opening and

19    closing hour on each end of that.  That was the unrebutted

20    testimony from each of these wineries is that staying open

21    until 11, we would have had two shifts.

22         Again, the Township challenges this, again, but not by

23    expert testimony.  They didn't hire an expert.  Instead they

24    rely on attorney argument.

25              THE COURT:  Am I right that most of the discussion

1    in the complaint as it related to closing time addressed only

2    the preemption issue?

3            MR. INFANTE:  You are correct that we did address

4    it, closing time, in preemption, but we addressed vagueness in

5    our complaint, the vagueness of the ordinance.  If you want to

6    talk about whether or not, you know, this idea of enforcing a

7    vague ordinance or an ordinance that doesn't exist, whether

8    that was addressed early on in this case, I think this is that

9    Sanderson case we discussed and the Chalmers case.

10           THE COURT:  Well, the first time I heard anything

11   about Sanderson was the post-trial briefs, correct?

12           MR. INFANTE:  It was at trial, Your Honor.

13           THE COURT:  Okay.

14           MR. INFANTE:  Correct.  But in ECF 136, we cited for

15   your Honor Chalmers v. City of Los Angeles.  Chalmers v. City

16   of Los Angeles is a Ninth Circuit case.  That case stands for

17   the proposition that when a local unit of government enforces

18   an ordinance that does not exist, a restriction on an

19   individual's occupation, that violates their liberty interest

20   in their chosen occupation, and lost profits are a measure of

21   damages for them.  That's a Ninth Circuit case that we filed

22   with this Court early on.  That was January of 2021?  2020?

23        Sanderson is the exact same proposition.  I cited to

24   Sanderson at trial to the Court on that issue because

25   Sanderson is a Sixth Circuit case.  Is a Sixth Circuit --

34

1         THE COURT:  Which is closer to home, obviously.

2         MR. INFANTE:  That's why I brought it up at trial,

3    it's closer to home, correct, but it's the exact same

4    proposition, that with a business having an ordinance that

5    doesn't exist and forced upon it, and the Court said it could

6    get lost profits for that.  I'll note those two cases are

7    cited together, Sanderson and Chalmers.  Judge Quist in Horn

8    v. City of Mackinaw Island, which is a 2013 case, he cited

9    both Sanderson and Chalmers for this same proposition.  But we

10   have cited that case -- that proposition long ago.  It's no

11   surprise that, you know, the issue of closing time -- there's

12   no surprise at trial that the issue of closing time and

13   damages were in this case.  You even said, your Honor, at

14   trial when counsel was objecting on that issue, you said,

15   counsel, the issue of closing time and the vague ordinance has

16   been in this case since the beginning, and you ordered him to

17   move on.

18        Also I'll note, and counsel helped me out here, we

19   discussed preemption in our brief because that was when the

20   Township was arguing that closing time was actually

21   enforceable, that it actually -- the ordinances included a

22   closing time on all tasting rooms, activities of the wineries.

23   I think in Mr. Meihn's memorandum he even addresses that, that

24   it's not preemptive, because that ordinance is enforceable.

25   That flipped during the case.

1          We have the testimony from Mr. Manigold.  We actually had

2     Mr. Meihn at the hearing on the motion for summary judgment.

3     During that hearing, ECF 155 or so, during that hearing he

4     said, these ordinances do not contain a closing time.  The

5     wineries' tasting rooms can stay open.  They didn't make that

6     explicit statement until the hearing on the motion for summary

7     judgment, which was April of 2021, I believe.  And then in

8     pretrial briefing, PTP, in their joint brief, now said, you're

9     right, these ordinances do not contain a closing time, so

10    we're enforcing an ordinance that doesn't exist.

11          Now, if they had said before we filed our complaint, if I

12    had evidence from Peninsula Township that they agreed these

13    ordinances did not contain a closing time, then I probably

14    would have pled it that way in the complaint.  But they were

15    enforcing it, so we put it as a preemption clause.

16          The damages, this is that Sanderson case, I had the cite

17    right there, Horn v. City of Mackinaw Island, that's a Judge

18    Quist case.

19          We presented Eric Larson unrebutted at trial.  I don't

20    intend to walk through his testimony.  I just want to address

21    some of the challenges that Peninsula Township makes to his

22    testimony.  One is on this issue of net profits.  They

23    challenge that he should have used net profit instead of gross

24    profit.  The Township's just wrong on that case, or on that

25    issue.  The cases they cite are cases with new businesses,

1   like start-up businesses.  And for start-up businesses, those

2   cases say that you should use net profits.  But Eric Larson

3   testified that these are not startups.  The winery

4   representatives testified that they're not startups.  These

5   are established businesses.  Chateau Grand Traverse has been

6   around for about 50 years.  They're established.  They

7   testified that they don't -- there's no investment they need

8   to make.  He testified that using net profit, that includes

9   operating expenses, cost of land, chemicals, netting, property

10  taxes, things that have already been taken account of.

11       What Larson testified was these activities, the things

12  the wineries want to do, these elements of damages are

13  ancillary to that.  Ancillary to those fixed costs.  So I'm

14  really looking at understanding is it incremental profit and

15  incremental cost, so profit and variable cost.  That's why he

16  testified that net profits was the wrong calculation, because

17  there were no increased incremental costs.  Peninsula Township

18  does not have an expert witness to say that net profit is the

19  right number to use.  They just have attorney argument.  But

20  Mr. Rajsic and Mr. McGraw, they're not expert witnesses on

21  that.  Mr. Larson is an expert witness on that.

22       There's two cases we cited for the Court that have found,

23  two Sixth Circuit cases, that when an expert testifies that

24  there are no incremental costs or no new overhead costs that

25  using net profits is incorrect; using gross profit is correct.

1          Peninsula Township challenges, you know, sort of what

2    Mr. Larson did, his methodology.  One thing they challenged is

3    that they say he should have personally gone and obtained

4    records from these wineries.  You know, that issue came up

5    early on in the case in a motion in limine I know Judge Kent

6    ruled on.  There's no obligation of an expert to physically go

7    and obtain records.  It's perfectly appropriate for an expert

8    to rely on either a party or counsel to provide records, to

9    provide evidence.

10          What he did, he created a framework.  He testified that

11   he's the one who came up with the framework of damages and the

12   categories of damages.  He created a matrix, a table that

13   would be used to bring all that information together for each

14   winery.  He participated in a pre-opinion video call with each

15   winery.  He reviewed their business records, sales reports,

16   purchase reports.  He asked follow-up questions to verify the

17   information was accurate.  He relied on industry data, like

18   the RMA, Risk Management Association.  He relied on his

19   accumulated skill, knowledge, training, experience, and

20   professional judgment.  And he also attended every single day

21   of trial, and he listened to the trial testimony of these

22   winery representatives and then after that he testified.

23          What you didn't hear, you didn't hear a rebuttal expert.

24   You didn't hear anyone from the Township saying that

25   Mr. Larson should have done something differently.  Again, we

1    just have attorney argument.

2         On this RMA data, Peninsula Township challenges that he

3    shouldn't have relied on the data from the RMA, but courts

4    routinely find it to be reliable, reasonable, appropriate,

5    routinely admitted.  Peninsula Township points out that the

6    RMA data has these caveats in them.  This Dietz case, the

7    Court addressed these caveats specifically, and the Court said

8    those caveats are immaterial, that the RMA data is one of the

9    preeminent authorities on this issue, and it's been around I

10   think at the time of this case it was 85 or 88 years it had

11   been around.

12        They allege that Mr. Larson made some errors.

13   Interesting, in their post-trial brief they discuss this issue

14   that he created a supplemental report, as if that's an error

15   in his opinion.  Your Honor addressed that in ECF 284.  They

16   had objected originally.  They filed a motion in limine on

17   that report, and your Honor said it was appropriate for him to

18   do it and that he actually had a duty to do a supplemental

19   report due to some errors that were found during his

20   deposition.  I think there was an Excel spreadsheet

21   calculation error, and he didn't account for COVID closure

22   restrictions.  So he made a supplemental report.  It was

23   perfectly appropriate.

24        At trial there were -- I believe there were three issues

25   that came up at trial.  Alex Lagina testified that the sales,

 1    hourly sales number for Villa Mari was accidentally doubled

 2    when they got pulled.  Mario Tabone and Lee Lutes testified

 3    that the merchandise sales numbers that were provided to

 4    Mr. Larson was inaccurate, and they testified to a higher

 5    number, meaning less damages.  Again, with Mr. Lagina, meaning

 6    less damages.  It reduced the amount of the damages.  And Bill

 7    Maier testified that historically Hawthorne was closed in the

 8    winter, not anymore but historically, so that damage number

 9    was reduced as well.

10        But Mr. Larson was sitting here throughout trial.  He

11    heard that testimony, and when it was his turn to testify, he

12    accounted for that, and he reduced his damage number.  It was

13    appropriate for him to do that, and I believe he had a duty to

14    do it.

15        Peninsula Township challenges that not all these wineries

16    are open 365 days a year and Mr. Larson's calculation was 365

17    days a year.  I'm not sure all of them are closed -- I believe

18    Chateau Chantal, Ms. Dalese testified that they're open every

19    single day.  But even if they are, I think the Township says

20    on average these wineries are closed five days a week (sic).

21    I did the math.  That's a 1 percent differential.  Almost

22    inconsequential.  I'm sorry, a year, not a week.

23        Mr. Larson at trial, because we don't know the date of a

24    judgment in this case, we don't know the date this is going to

25    end, the damages continue, his testimony he provided a yearly

1     damage number for each winery.  In our post-trial briefing, we

2     brought that yearly number to date and did a per diem for the

3     Court to calculate it.  I ran that number until today's date.

4     So three years prior to the date of filing the lawsuit until

5     today's date almost lines up exactly.  Exactly seven years.

6     These are the damages for each individual winery, plus

7     attorney's fees, costs, and interest.  We'd ask the Court to

8     award attorney's fees, a petition we would file at a later

9     date.

10         Also asking for injunctive relief.  Asking the Court to

11     enjoin the enforcement of sections it's deemed

12     unconstitutional or preempted.  Your Honor has already

13     declared in your summary judgment opinions you would enjoin

14     the enforcement of these ordinances going forward, any that

15     you found unconstitutional.  We think that should include any

16     restrictions in the SUP, any other restrictions Peninsula

17     Township might put in place, and we ask that the Court declare

18     the wineries' proposed uses are reasonable.  This is given the

19     MLCC and MDARD permissions these have and also the testimony

20     from the wineries.

21         And the wineries testified what is normal at wineries in

22     the state of Michigan.  You had the wineries from Black Star,

23     the owners from Black Star, testify about what they do at

24     Suttons Bay, the sorts of activities they have there.  We'd

25     ask the Court to declare things like serving food and

1    catering, promotional activities, educational activities,

2    large and small events, amplified music, selling merchandise,

3    making wine from grapes from any source they wish, it's the

4    Commerce Clause issue.  Selling wine to customers how they

5    want to sell their wine.  How they want to market and how they

6    want to advertise and sell their wine.

7        This is allowed under Michigan law.  It's the Schwartz v.

8    City of Flint case.  In that case, the Michigan Supreme Court

9    has declared that when a court finds an ordinance to be

10   unconstitutional, the court can declare that use is reasonable

11   so long as there has been evidence.  We put that evidence in

12   at trial, and that evidence is unrebutted.

13       Really you can look at the GAAMPs.  The farm market

14   GAAMPs.  It's unrebutted in this case that each of these

15   wineries is a farm market under the Michigan Right to Farm

16   Act.  Because they're a farm market, they cannot be held --

17   they cannot be found to be a public or private nuisance as

18   long as they conform to the GAAMPs.  And we put the GAAMPs

19   before you.  Gary McDowell testified as to what the GAAMPs

20   allow these wineries to do.  A local unit of government cannot

21   enact, maintain, enforce an ordinance or regulation that

22   conflicts with the Right to Farm Act or the GAAMPs.  This is

23   also why what the wineries want to do is reasonable.

24       I want to address PTP's argument on injunctive relief.

25   So PTP confuses a principal use and accessory use.  Wineries

1    are a principal use in Peninsula Township.  As a principal

2    use, they're allowed accessory uses which are, quote,

3    "Customarily incidental and subordinate to the principal use."

4    So this is that unrebutted testimony that we provided.

5    Customer uses that wineries -- you can look at what Black Star

6    does in Suttons Bay, what Gary McDowell testified that the

7    Michigan GAAMPs allow, they allow events and other value-added

8    agriculture.  Even Dr. Daniels concedes that the Township's

9    master plan contemplates agritourism, and he concedes that in

10   Michigan farm weddings are a form of agritourism.

11        The winery ordinances also recognize that music, food,

12   events, and other accessory uses are allowed at wineries.

13   They just try to restrict it in an unconstitutional manner.

14   For example, a 501(c)(3) can have an event at a winery in

15   Peninsula Township.  So an event must be allowed.  But a

16   non-501(c)(3) cannot have an event.

17        Some events are allowed at Peninsula Township.  They just

18   want to restrict in an unconstitutional manner.  Same with a

19   agriculturally related group.  Some are allowed; some are not.

20   They're just restricting in an unconstitutional manner.

21        On McDowell, I need to address this.  So PTP argues that

22   you should reject his testimony because it was based on his

23   hay farming experience in three years directing a state

24   development agency.  Gary McDowell was the executive director

25   of Michigan Department of Agriculture and Rural Development.

1    That's a cabinet-level position.  He has more real-world

2    experience preserving agriculture in Michigan than Dr. Daniels

3    does, a professor from Pennsylvania.

4        Speaking of Dr. Daniels, he just simply wasn't credible.

5    Courts routinely reject expert testimony when the expert

6    cherry picks what evidence they're going to rely upon.  Here

7    he testified he cherry picked.  Actually he testified that

8    counsel for PTP cherry picked what he relied upon.  He did not

9    review Liquor Control Code.  He didn't review the Right to

10   Farm Act.  He didn't review the Michigan GAAMPs.  His

11   testimony actually on the GAAMPs was he didn't even know what

12   they were until we asked about it at his deposition.

13       He didn't review the Code of Federal Regulations, aside

14   from the section on AVAs.  He didn't review the Bob Manigold

15   deposition, the Christina Deeren deposition, any winery

16   deposition, any Township witness deposition.  And, again, he

17   didn't review any of the board -- town board or planning

18   commission meeting minutes, which Peninsula Township says is

19   the most important evidence in this case.

20       He also wasn't credible because, you know, his testimony,

21   he testified that Peninsula Township has an interest in

22   keeping land values low.  Now, that wasn't an interest that

23   Peninsula Township put forth in this case.  He testified this

24   would allow Peninsula Township to buy development rights from

25   local farmers at a lower price and that this was somehow a

1    good thing.

2         Now, Gary McDowell, he was incensed by this.  He

3    testified that a farmer's land value, that's their retirement

4    fund.  That has their ability -- their ability to borrow money

5    from banks to invest in agriculture, to invest in equipment,

6    to invest in more farmland.  That's dependent on the value of

7    their farm land being high.  But, remember, this was PTP's

8    witness, and PTP represented to the Sixth Circuit that they

9    need to be let in this case because their members feared that

10   their land values would go down.  But yet it brought an expert

11   here to testify that the land values should go down, and if

12   land values go up, that's a bad thing.

13        So why is PTP in this case?  Their participation in this

14   case really ended up being just a sham.  This Court in ECF 301

15   said that PTP could participate only on those claims that

16   affect its members' land value, quiet enjoyment of their

17   property, and the viability of their farms.  But then they

18   didn't have a single member sit in that chair and testify that

19   their land values would go up or down, I'm not sure anymore,

20   that their quiet enjoyment would be affected if these winery

21   ordinances were struck down, or that the viability of their

22   farms would be affected by these ordinances.

23        I mean, there's no evidence before this Court that any

24   member of PTP is even a farmer because no one sat in that

25   chair and told you about their farm.  No one sat in that chair

1    and told you about how, you know, their ability to sit on

2    their deck and enjoy an evening will be affected if these

3    winery ordinances were struck down.  That evidence does not

4    exist in this record.  They alleged it.  They alleged it in

5    their motion to intervene to you.  They alleged it in their

6    appellate brief to the Sixth Circuit.  But they couldn't prove

7    it at trial.  They didn't show up to prove it.  And cases we

8    cited, Eastern District of Michigan case, the Coalition to

9    Defend Affirmative Action case, that case says that when an

10   intervenor has been allowed in by right and no longer meets

11   the requirements for intervention, it's proper for a court to

12   dismiss that intervenor.  PTP no longer meets the

13   qualifications for intervention because they couldn't prove it

14   at trial, and they should be dismissed.

15        The winery witnesses also discredited Dr. Daniels.  We

16   had Teri Quimby.  She testified the Liquor Control Code forms

17   the backbone of Michigan's alcohol policy and that it was

18   wrong for Dr. Daniels not to review it.  He testified that his

19   alcohol opinions are contrary to Michigan's interest in

20   promoting health, safety, and welfare.  For example,

21   Michigan's alcohol policies that food should be served with

22   alcohol.  Dr. Daniels testified that these wineries shouldn't

23   serve food at all, or if they do, it should be severely

24   limited.  She testified the Liquor Control Code allows the

25   wineries to operate restaurants at their tasting rooms.

1    Dr. Daniels testified that these wineries shouldn't operate

2    restaurants.  That's because he didn't read the Liquor Control

3    Code to see it's allowed.

4        McDowell, right, he testified that the Right to Farm Act

5    and the GAAMPs protect farmers, protect agriculture, and allow

6    for value-added agriculture.  He testified that Daniels'

7    testimony was, quote, "Totally unrealistic.  Just no way they

8    would apply in today's farming with the challenges and the

9    struggles that our farmers are facing.  Everything goes back

10   to that profitability.  To save our farmland, we need to make

11   sure our farmers are successful."

12       His opinions were contrary to Michigan law.  He testified

13   that the amount of the wine that these wineries should

14   produce -- can produce, should be limited.  Teri Quimby

15   testified the Liquor Control Code allows unlimited amounts of

16   wine.  He testified the commercial activity at wineries should

17   be restricted, but he conceded the wineries are allowed to

18   sell agriculture products, which is commercial.

19       Quimby and McDowell both testified that his opinions are

20   contrary to Michigan policy and the Liquor Control Code and

21   the GAAMPs.

22       He testified Wineries shouldn't sell water.  Teri Quimby

23   testified MCL 436.1537(7) allows wineries to sell water.  That

24   came about because of Eddie O'Keefe.  He testified he had an

25   issue with Peninsula Township, they wouldn't let him sell

1    water, and he found it easier to go to the state legislature,

2    get a bill drafted, get it passed, and it passed unanimously

3    in only a couple of months.

4        Daniels testified that these ordinances are necessary to

5    prevent the wineries becoming bars and wine shops.  Teri

6    Quimby testified with the three-tier system and different

7    licensing categories, the prohibition of holding licenses in

8    different categories, the wineries could not possibly become

9    that.  Could not possibly become bars and wine shops.  We

10   asked Daniels about that, and his testimony was, I don't even

11   know what the three-tier system is.

12       He testified that wine tasting should occur indoors.

13   Again, Teri Quimby testified that Michigan law allows tasting

14   outdoors.  He testified that marketing activities and weddings

15   should not occur at farms.  In response, McDowell said, it

16   must be another state that Daniels was talking about, but he

17   wasn't talking about Michigan.  He testified that GAAMPs allow

18   farm weddings and this preserves agriculture.

19       He also testified, Daniels, without any factual support,

20   he said Township restaurants need protection from the wineries

21   selling food.  He didn't know there was only three restaurants

22   in all of Peninsula Township.  He opined that weddings add

23   more cars to the road, but that's not the issue.  The issue

24   is, and the question is, how many more cars can Peninsula

25   Township roads handle?  He didn't testify to that, because he

1    conceded he's not a traffic expert.  There's no traffic study

2    in evidence before this Court that says, you know, one more

3    car, the township roads can't handle that.  There's no

4    evidence there, and they need that evidence.

5         He opined that on-farm marketing activities do not

6    preserve agriculture.  McDowell testified that these

7    activities give the farmer an opportunity to market his

8    product or increase the profitability of that farm operation,

9    that's how we are going to keep our land in farming.  Again,

10   Gary McDowell, former executive director of MDARD, has more

11   real-world experience preserving agriculture in Michigan than

12   Dr. Daniels.

13        That's really the bottom line.  You know, these wineries

14   are preserving agriculture.  They have 1,650 acres of land out

15   there made up by these wineries, and they want to keep that.

16   They want to protect that.  They testified that they're the

17   ones doing the protecting, but in order to do that, they need

18   value-added agriculture.  It's Peninsula Township and PTP that

19   are standing in their way.

20        Todd Oosterhouse testified that there's 82 acres next to

21   his winery at Bonobo, and he would like to buy those 82 acres

22   and plant those 82 acres, more grapevines, but he can't do it.

23   He won't invest that money with these winery ordinances in

24   place because he doesn't have a place to sell the wine.  He

25   doesn't have a place to sell those grapes.  These

1        unconstitutional ordinances are standing in the way.

2            This Court recognizes the wineries want to make a

3        business decision what's best for them.  They need to be

4        allowed to make that business decision.  The Court should

5        invalidate the remainder of the winery ordinances, issue an

6        injunction precluding their enforcement, and the SUPs, and any

7        similar restrictions.

8            We have here -- I know the Court's aware of Amendment

9        201.  You have another case in front of you on Amendment 201.

10       Everything that the Township has done shows us that unless

11       they're enjoined from not just these ordinances but any

12       similar ordinances, they're going to put it back in place.

13           Amendment 201 has a restriction in grapes sources, just

14       like this Court already struck down.  It has other

15       restrictions that this has Court already struck down.  If you

16       don't enjoin them from any similar restrictions, they're just

17       going to put them back in place, and we're going to be right

18       here again in a year from now or two years from now right back

19       before this Court.

20           This Court should award the wineries substantial damages

21       as well as their attorney's fees.  We think substantial

22       damages are necessary in this case and appropriate in this

23       case really given their conduct.

24           You know, Peninsula Township had a chance to avoid the

25       lawsuit when its attorney told them their ordinances were

1    unconstitutional and preempted and that they needed to change

2    them.  They worked with the wineries for a year.  They said

3    they were going to work with the wineries for a year to revise

4    the ordinances, and at the end they said, no, we're not going

5    to change them and went and tried to make the ordinances more

6    restrictive.  If they had followed their lawyers' advice, they

7    could have avoided this lawsuit, and they could have avoided

8    damages.  Damaging the wineries for five more years.  But they

9    continued to enforce them, and that's because according to

10   Supervisor Manigold, that's just the way it is in Peninsula

11   Township.

12          Unless your Honor has any questions?

13              THE COURT:  I do not at this point.  Thank you.

14              MR. INFANTE:  Thank you, Judge.

15              THE COURT:  Mr. Rajsic, before we begin we'll take

16   ten minutes, and I'll come back at ten to 11.

17              (Recess from 10:41 a.m. to 10:54 a.m.)

18              THE COURT:  We are back on the record in 20-1008.

19   All counsel are present.  Mr. Rajsic on behalf of the

20   Township, go ahead, sir.

21              MR. RAJSIC:  Thank you, Your Honor.  And good

22   morning again.  Bo Rajsic on behalf of Peninsula Township.

23          I have to say, your Honor, it's been a pleasure to stand

24   before the Court and represent Peninsula Township in this case

25   and its interests.  Again, I have to say, too, it's been an

1    adventure.  Getting this case prepared and then through trial.

2    Two weeks of trial.  A tornado that we survived.  There was a

3    gas leak in the courthouse.  What an adventure we've been on.

4        Your Honor, at base, this case involves attention between

5    competing interests.  The Township has a long, documented

6    history of and substantial interest in protecting agriculture

7    and its rural character, and rightfully so.

8        Old Mission Peninsula and agriculture go hand in hand and

9    go back well over a century.  Agriculture has played a vital

10   role and allies the Township residents from then until now,

11   and this will hopefully continue into the future.

12       As I mentioned, this history of agriculture on Peninsula

13   Township goes back well over a century.  As noted in the

14   master plan, which is an exhibit that was admitted at trial,

15   the 1904 census shows that more than 1,500 acres in 1904 had

16   been placed into apple orchards and cherry orchards.  Again,

17   more than 120 years ago at this point in time.  This has led

18   to a significant portion of the land in Peninsula Township

19   being zoned agricultural and being placed into agricultural

20   production over the years.

21       On the other side, of course, there are competing

22   interests to the agricultural and rural components, and it's

23   not surprising given the beauty and location of Old Mission

24   Peninsula.  Opposite of agricultural uses we have in this

25   instance commercial interests and proposed commercial uses.

1      Commercial uses without any sort of nexus to agriculture

2   are inconsistent with those agricultural uses.  But over the

3   years and through the efforts to amend the zoning ordinance

4   back to the '80s, the Township has worked to strike a balance.

5   Those efforts to strike a balance take center stage in this

6   litigation.

7      Part of the efforts to strike a balance between

8   agricultural and commercial uses has been over the years to

9   attempt to foster a thriving local wine industry, working with

10   them in this case, all while attempting to preserve the

11   Township's rural and agricultural nature.

12      I think through trial we looked at a lot of beautiful

13   photographs, showing a few of them here today.  The grape

14   growing, wine making, those both have obvious ties to

15   agriculture.  The nexus is clear.  But from there become

16   expanded uses that step further and further away from

17   agriculture.  Where and how should the Township draw the line?

18   How did the Township work in this case and over the years to

19   achieve a balance between those agriculture uses and the

20   commercial uses?

21      Here, as we demonstrated at trial, the Township worked to

22   achieve that balance through a deliberative legislative

23   process.  There's a framework for this process.  It's not

24   grasped out of thin air.  At trial, the Township laid out this

25   history in the only logical and appropriate way, by

1    introducing its legislative record in history, and the

2    framework for this is critical.

3        The Township master plan forms the foundation upon which

4    all zoning decisions are made.  The master plan is a vision,

5    and that vision is intended to guide the private sector and

6    local government in determining the best use for future

7    development, growth, and land preservation efforts in the

8    township.

9        Under Michigan law, the existence of the master plan and

10   the future land use map are generally sufficient to show

11   governmental interests, not that governmental interests were

12   even in dispute in this case given the Court's summary

13   judgment ruling.

14       From the master plan, the Township, through a

15   deliberative legislative process, in which the public,

16   including the wineries, participated, arrived at land uses

17   that advance the Township's interest in promoting agriculture

18   production while maintaining a rural character, but also

19   working to ensure that new land uses were compatible with the

20   master plan.

21       It's a delicate balance that has worked through a process

22   where you start at the planning commission, work to amend an

23   ordinance, go through a township board.  It's a deliberative

24   process that takes significant time to achieve.

25       The record at trial demonstrates the Township worked

1    to strike that balance between fostering a vibrant wine

2    industry while attempting to preserve the Township's

3    character.  As the Township has consistently argued, it speaks

4    through its minutes, it speaks through its ordinances, and it

5    speaks through its resolutions.  In other words, the board

6    operates as a whole, not as individuals, and not through the

7    testimony of individual board members.  In this case, the

8    Township presented a substantial --

9             THE COURT:  I didn't hear from any board member, did

10   I?

11            MR. RAJSIC:  At trial, no, your Honor, you did not.

12        And the Township submitted --

13            THE COURT:  Is there a reason for that?

14            MR. RAJSIC:  There was a conscious choice made given

15   the fact that as we have been consistently arguing throughout

16   this case, the Township speaks through its minutes.  It speaks

17   through its resolutions.  It doesn't speak through board

18   member testimony because individual board members can't bind

19   the Township.  The Township speaks through its legislative

20   history.  In this case, that legislative history was submitted

21   at trial in the form of voluminous planning commission

22   meetings, township board meeting minutes, and Zoning Board of

23   Appeals minutes stretching back nearly 40 years of history.

24        These meeting minutes show the history of how the

25   Township arrived at the challenged zoning provisions, the

1    alternatives that were considered and rejected over the years,

2    and the history of plaintiffs' involvement in those proposed

3    land uses, along with the record of their own land use

4    permits.

5         Plaintiffs demonstrate, excuse me, the records

6    demonstrate that in two of the three instances, challenged

7    laid uses, the winery chateau and the remote wine tasting

8    room, were requested by the plaintiffs and arrived at

9    following a deliberative process laid out in the legislative

10   record.

11        As we see on the screen, we go back to May 1, 1989.  At

12   the May 1, 1989, planning commission meeting, Bob Begin, the

13   founder of Chateau Chantal, approached the Township to request

14   a consideration of an amendment to establish the winery

15   chateau use in Peninsula Township.  And similarly in 1998,

16   Peninsula Cellars, the only remote wine tasting room,

17   approached the Township to also request a use that would allow

18   them to have a tasting room that was separate from their

19   farming operation.

20        From 1989 to 2004, the Township amended its zoning

21   ordinance to create land uses and opportunities that allowed

22   the wineries to engage in commercial uses that had a nexus to

23   agricultural purposes, commercial uses that would otherwise

24   not be permitted in the A-1 agriculture district without some

25   sort of amendment to the zoning ordinance.

1          These land uses allow for nearly limitless ability to

2     sell wine at retail, to draw customers in for experiences on

3     the land, and the record at trial demonstrates that these

4     customers, these visitors, number in the thousands on a daily

5     basis.

6          At trial the proofs demonstrated, among other things,

7     that plaintiffs can and do engage in all the following:  They

8     offer tastings, flights, and wine by the glass, and bottles

9     for purchase for individuals and groups in their tasting rooms

10    where the wineries can and do promote their products, wine

11    clubs, and the beautiful views that they have on Old Mission

12    Peninsula.  They offer tours through their vineyards and their

13    production facilities, which are built-in opportunities to

14    promote their products.  They host promotional activities,

15    such as Jazz at Sunset, Wind Down Wednesday, book clubs,

16    trivia nights, painting, yoga, and even snowshoeing.  They

17    host groups of people in their tasting rooms, such as alumni

18    groups, corporate groups, or perhaps most terrifyingly as we

19    established at trial, groups of lawyers that may wander

20    through the township.  They operate bed and breakfast

21    facilities that can be used to host weddings, corporate

22    retreats, and breakfast facilities, as long as they have

23    overnight guests.

24         As we look at the screen here, Chateau Chantal offers

25    corporate meetings and small groups as part of their

1    advertising.  Again, this was admitted at trial.

2        Additionally, Bonobo, for example, there was a document

3    with dozens upon dozens of event contracts that was submitted

4    in evidence at trial showing that they do offer group tastings

5    and other events on their property.

6        Additionally, the evidence established at trial shows

7    that the wineries sell branded merchandise, such as T-shirts,

8    hats, mugs, stemware, and more that allows for additional

9    revenue streams and self-promotion.

10        Here we have a photograph from Tabone where we see they

11    do indeed sell merchandise in their tasting room.  And this is

12    not something that's hidden or kept under wraps.  It's

13    actively promoted in the tasting room.

14        Similarly for Peninsula Cellars, they sell T-shirts and

15    other goods in the tasting room that's not hidden and open to

16    the public for consumption.

17        After decades of effort to craft a zoning ordinance that

18    balances the competing interests between agricultural and

19    commercial uses, plaintiffs bring this action to challenge

20    that balance.

21        THE COURT:  How would you describe the

22    administration of the ordinances by the Township officials who

23    testified in this case by deposition?

24        MR. RAJSIC:  Your Honor, I would describe it as --

25    first of all I have to address Supervisor Manigold was not

1    charged with the enforcement of the ordinance.

2              THE COURT:  He's the supervisor, isn't he?

3              MR. RAJSIC:  He is -- he was the supervisor, but,

4    your Honor, there is a zoning enforcement administrator that

5    is charged with --

6              THE COURT:  And he reports to who?

7              MR. RAJSIC:  Your Honor, I would assume to the

8    entire Township board, not just --

9              THE COURT:  You assume?  Doesn't the Township zoning

10   administrator report to the Township board like any other

11   Township official?

12             MR. RAJSIC:  I would agree the entire Township --

13             THE COURT:  So answer my question about the

14   administration of the ordinance as described by Mr. Manigold

15   and Ms. Deeren.

16             MR. RAJSIC:  I would say the enforcement of the

17   ordinance, your Honor, has been strained over the years and

18   under certain instances could be considered inconsistent

19   given that there are --

20             THE COURT:  Could be considered to be inconsistent?

21   Are you serious?

22             MR. RAJSIC:  Your Honor --

23             THE COURT:  Isn't it manifested that it was

24   inconsistent?

25             MR. RAJSIC:  I would note that again we have

1    different individuals who interpreted our zoning ordinance

2    over a period of years, so, yes, I would say that when those

3    different individuals interpreted the zoning ordinance, there

4    were inconsistencies over the years.

5         Over the past six months, substantial link has been

6    devoted to this case.  Before trial, the parties submitted

7    voluminous pretrial briefing on the issues that remained for

8    trial.  We submitted proposed findings of fact and conclusions

9    of law, which distilled the proofs down, and we've relied on

10   those in our post-trial briefing.  And, again, this Court

11   heard more than two weeks of trial testimony, with hundreds of

12   exhibits and testimony by the plaintiffs and defendant expert.

13   Hundreds of pages of post-trial briefing were submitted

14   summarizing what occurred at trial.

15        With all of that briefing, your Honor, sometimes, and

16   perhaps even I'm guilty of it, lose track of the bigger

17   picture, what was resolved before trial and what issues

18   remained to be addressed at trial.

19        There were a set of critical issues that were resolved by

20   the Court before trial that take care of a number of claims

21   and potential damages.  First, on the regulatory takings

22   claim, the Court resolved that on summary judgment in

23   defendants' favor.  The Court also resolved the freedom of

24   association and freedom of religion claims on summary judgment

25   in defendants' favor.  The Court also found that event hosting

1    does not implicate the First Amendment.  This is something

2    that was addressed both in pretrial briefing and live at

3    trial, your Honor, and as the Court concluded, that issue was

4    not a live trial issue in terms of event hosting, and it does

5    not implicate the First Amendment.

6         And I have to say, we've heard a significant amount of

7    testimony at trial that relates to event hosting and then

8    argument regarding event hosting after the trial considering

9    that that issue was no longer live.

10        Additionally, the Court concluded that the Township was

11   immune to any claim for damages on a preemption claim.  While

12   the preemption claim was resolved, some in favor of the

13   Township, some in favor of the plaintiffs, the Court did

14   conclude that the Township was immune from any damages as

15   alleged in a preemption theory.

16        The Court also concluded Section 8.7.3(10)(u) has not

17   been applied to Bonobo, Chateau Grand Traverse, Brys,

18   Hawthorne, or Bowers Harbor.

19        This is important because the resolution of these issues

20   before trial resolved a significant number of categories of

21   damages sought in plaintiffs' case, substantially limiting any

22   potential relief.  While plaintiffs' damages claim has always

23   been nebulous and untethered to particular ordinance sections,

24   the following categories or schedules from the much-discussed

25   Eric Larson expert report have been fully resolved in the

1    Township's favor.  First, there's no damages for event

2    hosting.  No matter how you caption them, this Court concluded

3    that it's not an activity that's protected by the First

4    Amendment.  So regardless if it relates to commercial speech

5    or due process void for vagueness, that issue was resolved

6    either pretrial or on the first day of trial.

7        There's no damages related to restaurants or catering, no

8    matter what theory that that's put under, either preemption or

9    regulatory takings.  If it's under regulatory takings, there's

10   no viable claim because the Court has dismissed regulatory

11   takings on summary judgment.

12       Similarly if it's based on preemption, even if the

13   ordinance was preempted, there's no viable damages claim

14   against Peninsula Township.

15       The damages claim as it relates to hours of operation was

16   initially pled as part of a preemption claim.  And, again, the

17   Court declined to enter any judgment against the Township for

18   money damages based on the preemption claim.  At trial, that

19   morphed into this now Sanderson claim discussing whether or

20   not the due process void for vagueness claim could be a

21   vehicle for money damages for hours of operation against the

22   Township.

23       We addressed that issue at length in our post-trial

24   brief, but I just want to note briefly, your Honor, the

25   Sanderson case and its progeny in the Sixth Circuit deals with

1    due process when the right to operate a business in its

2    totality has been shut down.  In Sanderson, the plaintiff

3    was -- he opened the pool hall, and the local municipality

4    came and shut down the pool hall's operation in its entirety.

5    Essentially all of the bundle of rights, the sticks and the

6    bundle of rights were rejected.  He could no longer operate

7    his entire business.

8        In this case, it's a very different story.  The only

9    right that -- to the extent the plaintiffs have a right to

10   stay open until a particular time, they otherwise were able to

11   continue to operate their businesses as a going concern.  They

12   could still be open.  They could still host events.  They

13   could still host groups in their tasting room.  It's a very

14   different case than what's pled in Sanderson.

15       Your Honor, I will leave the briefing as it is, but

16   there's a substantial amount of discussion in our post-trial

17   brief regarding the application of Sanderson.

18       Finally, the only remaining categories of damages in this

19   case after the pretrial and trial resolution of certain issues

20   are the grape cost schedules in Mr. Larson's report and the

21   schedule for merchandise, and we're going to address each one

22   of those schedules and the potential damages as we move

23   through the argument.

24       So in light of that, what are the issues that were left

25   live at trial to be resolved?  We have a series of five

1    issues.  This is something that we've argued both before trial

2    and after trial.  The Dormant Commerce Clause, there's a

3    question regarding what damages would be available to the

4    plaintiffs and injunctive relief.  Due process void for

5    vagueness, what damages, if any, and injunctive relief.

6    Preemption, while that's been fully resolved, we do still have

7    the question of what injunctive relief, if any, would be

8    available on the preemption theory.

9        The biggest issue that was left live for trial is the

10   First Amendment claim.  We note that there's a merits issue to

11   be addressed there, Central Hudson, which both sides are going

12   to argue significantly as what is the outstanding issue

13   essentially on liability for Central Hudson.

14       And then finally we have a damages question and

15   injunctive relief.  Even if the Court were to conclude that

16   Central Hudson -- the Township was not regulating commercial

17   speech, we do have the compelled speech and prior restraints

18   issues for damages that do need to be resolved.

19       And finally, there's the laches defense that was left

20   live for trial.

21       As I noted, your Honor, the largest remaining question

22   for trial was the proofs as it relates to liability under

23   Central Hudson.  The First Amendment issue involves issues of

24   liability and relief.  Plaintiffs' First Amendment theories

25   that do remain are commercial speech, prior restraints, and

1    compelled speech.

2         The commercial speech in question involves whether the

3    challenged zoning provisions implicate the First Amendment

4    under Central Hudson, and if they do, what are plaintiffs'

5    damages?  So what do we have to show under Central Hudson and

6    what was resolved pretrial?  Under Central Hudson, the first

7    question is is the expression protected by the First

8    Amendment.  This Court resolved that issue before trial and

9    found that five sections of the Peninsula Township Zoning

10   Ordinance implicated speech, which would then ask to move

11   forward into the Central Hudson test.  We're going to get into

12   those six sections in a second, your Honor.

13        The second issue is is the asserted governmental interest

14   substantial.  This Court ruled before trial that Peninsula

15   Township's asserted governmental interests are substantial, so

16   there's no reason or need to put on any proofs at trial

17   regarding that issue.  The Court has resolved that.

18        The third question is does the regulation directly

19   advance the governmental interest.  This was a question that

20   was left live for trial.  How does the regulation directly

21   advance the governmental interest.

22        And, finally, is the regulation not more extensive than

23   is necessary to serve that interest.  That was another issue

24   that the Court left pretrial to be resolved on the proofs.

25        I want to note that this is not a least restrictive means

1    test.  The Supreme Court has especially rejected that notion.

2    Instead what is required is a reasonable fit between the

3    legislature's ends and the means chosen to accomplish it.

4        So, what were the five sections of the PTZO that this

5    Court ruled before trial implicated speech and therefore we

6    needed to dive into the Central Hudson analysis?

7        The first section we look at is Section

8    6.7.2(19)(b)(1)(v).  This ordinance section relates to farm

9    processing facilities.  The next two sections,

10   8.7.3(10)(u)(1)(b) and (10)(u)(5)(h) relate to winery

11   chateaus.  And, finally, 8.7.3(12)(i) and (k) are for farm

12   processing facilities.  So at trial, the Township was left to

13   first establish that the five sections directly advance their

14   interest that this Court has held were substantial and that

15   the challenged sections were not more extensive than

16   necessary.

17       At trial, the Township presented proofs that establish

18   both prongs.  First, the Township presented an extensive

19   legislative history, meeting minutes that stretch decades, the

20   master plan, and the Peninsula Township Zoning Ordinance

21   itself, all of which document how the challenged sections

22   directly advance the governmental interest and how the

23   Township worked to find a reasonable fit between the ends and

24   the means that they had chosen.

25       Second, Dr. Daniels presented unrebutted testimony as a

1  land use planning expert.  Dr. Daniels' testimony established

2  how the challenged sections of the PTZO relate to agriculture

3  and how the harms the Township is trying to prevent are

4  materially reduced by the ordinance sections.

5      Plaintiff offered no direct rebuttal to Dr. Daniels'

6  testimony.  While they had identified a land use planning

7  expert and identified him as a trial witness, for whatever

8  reason he was not called at trial.  Plaintiffs instead called

9  Gary McDowell and Teri Quimby as their rebuttal experts to

10  Dr. Daniels.

11      Mr. McDowell was identified as an expert in rural

12  development, agriculture preservation, and agricultural

13  tourism, but he had no opinions regarding any of the actual

14  sections of the PTZO.  And even then, portions of his

15  testimony were strikingly beneficial to the Township, in

16  particular, his testimony regarding the effectiveness of the

17  Township's efforts to fit the ordinance to the harms.

18      The evidence presented at trial shows that the PTZO

19  sections that are challenged under the Central Hudson analysis

20  do not implicate commercial speech, and they're not subject to

21  protection under the First Amendment.  But even if they did

22  relate to commercial speech and implicated First Amendment

23  protections, plaintiffs failed to present evidence as to how

24  they were damaged.

25      Let's look first at Section 6.7.2(19)(b)(1)(v).  This

1    relates to the sale of logo'd merchandise for farm processing

2    facilities.  Plaintiffs claim they're damaged because the

3    ordinance limits the sale of certain merchandise, including

4    clothing sales and coffee cups, but the farm processors are

5    already selling those goods.  Two Lads sells a wide variety of

6    logo'd merchandise in their tasting room, which is, as they

7    testified, a good form of advertising for Two Lads because it

8    turns people into walking advertisements.  Their merchandise

9    sales include hats and T-shirts.

10       Black Star, another farm processing facility, sells

11   logo'd merchandise in their tasting room that promotes Black

12   Star.  They testified it's a good thing for the winery to sell

13   merchandise because it turns their -- the people that buy

14   those goods into brand ambassadors.  The merchandise they sell

15   includes shirts, sweatshirts, hats, tumbler mugs, and wine

16   glasses in their tasting room.

17       Finally, Tabone, the last alleged farm processing

18   facility in this case, claims it wants to sell more

19   merchandise but agrees that they already sell T-shirts, hats,

20   sweatshirts, and mugs in their tasting room.  These are all

21   things they claim they can't sell under the section of the

22   ordinance, but they're selling them all already.

23       The next section that's challenged is 8.7.3(10)(u)(1)(b).

24   This section regulates the promotion of Old Mission Peninsula

25   agriculture at guest activity uses.  There was no testimony

1    that the promotion of Peninsula agriculture caused the

2    plaintiffs any damages at trial.  In fact, the promotion of

3    those products at events is part and parcel to the success of

4    the wineries.  They want to promote Peninsula-produced food

5    and beverages, in particular the beverage being the wine that

6    they promote at their events.  Promoting Peninsula agriculture

7    is exactly what the wineries want to do.

8        Section 10(u)(5)(h) indicates that there are no outdoor

9    displays of merchandise, equipment, or signs at guest activity

10   uses.  There was no testimony how this section caused the

11   plaintiffs any lost profits or how they were harmed in any

12   way.

13       The next ordinance section, 8.7.3(12)(i), relates to the

14   retail sale of nonfood items which promote the winery or

15   Peninsula agriculture and has the winery, excuse me, the

16   winery logo permanently affixed.  These two sections of the

17   ordinance relate only to Peninsula Cellars as the single

18   remote winery tasting room on Peninsula Township.

19       Peninsula Cellars already sells logo'd merchandise and

20   agrees they want to sell logo'd merchandise because people

21   wearing those items or purchasing them become brand

22   ambassadors.  They prefer to sell items that are branded.

23       Section (12)(k) of the ordinance indicates that signs and

24   other outdoor advertising may not promote, list, or in any way

25   identify any of the food or nonfood items allowed for sale in

1   the tasting room.  But, again, Peninsula Cellars testified at

2   trial that it already does advertise items for sale in the

3   tasting room and identifies the purchase price.

4       Additionally, Peninsula Cellars engages in marketing

5   efforts, including social media, print media, and even

6   television media.

7       After considering the commercial speech claims from both

8   a liability and damages perspective, the next issue relates to

9   the prior restraints and compelled speech theories from trial.

10      While the Court concluded that two sections of the

11  Peninsula Township Zoning Ordinance were prior restraints and

12  two sections of the Peninsula Township Zoning Ordinance

13  constituted compelled speech, plaintiffs still needed to

14  present evidence at trial that they were damaged by those

15  sections of the ordinance.

16      Section 8.7.3(10)(u)(2)(b) permits hosting of certain

17  501(c)(3) nonprofits from Grand Traverse County.

18  Additionally, 8.7.3(10)(u)(2)(c) permits hosting of

19  agriculture-related groups.  Plaintiffs Mari and Chateau

20  Chantal failed to present evidence that they suffered damages

21  as a result of either of these sections.

22      Chantal has never requested to host a 501(c)(3) nonprofit

23  or agriculture-related group, and Mari failed to present any

24  evidence that it was denied to host either a 501(c)(3) or an

25  agriculture-related group.

1          The next two sections deal with compelled speech.  Again,

2    while the Court found that these two sections compelled

3    speech, plaintiffs offered no evidence that they were damaged

4    by allegedly being compelled to speak as it relates to under

5    8.7.3(10)(u)(1)(b).  This is the intent provision of the guest

6    activity use section of the ordinance.  It doesn't guide any

7    conduct, and it's not an operative section of the ordinance,

8    and there's no plaintiff -- evidence that the plaintiffs were

9    damaged by the section of the ordinance.

10          10(u)(5)(a) requires the guest activity uses include

11    agricultural protection promotion as part of the activity.

12    But, again, the evidence that was established at trial was

13    that the plaintiffs do want to promote Peninsula agriculture

14    because it includes their own products.  They obviously want

15    to promote their own products during their events.

16          In sum, the plaintiffs failed to present evidence that

17    they have been damaged or had any lost profits as a result of

18    these ordinance sections.

19          Plaintiffs relied on the testimony of Eric Larson to

20    quantify their alleged damages, but it's important to note

21    that Mr. Larson had a number of failings in his expert report

22    and testimony at trial.  Mr. Larson failed to offer testimony

23    regarding damages that are recoverable as a matter of law, and

24    his testimony and report are not reliable.

25          Mr. Larson never attempted to calculate lost net profits

1    on any aspect of plaintiffs' businesses, which is required for

2    an award of lost profits.  Instead, Mr. Larson's damages

3    theory is predicated only on a claim for alleged loss of gross

4    profits without even attempting to consider net profits.  As

5    he testified at trial, he has no opinion whatsoever in this

6    case as to what the lost net profits are.  He agreed, lost net

7    income I do not have an opinion regarding that.

8         THE COURT:  What's your reaction to the caselaw

9    cited by Mr. Infante to support Dr. Larson's opinion?

10        MR. RAJSIC:  If I'm correct in recalling what

11   Mr. Infante's caselaw was, it dealt when there is sufficient

12   showing of lost net profits based on a business that was

13   already in existence.  And in these instances, the businesses,

14   as we talked about here, the wineries on Old Mission

15   Peninsula, have a long history of being in business.  There is

16   data that Mr. Larson could have collected:  Income tax

17   returns, profits and losses, cost of goods sold, a whole host

18   of documents that he could have requested, he could have

19   collected, he could have analyzed in order to arrive at his

20   conclusions in this case, and he didn't look at any of it.

21        The only thing that Mr. Larson looked at to arrive at his

22   conclusions was the damages matrix that was prepared by the

23   plaintiffs and submitted through counsel to Mr. Larson for his

24   review.  He didn't actually look at any of the financial data,

25   which was all readily available to him if he had simply asked

1      for it in order to arrive at his conclusions.

2              THE COURT:  Other than the subject matter of your

3      cross examination of Dr. Larson, what evidence is there in the

4      record contrary to his opinion?

5              MR. RAJSIC:  Regarding --

6              THE COURT:  From the Township's perspective.  Did

7      the Township produce any witness to rebut Dr. Larson directly?

8              MR. RAJSIC:  No, your Honor, we did not have a

9      damages expert despite, obviously, our intent and efforts to

10     secure a damages expert to testify at trial.  We didn't rely

11     simply on attorney's statements, though, as I would like to

12     point out.  It was based on cross examination of Mr. Larson's

13     work, cross examination of Mr. Larson himself at trial, which

14     pointed out all of these deficiencies in his report.  It was

15     also based on the documents that we introduced through the

16     cross examination of Mr. Larson, including the RMA guidelines,

17     which I think is important to note that the RMA guidelines

18     that Dr. Larson bases his entire opinion on contain a

19     percentage of net profits that Mr. Larson could have looked

20     at, that he could have relied upon in reaching his

21     conclusions, but he ignored the net profit calculation in

22     favor of a gross profit calculation.  As he testified at

23     trial, if he had simply looked at the RMA in there and run the

24     RMA net profit calculation, he agreed net profits would have

25     been approximately one-thirteenth of the amount of damages

1    that were shown that he testified to in his report and his

2    testimony at trial.

3         So, again, that information was available to him, and he

4    didn't even consider it.  And it's not just RMA.  It's the

5    lack of information that he obtained that would be any sort of

6    reasonable basis for him to arrive at his conclusions.

7         It's not just RMA, though, your Honor.  Mr. Larson's

8    testimony confirmed that he failed to comply with the American

9    Institute of Certified Public Accountant standards for

10   forensic services in arriving at his conclusions.  Mr. Larson

11   agreed that those standards applied to his work in this case

12   as an expert witness and he should be held to them.

13        The AICPA standards indicates under Number 6 that the

14   expert needs to engage in sufficient planning and supervision.

15   They need to adequately plan and supervise the performance of

16   the professional services, and they need to rely on sufficient

17   relevant data.  They need to obtain sufficient relevant data

18   to afford a reasonable basis for conclusions or

19   recommendations in relationship to any professional services

20   that are performed.

21        But, again, in this case Mr. Larson didn't supervise any

22   aspect of this requesting, formulating, or obtaining any

23   underlying current or historic financial data.  He didn't

24   provide plaintiffs with any instruction for what information

25   to gather for their damages matrix.  He didn't send a request

1    for documents.  He didn't review or ask to review any

2    financial statements.  And while compilation of documents is

3    very important for the project, he didn't oversee it or send

4    anyone from his office to oversee that.  Instead, he sent a

5    blank damages matrix and didn't know who participated in

6    compiling that information and then it was simply provided

7    back to him.  The only evidence regarding the validity of the

8    numbers in the damages matrix is plaintiffs' counsel

9    assurances to Mr. Larson that the numbers were accurate.  And

10   most damningly, Mr. Larson never obtained or reviewed any

11   current or historic financial data from the wineries, no tax

12   records, no profit and loss reports, no cost of goods sold

13   records, no records regarding operating percentages or net

14   profit percentages.

15       Mr. Larson failed to support his lost profit calculation

16   with any sufficient evidence that would be reliable on at

17   trial.  And I think it's also important to note that during

18   closing argument, Mr. Infante indicated that if there was

19   evidence regarding incremental costs for RMA purposes, that

20   that evidence then could be used to support the damages

21   calculation in this case, but Mr. Larson testified at trial

22   that there are no incremental costs.  Excuse me, he never

23   testified that there are incremental costs, and he had no clue

24   what those incremental costs might be.

25       Additionally, we would note that there's no issue with

1    Mr. Larson using the RMA data.  That was something that was

2    pointed out in closing argument was is it effective to use the

3    RMA data, but that's not the issue.  The issue is that the RMA

4    data needs to be used correctly, and that's not what

5    Mr. Larson did in this case.  He failed to use the RMA data

6    effectively, and so his report and calculations are rendered

7    suspect.

8         Mr. Larson also failed to support his lost profits

9    argument, either gross or net, with sufficient evidence

10    rendering his calculations speculative at best.  He performed

11    no market analysis.  He performed no feasibility studies.

12    And, again, he didn't obtain a single financial document.  He

13    was simply provided a damages matrix and performed

14    multiplication to arrive at his numbers.  And he didn't have

15    any checks or balances regarding what those calculations were

16    and if they were effective and a proper measure of damages in

17    this case.

18         Over the course of trial, your Honor, through the hours

19    of testimony and hundreds of exhibits that were submitted,

20    Peninsula Township established under Central Hudson that in

21    addition to its interests being substantial, the sections of

22    the Peninsula Township ordinance were advanced through the

23    tailoring that the Township engaged in, and the means extended

24    were not more extensive than necessary to achieve those.

25         Finally, even on the limited damages issues which

1    remained, and it's important to note that it's two schedules

2    that were not resolved by this Court before trial, and that's

3    grape costs and cost of merchandise.  Even on those limited

4    damages issues, plaintiffs' evidence at trial demonstrated the

5    sheer volume of activities, events, merchandise and goods that

6    they sell on their properties while catering to thousands of

7    guests on a daily basis.  They fail to prove that they're

8    harmed in any way by the ordinance sections that are

9    challenged and left live for trial.

10        Defendant Peninsula Township would ask the Court to enter

11   a judgment in its favor, and otherwise, your Honor, I'll rest

12   on the significant briefing that was submitted both before and

13   after trial unless you have any questions, your Honor.

14        THE COURT:  What do you make of Mr. Infante's

15   argument as it relates to Dr. Daniels' testimony?

16        MR. RAJSIC:  Which -- not to -- which argument

17   regarding Mr. Daniels, because there were quite a few slides

18   as it relates to Mr. Daniels.

19        THE COURT:  Well, basically the attack on

20   Dr. Daniels is what he didn't do.

21        MR. RAJSIC:  Understood, your Honor.

22        THE COURT:  You have made significant argument as it

23   relates to what Dr. Larson didn't do.  What's left of

24   Dr. Daniels' testimony based on the cross examination, and why

25   should the Court put any stock in it at all?

1          MR. RAJSIC:  Your Honor, I think Dr. Daniels, based

2     on his knowledge and experience as someone who is an expert in

3     land use planning for their entire career as a professor of

4     land use planning, he relied on that knowledge and experience

5     to -- after visiting the Township, as indicated in his report,

6     and based on his knowledge, he can testify regarding the

7     Township's efforts to tailor and not have means that were more

8     restrictive in achieving the Township's substantial

9     governmental interests.  But I will say, I would like to note

10    I don't want to step on PTP's toes as it relates to this issue

11    too much, because, again, Dr. Daniels was PTP's expert.  We

12    were not allowed to call a planning expert at trial.  So I

13    don't want to step on PTP's toes when it comes to the

14    importance of Dr. Daniels' testimony.

15         And, your Honor, I know that Ms. Hillyer is going to

16    address this, but we have tried to tailor our closing

17    arguments so that we don't address the exact same thing during

18    our arguments, and so that's why I was more focused on

19    damages, your Honor.  So I don't want to step too much on

20    Ms. Hillyer's toes.

21         THE COURT:  Fair enough.  What was the timing of the

22    entry of the joint defense agreement in this case as it

23    relates to the circuit court decision?

24         MR. RAJSIC:  I can speak to the JDA that we entered

25    into once we became involved in this case.  Off the top of my

1   head, your Honor, I don't recall exactly when the previous JDA

2   involving Mr. Meihn's office and PTP was entered into.

3           THE COURT:  Because there were certain

4   representations made to the circuit panel as it relates to

5   whether the Township was going to be able to protect the PTP's

6   interest, correct?

7           MR. RAJSIC:  I mean, your Honor, I don't know off

8   the top of my head because it does predate my involvement in

9   this case.

10          THE COURT:  Well, did the decision of the circuit

11  court note that?

12          MR. RAJSIC:  I would be -- it's been a few minutes

13  since I reviewed that decision, your Honor, so I don't want to

14  speak out of turn and say yes or no with absolute certainty

15  one way or the other, but given that that would involve PTP,

16  perhaps, and I'm not trying to shirk responsibility, but

17  perhaps it would be something they'd be more knowledgeable on.

18          THE COURT:  But this was a representation of the

19  circuit court on behalf of your client to allow PTP into the

20  case, right?

21          MR. RAJSIC:  I'm not aware of any representations

22  that were made on behalf of Peninsula Township, your Honor.

23          THE COURT:  Well, I think the four squares of the

24  circuit opinion uses that as one of the linchpins to allow PTP

25  in the case, and then after it comes back to this Court

1     there's a joint defense agreement, and I'm just wondering how

2     is that consistent?

3             MR. McGRAW:  Your Honor, Mr. Rajsic may not know, we

4     became involved in the case the January after the Sixth

5     Circuit decision.

6             THE COURT:  But you're stuck with what happened

7     before, correct?

8             MR. McGRAW:  We're stuck.

9             THE COURT:  And I'm trying to find out when the

10    joint agreement was made as it relates to the deliberations of

11    the circuit court regarding PTP getting in the case.

12    Ms. Hillyer, do you know?

13            MS. HILLYER:  Your Honor, I apologize, Mr. Rajsic

14    has my laptop.

15            THE COURT:  Did you steal the laptop?

16            MR. RAJSIC:  I did, Your Honor.

17            MS. HILLYER:  What I'd like to clarify is that

18    there's a difference between the joint defense agreement and

19    intervention, so --

20            THE COURT:  Now wait a minute.  Wasn't there a

21    representation made by either PTP or the Township that the

22    Township could not represent PTP and the interests of the

23    two -- the two parties might be different, true, and wasn't

24    that one of the linchpins of the circuit decision?

25            MS. HILLYER:  So the question for intervention is

1    whether or not the Township can adequately represent PTP's

2    interests, and it cannot, and it has not.  The joint defense

3    agreement is about privilege and about ensuring that

4    communications between codefendants can remain privileged.

5    They're separate issues.  Although they have been conflated, I

6    think plaintiffs have argued these things are relevant,

7    they're completely separate analyses, and the Township to this

8    day does not adequately represent PTP's interest, although we

9    tried to coordinate our presentation of evidence at trial.

10              THE COURT:  Okay.  Thank you.

11              MR. RAJSIC:  And just to be clear, again, your

12   Honor, I can speak to when our JDA that involves PTP's office

13   and ours was in.  It was in 2023, but I don't recall exactly

14   the dates.  But any JDA before then, it may be in my file, but

15   I don't know the date in front of me, your Honor.

16              THE COURT:  All right.  Fair enough.  I recognize

17   there's been a change in representation of the Township.

18              MR. RAJSIC:  And change in strategy as well, but

19   that's neither here nor there.  I would be happy to answer any

20   other questions, your Honor; otherwise, at this point we would

21   rest on our briefing.

22              THE COURT:  Okay.  Thank you.  That's all for now.

23   Ms. Hillyer, go ahead.

24              MS. HILLYER:  Thank you, your Honor.  Holly Hillyer

25   on behalf of Protect the Peninsula.

1       By way of providing a road map, I'm going to, as I

2    mentioned, try not to overlap with what the Township just

3    presented.  I am going to talk about one issue that was not

4    ripe for trial but that plaintiffs raised and that I think

5    warrants a response.  It's the intervention issue that we've

6    talked about.  And I'm going to talk about two of the three

7    main issues that were ripe for trial.

8       I believe the Township talked about there being five

9    issues and kind of organized things a little bit differently.

10   We saw there being three main issues for trial:  The

11   commercial speech question, the question of damages, which PTP

12   will not weigh in on, and then the question of injunctive

13   relief.

14      We will not address the plaintiffs' new claims, unpleaded

15   claims, the Sanderson issue, unless your Honor has questions,

16   the requests to revisit certain findings that were made in

17   summary judgment.  We briefed those extensively in our

18   pretrial brief and in our post-trial brief, and we'll rely on

19   our briefing for those issues.

20      So the nontrial issue is PTP's intervention.  Plaintiffs

21   have called for our intervention to be revoked, and I want to

22   make it clear that intervention has been resolved.  The Sixth

23   Circuit has spoken on it.  This Court has spoken on it.  There

24   were no intervention-related issues left for trial.  Trial is

25   about the claims and the defenses of the parties.  Plaintiffs

1    brought their claims; the defendants defended against their

2    claims.   Intervention and whether PTP's interests were

3    sufficient for intervention purposes were not a claim or a

4    defense, and they weren't ripe for trial.

5         And to the extent that plaintiffs suggest that PTP did

6    not do enough at trial because we did not separately cross

7    examine witnesses, we did what we said we would do in

8    defending the challenged zoning ordinance.  We conducted

9    discovery to get a full legislative history.

10        We conducted 30(b)(6) depositions of every party.

11   Previously no one had deposed -- conducted any 30(b)(6)

12   deposition.  There were lay witness, fact witness depositions.

13   We filed a motion for summary judgment.  This Court directed

14   PTP to file a motion for summary judgment on the issues that

15   the Court determined PTP had an interest in.  We did that.  We

16   participated in other motion practice.  We presented an expert

17   witness, and we cross examined plaintiffs' offered rebuttal

18   witnesses.

19        And in case anyone has forgotten, plaintiffs filed a

20   motion in limine asking the Court to order us to coordinate

21   our presentation of evidence at trial with the Township.

22   Plaintiffs asked us to not duplicate cross examination.  So

23   the Court declined to grant their request, but, your Honor,

24   you urged us to not waste time, and that is what we have tried

25   to do.

1         We filed a joint trial brief.  We filed joint conclusions

2    of law, findings of fact, and we didn't duplicate cross.  And

3    today I'm going to do my best not to duplicate their closing

4    argument.

5         So we would ask the Court to just at this point not

6    entertain plaintiffs' request to relitigate intervention, but

7    if you have questions about it, I'm happy to answer them.

8         So moving on to the evidentiary issues for trial, as I

9    mentioned we had commercial speech, damages, and injunctive

10   relief as the three main buckets that were live for trial.

11   And the Township has gone through the five subsections that

12   were subject to the Central Hudson inquiry.  There were two of

13   the four Central Hudson prongs left, and those were the

14   questions of whether or not the ordinances directly advanced

15   substantial governmental interests and were narrowly drawn.

16        And then skipping over damages to injunctive relief,

17   there were several claims where plaintiffs either have

18   prevailed or things that have yet to be determined, and so for

19   any -- any ordinance provision that has been found

20   unconstitutional or preempted, there's a question about

21   whether and to what extent plaintiffs have proven entitlement

22   to injunctive relief.

23        So I think we all are now familiar with these five

24   subsections.  I'm not going to repeat what these were.  I'm

25   going to skip this slide, and I'm going to talk about the

1    evidence that was presented at trial.  And there were three

2    types of evidence that were presented primarily.  There were

3    the meeting minutes and the contemporaneous records of

4    Peninsula Township, the legislative history, there was expert

5    testimony, and there were lay witness depositions.

6        The meeting minutes go back to the late '80s.  And you

7    can see from the type face there, right, they are old minutes.

8    These are, I think, Bowers Harbor from 1992.  And there were

9    discussions spanning hundreds of pages, probably thousands of

10   hours, more meetings than I can imagine, discussing all of the

11   zoning provisions that are challenged and all of the requests

12   for special use permits under these provisions, amendments to

13   special use permits.  All of these were deliberated by the

14   planning commission, by the township, sometimes by special

15   committees.

16       And the minutes tell a story.  And the minutes couldn't

17   testify, but the minutes are the key witness that show how the

18   Township was trying to follow its master plan and keep

19   commercial activity in A-1 tethered to agricultural

20   production.

21       And I want to be clear, the Township mentioned this, but

22   it is true Central Hudson does not require a least restrictive

23   means inquiry.  It is about a reasonable fit.  And this is

24   what the Township was trying to accomplish over these decades

25   of meetings.  They were trying to achieve a reasonable fit and

1     to tailor the zoning ordinances they drafted when it enacted

2     them back in 1999, in 1998, 2002, 2004, and they spent

3     countless hours gathering input from the community, conducting

4     surveys, reviewing the master plan, reviewing reports, having

5     committees work on reports, taking public comment, debating,

6     trying to wordsmith and refine draft language over many

7     months.

8          And I also want to be clear that they did consider

9     alternatives.  The alternatives they considered were the

10    plaintiffs' proposals.  So none of these ordinances sort of

11    just sprang from the mind of Township officials.  Most of

12    these were the result of requests that winery owners or

13    perspective winery owners made.

14         So the alternatives that were considered were things like

15    Bob Begin's original request to have a resort in the Township.

16    Going back to the '80s and early 90s, he was asking for

17    weddings and unlimited events and conference center activities

18    and a pool and other kinds of things, and the Township reached

19    the ordinances that we have today by considering those

20    alternatives to what we have now, by reviewing the requests

21    that were before it, and trying to make sure that they said

22    yes to as much as they could while maintaining a connection to

23    agriculture.  And these minutes were unrebutted, and they're

24    mostly unaddressed.

25         Plaintiff submitted I think a 145-page post-trial brief,

1    and they don't talk about what's in the minutes.  And I

2    understand that there are a lot of pages, but we have a road

3    map to the minutes, and it's in our joint findings of fact.

4    So we have got hundreds and hundreds of pages of minutes

5    condensed to about 40 pages of individual facts with citations

6    to each set of minutes, and this is where the story of

7    township zoning lies.  And these, we would submit, are the

8    most compelling and most probative pieces of evidence for

9    Central Hudson purposes.

10        So talking about the experts now.  Plaintiffs have made a

11   lot about how Dr. Daniels is from Pennsylvania, but I would

12   point out that he is a nationally recognized expert on land

13   use planning.  He has worked on land use planning issues all

14   over the country.  He has evaluated Peninsula Township's

15   purchase of development rights program which is the Township's

16   key agricultural preservation program.

17        And Dr. Daniels testified about how challenged zoning

18   works to advance the Township's governmental interests.  He

19   was the only witness to talk about the zoning ordinances.

20   Plaintiffs have attacked his credibility for things like

21   opining that a tasting room is something that should be

22   indoors.  And, sure, in Michigan, the Michigan Liquor Control

23   Code allows for outdoor wine tasting.  In fact, the Township

24   allows for outdoor wine tasting.

25        So as an agricultural preservation and land use planning

1    scholar, Mr. Daniels, or Dr. Daniels, probably does have a

2    more conservative opinion about what is appropriate in an

3    agricultural zone, but what that shows is reasonable minds can

4    differ about what is appropriate in the land use world and

5    what is appropriate in an agricultural zone.  And what

6    Dr. Daniels has said over and over again and what the law says

7    is that it's up to communities to draw those lines for

8    themselves through the legislative process.  And plaintiffs

9    have attacked Dr. Daniels for not reviewing Michigan Liquor

10   Control Code, for not reviewing the Right to Farm Act or the

11   GAAMPs.

12            THE COURT:  That's not important?

13            MS. HILLYER:  I would submit, your Honor, they're --

14            THE COURT:  How does Dr. Daniels come in and give

15   his opinions when he has not reviewed those materials?

16            MS. HILLYER:  So those materials are from separate

17   bodies of law.  Dr. Daniels is an expert on land use planning

18   and zoning.  And land use planning and zoning doesn't

19   necessarily look to the Michigan Liquor Control Code or other

20   state bodies of law or policy.  So Dr. Daniels was not an

21   expert on alcohol policy.  He was not an expert on Michigan's

22   Right to Farm Act or rural development.  And I would point out

23   that the GAAMPs were enacted, the ones that plaintiffs rely so

24   heavily on.  They were written in 2010, and the last of the

25   zoning provisions that we're talking about today was enacted

1    in 2004.  So we're six years too late in terms of even

2    considering the GAAMPs.  What matters for Central Hudson

3    purposes is what the Township considered when it did the

4    tailoring.

5        The Township could not have foreseen that six years later

6    rural development policy in Michigan would evolve in such a

7    way, and so what we have to look at for Central Hudson

8    purposes in determining the constitutionality of the

9    legislative acts that the Township did, we have to look at

10   when they did them.

11       So Dr. Daniels' testimony essentially went unrebutted.

12   Plaintiffs had designated a land use planning expert.  They

13   didn't call him.  They didn't try to admit his report.  They

14   called experts on liquor control policy and rural development

15   and agritourism.  And at the end of the day, this is because

16   the plaintiffs want to use Ms. Quimby and Mr. McDowell to

17   revive their preemption claims, their agritourism theory, and

18   bolster their injunction claim.  They don't have any value for

19   Central Hudson purposes.  And I'm going to talk about the

20   injunction issue in a few minutes, but first I want to touch

21   on the deposition designations.

22       So plaintiffs have relied a lot on the depositions of

23   Mr. Manigold and Ms. Deeren, but there are actually six

24   witnesses who were deposed around the same time, and all of

25   them had different relationships to the zoning ordinance.

1    Three of them were sort of co-architects of the zoning

2    ordinances.  Mr. Parsons, Mr. Wunsch, and Mr. Hayward all took

3    part in drafting the zoning amendments that are challenged

4    now.

5        Mr. Manigold was the supervisor, and his role was to vote

6    on zoning amendments and SUPs.  Ms. Deeren was the zoning

7    administrator for a time, so she was primarily tasked with

8    administering the zoning ordinance, approving land use

9    permits.  And then Mr. Sanger was the zoning enforcement

10   officer.  He's the guy that comes out and writes tickets and

11   enforces the zoning ordinance.

12       So plaintiffs rely mostly on Mr. Manigold and to some

13   extent Ms. Deeren's testimony, and they rely on the same --

14   the same lines.  We have actually seen most of the same quotes

15   from these two individuals in their summary judgment briefs

16   going back to 2021.  But Mr. Manigold, he was not tasked with

17   administering or interpreting or enforcing the zoning

18   ordinance.  And mostly he didn't know or he didn't remember.

19   He struggled to answer a lot of plaintiff counsel's questions,

20   partly because many of them called for legal conclusions.

21       He also talked at length about how the zoning ordinance

22   was designed to help plaintiffs, and much of his testimony

23   expressed confusion about what it would mean to consider less

24   restrictive means when the Township was considering

25   Plaintiffs' proposals.  And so the context of his testimony

1    and of what was happening when the Township was enacting these

2    ordinances was that the plaintiffs had been coming to the

3    Township and asking for things.  And so Mr. Manifold's

4    testimony reflects confusion in a lot of places, but certainly

5    weighed against the minutes and placed in context does not

6    counter defendants' Central Hudson evidence, which are the

7    meeting minutes and the expert testimony.

8         So to talk about injunction, plaintiffs have asked for

9    injunctive relief, and there are six claims, or six topics.

10    And I'm not going to repeat all.  Gosh, there are many, many

11    zoning ordinance provisions, especially relating to guest

12    activity uses.  I'm not going to cite these, but generally

13    these are zoning ordinance provisions that address local grape

14    sourcing, guest activity uses, catering, the compelled speech

15    promoting Peninsula agriculture during guest activity uses,

16    and then any provisions that might later be found to restrict

17    commercial speech.  All of these provisions have been repealed

18    and they have not been part of the zoning ordinance since I

19    believe December of 2022.  So at this point there are no

20    zoning ordinance provisions to enjoin.

21         THE COURT:  Part of the analysis there is a

22    reasonable expectation that perhaps the Township would revisit

23    after this litigation is completed.  What's your reaction to

24    that in light of the history here?

25         MS. HILLYER:  So I can't speak for the Township, but

1      my reaction is that the Township is going to continue

2      balancing agricultural versus commercial uses probably forever

3      or unless and until something else replaces zoning.  So

4      certainly the Township is going to consider, you know,

5      consider what uses are appropriate in Peninsula Township's

6      agricultural zone.  The zoning has evolved over 30, almost 40

7      years now there and will continue to do so.

8          But plaintiffs have also asked for winery-specific

9      relief, and plaintiffs did not put -- plaintiffs did not put

10     sufficient evidence into the record that would allow the Court

11     to analyze their special use permits and authorize amendments

12     to these.  They didn't plead what they would want.

13         There is an SUP amendment process that's also a

14     legislative process like the process for enacting zoning

15     amendments.  So SUPs are amended by -- typically after review

16     of the planning commission.  There's a public hearing, there's

17     typically a board meeting then and a public hearing, and then

18     the board is authorized to place conditions on SUPs.  There

19     are vested interests that would be at issue.  There are

20     questions about whether and to what extent plaintiffs have

21     established a vested interest in some of the uses that they

22     currently conduct.

23         One big unanswered question is whether you can even have

24     a vested interest in an unconstitutional land use.  So if, for

25     example, the Court were to find a commercial speech provision

1    that allows them to sell logo'd merchandise unconstitutional,

2    it's unclear whether one could have a vested interest in an

3    unconstitutional land use to continue selling logo'd

4    merchandise.

5         There are questions of severability that have not been

6    addressed at trial, and one of the big ones is pertaining to

7    farm processing facilities.  So this is the zoning ordinance

8    that starts with 6.7.2(19).  So this ordinance was designed to

9    allow wineries to have a use by right, so if you grow it you

10   can sell it.  And that was -- that was the -- that was the

11   balance, and that was the intent in creating that use by

12   right.  And so it is unclear whether or to what extent you

13   could sever the land use, the permission, the use by right to

14   have a winery on 40 acres as a use by right from the

15   appellation 85 percent grape requirement.

16        And finally for individual winery relief, we're missing

17   land owners.  Most of the plaintiffs in this case were

18   lessees, and because land uses run with the land, the -- in

19   many cases the special use permit holders were not present at

20   trial.  They're not in this case.  These are land uses that we

21   would be talking about, and without the landowners here to

22   litigate their interests, it's unclear whether and to what

23   extent the Court could offer any relief relating to specific

24   land uses.

25        But I would suggest the third part of plaintiffs'

1    injunctive relief request is that the Court declare new uses

2    reasonable.  And this is where -- this is where the testimony

3    of Ms. Quimby and Mr. McDowell comes in.  This is really what

4    they're trying to use it for.  They're trying to suggest that

5    the Court can declare certain uses reasonable, and they're

6    using that testimony to support this claim.  They're asking

7    the Court to violate the separation of powers.

8        And I would read this quote briefly from a Michigan case

9    called Brae Burn, Inc., versus the City of Bloomfield Hills.

10   I promise I won't read the whole thing.  "In view of the

11   frequency with which zoning cases are now appearing before the

12   Court," this was in 1957, "we deem it expedient to point out

13   again, in terms not susceptible of misconstruction, a

14   fundamental principle:  This Court does not sit as a

15   superzoning commission.  Our laws have wisely committed to the

16   people of a community themselves the determination of their

17   municipal destiny, the degree to which the industrial may have

18   precedence over the residential, and the areas carved out of

19   each to be devoted to commercial pursuits.  With the wisdom or

20   lack of wisdom of the determination we are not concerned.  The

21   people of the community, through their appropriate legislative

22   body, and not the courts, govern its growth and its life.  Let

23   us state the proposition as clearly as may be:  It is not our

24   function to approve the ordinance before us as to wisdom or

25   desirability.  For alleged abuses involving such factors, the

1    remedy is the ballot box, not the courts.  We do not

2    substitute our judgment for that of the legislative body

3    charged with the duty and responsibility in the premises."

4        So courts determine constitutionality, and courts

5    determine preemption, but courts do not determine the best use

6    of land.  That is -- that is what townships do.  That is part

7    of what Dr. Daniels testified to.  And I want to leave you

8    with this image courtesy of Plaintiffs' Exhibit 112, I

9    believe.  And this is not an accident.  This is incredible.

10   This is miles and miles and miles of agricultural land,

11   unspoiled beaches just north of Traverse City.  And you have

12   Traverse City, which is crowded with tourists and with traffic

13   all summer long.  It's not just summer anymore.  And this

14   is -- this is just outside of Traverse City, and it is

15   peaceful and it is tranquil and it is beautiful.  And this is

16   the result of the Township's planning.  This what the 30, 40

17   years of zoning has resulted in.  This is taxpayer-funded

18   preservation efforts.  This is PDR.  This is the purchase of

19   development rights.  This is Township residents taxing

20   themselves to buy development rights to make sure that land

21   stays in agriculture.  And this is the result of local

22   government listening to the requests and the concerns of all

23   its residents, all of its businesses, including the wineries,

24   and balancing those interests.

25       The Township has found a way to say yes to almost every

1    request the wineries ever made, but it has very reasonably

2    decided that event venues, restaurants, late hours, and retail

3    shops do not belong in here.

4         And township zoning works.  What plaintiffs are asking

5    the Court to do is to step into the role of local government

6    and give them what they want through litigation because they

7    can't get it through the legislative process that's been

8    designed to allow communities to determine what's right for

9    themselves.

10        The Court has the power to determine what parts of the

11   PTZO may be unconstitutional or preempted, but only the

12   Township can zone.  And so we ask that you find the five

13   zoning subsections that were remaining for trial satisfies

14   Cental Hudson scrutiny and reject plaintiffs' demand for

15   improper injunctive relief and enter judgment in PTP's favor.

16   And I'm happy to take questions.

17        THE COURT:  What do you make of Dr. Daniels' opinion

18   as to one of the sequelae of the Township's efforts which was

19   to reduce land values?

20        MS. HILLYER:  So I don't think that is an entirely

21   accurate characterization of his testimony.  I understand

22   that's what plaintiffs have said that he said.

23        THE COURT:  Well, what's your understanding of what

24   he said on that subject?

25        MS. HILLYER:  So the issue is, if you have certain

1      farms -- because grape growers and wineries are not the only

2      farms on the peninsula.  You have flower growers.  You have

3      apple growers.  And if you authorize uses other than

4      agricultural production to the point where now if you are a

5      winery and you are growing grapes and you are having weddings

6      and you're having conventions and you're having retreats and

7      you're opening a restaurant on your property, that is going to

8      shift the relationship of the value of your land, and it is

9      going to make it more difficult for other types of farmers,

10     other types of business owners who can't do those kinds of

11     lucrative activities to basically afford to buy land.

12         So you have -- you talk about farmers who want to pass

13     their farm on to the next generation, and you talk about, you

14     know, a farmer who wants to retire.  Some of these, you know,

15     some of these options might be then to turn your land into an

16     event center and to not put grapes -- land and growing grapes

17     anymore.  Right?  Like you'll grow enough grapes to have a

18     winery so that you can have events and so that you can have a

19     restaurant, and what Dr. Daniels is saying is that as land

20     values go up, the Township's ability then to use purchase of

21     development rights dollars is threatened, and purchase of

22     development rights is an important way to preserve

23     agriculture.  It's also an important way to get farmers money

24     to keep farms in their families, to invest in new equipment.

25     And so as land values go up, then PDR becomes more challenging

1    and the Township can afford to purchase less -- fewer

2    development rights.  So that is part of what Dr. Daniels was

3    testifying to.

4                THE COURT:  All right.  I don't have any further

5    questions at this point, Ms. Hillyer.  Thank you.

6                MS. HILLYER:  Thanks, Your Honor.

7                THE COURT:  Mr. Infante.  I'll give everybody 10

8    more minutes.

9                MR. INFANTE:  Each or total?

10               THE COURT:  Each party gets 10 more minutes.

11               MR. INFANTE:  Has my clock started?

12               THE COURT:  Mr. McGraw didn't even want me to give

13   you that.

14               MR. INFANTE:  I don't blame him.

15        Your Honor, I have those dates you were asking for about

16   the joint defense agreement.  So the joint defense agreement

17   was filed ECF 395-1.  The date of it is October 27, 2021.  The

18   PTP filed its Sixth Circuit appeal brief on 1-10-22, so month

19   and a half later.  And Rob Manigold, that was the first

20   deposition.  That occurred November 3, 2021, so about a week

21   after the joint defense agreement was signed.  And Ms. Deeren

22   and Mr. Hayward I think were two days later.

23        Also note that in responding to PTP's motion for

24   intervention, originally Peninsula Township did take the

25   position that they were not capable of defending PTP's

1    interest in the case.  That was in their filing before this

2    Court.

3              THE COURT:  Thank you.

4              MR. INFANTE:  And the Sixth Circuit did cite to

5    that.

6              THE COURT:  That's what I thought, too.  Go ahead.

7              MR. INFANTE:  On the issue of the meeting minutes,

8    we saw Ms. Hillyer go through a bunch of meeting minutes, but

9    the one thing we didn't see is, you know, even there they

10   don't really cite to specifics.  It was just attorney argument

11   about what happened there.  And, again, the Township has

12   conceded that these meeting minutes were not offered for the

13   truth of the matter asserted.

14        On the issue of why we did not have our own land use

15   planning expert, we did name one originally.  He was deposed.

16   But given the, you know, Mr. Daniels, given his deposition

17   testimony and given his testimony at trial, our own expert

18   just wasn't necessary on that.  He just wasn't credible

19   whatsoever.

20        On the issue of what Mr. Larson looked at, this issue of

21   he didn't gather documents, just want to -- I actually have a

22   slide I actually didn't use in this case.  I took it out, but

23   it works now.  So they basically say that he should have

24   personally collected documents, Mr. Larson.  There are a bunch

25   of cases.  We've cited all these cases.  Well, we cited the

1      Southland case, and I believe we cited the Coyne case to your

2      Honor.  That is not a requirement.  There is no requirement

3      that an expert personally gather documents.  Courts have held,

4      and all these courts here have held that it's reasonable for

5      an expert to rely on a company to provide records to them or

6      even in witness interviews in providing their opinions.

7          Counsel for Peninsula Township, he said an event hosting

8      doesn't implicate the First Amendment.  One thing that -- you

9      know, couple issues on that.  One, event hosting does

10     implicate their conference clause claim here.  It does

11     implicate our vagueness claim here.  So those are two things

12     you've already ruled in our favor.  We do not concede, and you

13     and I went around and around about this on the first day of

14     trial, we do not concede that your Honor's summary judgment

15     opinion granted the Township and PTP, or actually it was PTP,

16     not even the Township, granted PTP summary judgment on that

17     issue.  I don't want to go around and around on that.

18         But even if the Court did intend to or did grant PTP's

19     summary judgement on that issue, under Rule 54(b) your Honor

20     can revisit that.  This is a Fifth Circuit case, Dale v Equine

21     Sports Medicine & Surgery, 750 Fed.Appx 265.  It says, quote,

22     "Courts may reconsider a partial summary judgment opinion for

23     any reason it deems sufficient, even in absence of new

24     evidence or intervening change in or clarification of

25     substantive law."

1          Huss v King Company, 338 F.3d 647, a 2003 case from the

2     Sixth Circuit, stands for the same proposition.  In that case,

3     the Sixth Circuit said it was appropriate for Judge Miles from

4     this court to amend his partial summary judgment opinion based

5     on evidence that was presented at trial.  Because, like here,

6     the party in that case had the opportunity to cross examine

7     every one of those witnesses at trial on that issue.  PTP, or,

8     I'm sorry, Peninsula Township, cross examined all of these

9     witnesses on that issue at trial.  This was Mr. Rajsic's pitch

10    question, you get to pitch your products, you pitch your

11    products.  He asked that question 25 times.

12          Unless your Honor has any questions, that's all I have.

13          THE COURT:  You only used five minutes.  Thank you,

14    Mr. Infante.

15          MR. INFANTE:  I do what I can.  I used an hour and

16    10 this morning.

17          THE COURT:  Thank you.  Mr. Rajsic, go ahead, sir.

18          MR. RAJSIC:  Your Honor, I can guarantee I'm not

19    going to use all 10 minutes.

20          The first thing I want to address is the question

21    regarding the meeting minutes and the hearsay objections as it

22    relates to the meeting minutes.  There was a limited hearsay

23    objection as it relates to public comments during the meeting

24    minutes.  That was the objection regarding, are we offering

25    those statements to prove the truth of the matter asserted.

1    That was the issue that was resolved at trial is are those

2    public statements being offered to prove the truth of the

3    matter asserted.  The larger meeting minutes themselves are

4    admissible as governmental records.  So I think it's important

5    to note that it's a very -- was a very limited issue that was

6    addressed on whether or not it was a -- being offered to prove

7    the truth of the matter asserted.

8         And I also want to touch briefly on Mr. Infante's last

9    argument as it relates to the vagueness claim again in

10   attempting to apply the vagueness claim to the hours of

11   operation.  That issue was resolved, we argued for nearly a

12   half hour on day one of trial, and this Court sustained the

13   Township's objection regarding event hosting, and it was

14   not -- that argument was not just limited to the First

15   Amendment issue.  It was also related to the due process void

16   for vagueness issue, because as we noted there has to be some

17   sort of link under a vagueness theory to an underlying

18   constitutional claim.

19        In this case when we look at plaintiffs' complaint, it

20   was a First Amendment issue.  And I want to note the Court

21   sustained the Township's objection and allowed plaintiffs to

22   make an offer of proof, and that offer of proof spiraled into

23   a significant amount of testimony at trial regarding event

24   hosting.

25        So, sure, we did ask questions regarding event hosting

1    because plaintiffs put on offer of proof, and I intend to ask

2    questions at trial to elicit testimony against that.

3        Otherwise, your Honor, unless you have any questions,

4    I'll go ahead and leave it be.

5            THE COURT:  That was only two minutes.  Thank you,

6    Counsel.

7            MR. RAJSIC:  Thank you, Your Honor.

8            THE COURT:  Ms. Hillyer.

9            MS. HILLYER:  Your Honor, I'm going for the record,

10   and I have nothing further unless you have questions.

11           THE COURT:  All right.  Thank you.

12           MR. INFANTE:  I do need to stand back up.  I

13   apologize.  On the Rule 54(b) issue, I do want to make on the

14   record that if the Court did rule in PTP's favor on that issue

15   that I would make an oral motion under Rule 54(b) for the

16   Court to revisit it.  I think I need to make that for the

17   record.

18           THE COURT:  All right.  Thank you.

19           MR. RAJSIC:  Your Honor, I would object, obviously,

20   to reconsidering anything that was granted prior to trial.

21   I'm making my record.

22           THE COURT:  I understand.  And Ms. Hillyer, she's in

23   the amen corner, right?

24           MR. RAJSIC:  Not waiving anything but the American

25   flag, your Honor.

1          THE COURT:  I notice you put that in your brief.

2          MR. INFANTE:  It was a good comment.

3          THE COURT:  Well, it's one of my favorites.

4      Okay.  The Court will deem the case submitted.  I'll get

5   an opinion out as soon as I can.  As I said, as soon as I can.

6   Obviously this case is very important to all the parties.  The

7   record here is very extensive as the factual record and the

8   legal positions of the parties are pretty dense in terms of

9   its -- the gravamen of the complaint and the defense, so I'll

10  get it as soon as I can.  Thank you very much.

11         MR. INFANTE:  Thank you, Judge.

12         MR. RAJSIC:  Thank you, your Honor.

13         THE CLERK:  All rise, please.  Court is in recess.

14         (Proceedings concluded at 12:11 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2

3         I, Lauret J. Henry, Official Court Reporter for the

4    United States District Court for the Western District of

5    Michigan, appointed pursuant to the provisions of Title 28,

6    United States Code, Section 753, do hereby certify that the

7    foregoing is a full, true and correct transcript of the

8    proceedings had in the within entitled and numbered cause on

9    the date hereinbefore set forth; and I do further certify that

10   the foregoing transcript has been prepared by me or under my

11   direction.

12

13

14

15

16

17                              /s/ Lauret J. Henry
                                Lauret J. Henry, CSR, RPR
18                              U.S. District Court Reporter
                                410 West Michigan Avenue
19                              Suite 137
                                Kalamazoo, MI 49007
20                              (269) 720-9529

21

22

23

24

25