UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WINERIES OF THE OLD MISSION PENINSULA      )
ASSOCIATION, *et al.*,                      )
                Plaintiffs,    )
                                   )      No. 1:20-cv-1008
-v-                                         )
                                   )      Honorable Paul L. Maloney
PENINSULA TOWNSHIP,                         )
                Defendant,     )
                                   )
and                                         )
                                   )
PROTECT THE PENINSULA, INC.,                )
               Intervenor-Defendant.    )
_____ )

## BENCH OPINION

    This matter comes before the court after an eleven-day bench trial. As explained below, the Wineries largely prevailed on the remaining issues at trial. The court will award millions of dollars in damages but will decline to issue injunctive relief.

## I. Procedural History

### A.  The Parties and Venue

    This is a case about a group of wineries located on the Old Mission Peninsula in Michigan. The Plaintiff-Wineries are subject to the zoning ordinances promulgated by Peninsula Township. After decades of strife, arbitrary enforcement, and frustration, the Plaintiff-Wineries sued Peninsula Township.

    Plaintiffs include (1) Wineries of the Old Mission Peninsula Association ("WOMP"), a Michigan nonprofit corporation comprised of numerous wineries located on the Old

Mission Peninsula; (2) Bowers Harbor Vineyard & Winery, Inc. ("Bowers Harbor"), a Michigan corporation; (3) Brys Winery, LC ("Brys"), a Michigan corporation; (4) Chateau Grand Traverse, Ltd., a Michigan corporation; (5) Chateau Operations, Ltd., a Michigan corporation; (6) Grape Harbor, Inc.,[1] a Michigan corporation; (7) Montague Development, LLC,[2] a Michigan limited liability company; (8) OV The Farm, LLC,[3] a Michigan limited liability company; (9) Tabone Vineyards, LLC, a Michigan limited liability company; (10) Two Lads, LLC, a Michigan limited liability company; (11) Villa Mari, LLC, a Michigan limited liability company; and (12) Winery at Black Star Farms, LLC ("Black Star"), a Michigan limited liability company. That's eleven individual wineries and their collective association, WOMP.[4] Plaintiffs want to farm, produce wine, and run profitable business ventures.

The original Defendant, Peninsula Township ("Township"), is a township of Grand Traverse County in the northern portion of Michigan's Lower Peninsula. The Township covers nearly all of the Old Mission Peninsula ("OMP"), which is nineteen miles long and approximately three miles wide. The Old Mission Peninsula juts out into Lake Michigan and splits the West and East arms of the Grand Traverse Bay. Property on the Old Mission Peninsula is some of the most sought-after in the State of Michigan. Some come for the summer views and wine, but others live there year-round and make their living.

---

[1] Grape Harbor operates under the trade name "Peninsula Cellars."
[2] Montague Development operates under the trade name "Hawthorne Vineyards."
[3] OV The Farm operates under the trade name "Bonobo Winery."
[4] OV The Farm is not a member of WOMP.

Intervenor Defendant Protect the Peninsula, Inc. ("PTP") consists of individuals who live on the OMP. In its words, PTP organized to promote the benefits of life in the region. PTP is a volunteer organization and has been involved in zoning in Peninsula Township since 1988. As for PTP's involvement in this case, PTP is largely a NIMBY[5] group devoted to stifling development on the OMP. This court originally denied PTP's motion to intervene. (ECF No. 108). But PTP prevailed on appeal and intervened as a matter of right. *Wineries of the Old Mission Peninsula Ass'n v. Twp. of Peninsula*, 41 F.4th 767, 777 (6th Cir. 2022).

### B. Claims

Plaintiffs filed their original complaint on October 21, 2020. On January 4, 2021, Plaintiffs amended their complaint. (ECF No. 29). Plaintiffs pled ten causes of action: Count I: Facial Free Speech Claims; Count II: As-Applied Free Speech Claims; Count III: Freedom of Association Claims; Count IV: Due Process Claims; Count V: Dormant Commerce Clause (Discrimination Against Interstate Commerce); Count VI: Dormant Commerce Clause (Excessive Burden on Interstate Commerce); Count VII: Regulatory Takings Claims; Count VIII: State Law Preemption Claims; Count IX Michigan Zoning Enabling Act Claims; Count X: Injunctive Relief.

This case went through two rounds of summary judgment motion practice. This court issued its first opinion on June 3, 2022. (ECF No. 162). The first opinion resolved Plaintiffs'

---

[5] "The generalized complaints effectively amount to NIMBY—not in my backyard." *T-Mobile Cent., LLC v. Charter Twp. of W. Bloomfield*, 691 F.3d 794, 800 (6th Cir. 2012). "Whatever else they may think about the state of public finances, [PTP] members are primarily concerned with safeguarding their land values, ensuring the quiet enjoyment of their homes, and preserving the viability of their farms." *Wineries of the Old Mission Peninsula Ass'n v. Twp. of Peninsula*, 41 F.4th 767, 775 (6th Cir. 2022).

partial summary judgment motions (ECF Nos. 53, 135), and the Township's cross motions for partial summary judgment. (ECF Nos. 62, 142). The court issued an injunction on July 19, 2022 (ECF No. 206), which prohibited the Township from enforcing the sections of the Township Ordinances that the court held to be contrary to law in the June 3 summary judgment opinion and order. Following the Township's appeal of that injunction, the Sixth Circuit vacated the injunction, given the changed landscape of this matter and the fact that the June 3 Order issued before PTP was permitted to intervene. *See Wineries of Old Mission Peninsula Ass'n v. Twp. of Peninsula,* No. 22-1534, 2022 WL 22236853, at *4 (6th Cir. Aug. 23, 2022).

Following its wins at the circuit, **PTP** moved to set aside the entire June 3 Order under Federal Rule of Civil Procedure 54(b). (ECF No. 285). This court did not set aside the entire June 3 Order. But this court did realize, with the guidance from the circuit, that **PTP** would face prejudice if the entirety of the June 3 Order remained effective without giving **PTP** the opportunity to raise defenses to the Wineries' claims that implicate **PTP**'s interests. (ECF No. 301 at PageID.10696). Thus, this court cabined **PTP**'s involvement in this matter to the claims that "could potentially affect **PTP** members' property interests." *Id.* This court also observed the circuit's explicit direction to set aside original rulings that were granted on the Township's failure to defend. Accordingly, this court set aside swaths of the June 3 Order. (*Id.* at PageID.10697-98). But it left in place the following:

> For clarity's sake, the Court is not setting aside Subsection V.A.3 (content-based restrictions; PageID.6008-10), Subsection V.B.1 (laches; PageID.6021-23); Subsection V.B.5 (freedom of association/freedom of religion; PageID.6024); and Subsection V.B.8 (regulatory taking; PageID.6025-27) because no party received summary judgment on these claims, and thus, these

4

issues are still ripe for trial. The Court also will not set aside Subsection V.A.1 (dormant Commerce Clause; PageID.5995-6001) because this claim does not affect PTP members' property interests, nor was summary judgment granted to the Wineries on this claim due to the Township's failure to defend. Finally, the Court will not set aside Subsection V.A.6 (vagueness/due process; PageID.6016-19) because although this claim may implicate PTP members' property interests, PTP's intervention does not change the Wineries' entitlement to summary judgment on this issue. Looking at the Township Ordinances on their face, the term "Guest Activity Use" is vague, and it is unconstitutional for the reasons that the Court has previously articulated, regardless of whether PTP is a party in this matter and had the opportunity to defend against this claim (see ECF No. 211 at PageID.7812-13).

*Id.* The court was also explicit following PTP's intervention: "The court will not rewind this case back to February 2021." (*Id.* at PageID.10700).

C.  Issues Resolved Prior to Trial

This court ruled that the following Peninsula Township Zoning Ordinance ("PTZO") sections violated the Dormant Commerce Clause because they require Farm Processing Facilities and Winery-Chateaus to purchase a certain percentage of grapes from Peninsula Township farmers: 6.7.2(19)(a), 6.7.2(19)(b)(1)(ii), 6.7.2(19)(b)(1)(iii), 6.7.2(19)(b)(2)(i), 6.7.2(19)(b)(2)(v), 8.7.3(10)(u)(2)(e), 8.7.3(10)(u)(3), 8.7.3(10)(u)(5)(c), and 8.7.3(10)(u)(5)(d). (ECF No. 162 at PageID.6001).

This court ruled that any subsection of Section 8.7.3(10) that uses the term 'Guest Activity' is unconstitutionally vague and must be stricken from the Township Ordinances. (*Id.* at PageID.6019).

This court ruled that Sections 8.7.3(10)(u)(1)(b) and 8.7.3(10)(5)(a) "compel speech because they require a Winery-Chateau to promote Township agriculture at all Guest

Activities by doing one of the following: (1) identifying 'Peninsula Produced' food or beverages, (2) providing 'Peninsula Agriculture' promotional materials, or (3) including tours through the Wineries or other agricultural locations." (ECF No. 559 at PageID.21911).

This court ruled that Sections 8.7.3(10)(u)(2)(b) and 8.7.3(10)(u)(2)(c) are unconstitutional prior restraints on speech because the Township required the Wineries to seek township approval before hosting a meeting of a 501(c)(3) non-profit group or agricultural related groups while lacking definite criteria to make an approval determination. (*Id.* at PageID.21910). This court ruled that Sections 8.7.3(10)(u)(2)(d), 6.7.2(19)(b)(6), 8.7.3(10)(u)(2)(a) are not unconstitutional prior restraints because they do not implicate speech. (*Id.* at PageID.21909).

This court ruled that Mich. Comp. Laws § 436.1547 preempts Section 8.7.3(10)(u)(5)(i), which says "Kitchen facilities may be used for on-site food service related to Guest Activity Uses but not for off site catering." (ECF No. 525 at PageID.21134).

This court ruled that "the 'No amplified instrumental music is allowed' language" of Section 8.7.3(10)(u)(5)(g) "is preempted by [Mich. Comp. Laws § 436.1916(11)] which expressly allows certain licensees to have musical instrument performances without a permit." (*Id.* at PageID.21133). However, because the limitation on the amplification level of music is merely a limitation and not a prohibition, "the regulation of the amplification level of music—a mere limitation—is not preempted." *Id.*

## II. Findings of Fact

At trial, Plaintiffs called twelve fact witnesses, one damages expert, and two rebuttal experts. Peninsula Township did not call a single witness. Protect the Peninsula did not call any fact witnesses but did call one expert to opine on the reasonableness of the PTZO.

Overall, the court found that Plaintiffs' fact witnesses, most of whom were Winery representatives or owners, were credible. The Wineries' fact witnesses were model witnesses, knowledgeable, and tough to cross examine. They told a single story through twelve lenses: the PTZO was unreasonable, burdened their operations, and at times made them rethink continuing their enterprises on the OMP.

Dr. Thomas Daniels, who was called by PTP to opine on the reasonableness of the PTZO, was not credible. Plaintiffs' counsel stretched Dr. Daniels' credibility on cross examination and was plainly able to impeach his testimony. Aside from effective cross examination, Dr. Daniels' testimony was largely dispelled by Plaintiffs' rebuttal expert witnesses, Teri Quimby and Gary McDowell. The court has no trouble concluding that the facts at trial largely favored Plaintiffs. Instead of calling witnesses, the Township relied on government documents, some of which were decades old.

The Township's reliance on meeting minutes and other documents raises an issue. How much weight and credibility should the court give to them? Plaintiffs objected to these documents' admissibility at trial because, in their view, the documents are riddled with hearsay. Even so, the court admitted the documents into the record over Plaintiffs' continuing hearsay objection. Peninsula Township agreed that the meeting minutes were

"not offered for the truth of the matter asserted." (ECF No. 608 at PageID.25007). So the court can consider that the meeting minutes and other Township documents recount the bureaucratic history of the OMP, but the court can glean little regarding the reasonableness of that history. Neither the Township nor PTP presented a fact witness—subject to cross examination—who could explain the meeting minutes and give them a credibility litmus test. The court is not blind to these documents' existence, but it is largely deaf to their value as proof. *See e.g., United States v. Beasley*, 513 F.2d 309, 314 (5th Cir. 1975) (explaining that "recordation imported no guaranty of their truth" when discussing meeting minutes).

Plaintiffs' damages expert, Eric Larson, was generally credible. But his report was not as cohesive or up-to-date as it could have been. In all, the court accepts in part his testimony as a reasonably certain calculation of Plaintiffs' damages, especially in the absence of a competing damages expert.

The court has reviewed hundreds of pages of briefing and listened to more than ten days of trial. One story from trial, however, captures the spirit of this decades long dispute.

Q: Was Chateau Grand Traverse ever the subject of potential enforcement action by Peninsula Township?

A. Yes.

Q. What happened?

A. It's an unfortunate event, but we were -- my wife and I were very involved in resurrecting the local elementary school that was going to be shut down by the public school system. And one of the teachers that was there . . . was a beloved first grade teacher who had breast cancer. And she was Stage 4, and we decided that we were going to throw a fundraiser for her, that a hundred percent of the proceeds from the sale of our wine tasting room at an event at our winery would go to her directly. And the day of the event, I got a phone call, which again, I've never really received any sort of a phone call before on

something like this. And it was from -- I believe she was the Township clerk. It was Joanne Westphal.

> And she called me up and said, "I see you're having an event at your winery tonight and you don't have a permit." I said, "To the best of my knowledge, I do not require a permit if the event is not going to exceed 75 people." And she said, "Oh, is that so?" And I go, "Yes, that is so. And I suggest before you call and make a threatening act on me, that you familiarize yourself with our SUP." And she goes, "Well, we'll see about that." And it just struck a chord in me that this was a -- really, a nonconcerning event, and I got in my car. It's only a mile down the road to the Township. I drove down to the Township and I said, "I would like to see Ms. Westphal." And the lady at the counter said -- went in the back room, talked to her for a little bit, came back out and said, "Ms. Westphal says you need to make an appointment to see her."

> And I said, probably in a little bit of a heated way, another word for posterior, to have her please step out of her office. And I said, "You can't make a threatening act like that when it's unenforceable and you do not understand your own rules." And I just said, "We are holding our event tonight. It's within the realm of what I can do as a winery." And I said – that's where I left it. And she said, "If it exceeds 75 people, we will know about it." So it was implied that -- well, you can take the implication however you want, but it was a very -- like, wow, we are going to be counting cars and numbers. Needless to say, I think the event was maybe 50 people, and it went off successfully.

(ECF No. 607 at PageID.24701-03).

1. Uncontroverted Facts

Plaintiff Bowers Harbor has a Small Wine Maker license from the State of Michigan, which includes an Outdoor Service Area permit, a Sunday Sales AM permit, and a Living Quarters permit.

Plaintiff Brys has a Small Wine Maker license from the State of Michigan. Brys also has an On-Premises Tasting Room permit issued by the State of Michigan, which includes an Outdoor Service Area and a Sunday Sales AM permit.

Plaintiff Chateau Grand Traverse has a Wine Maker license and a Small Distiller license from the State of Michigan, which includes an Outdoor Service Area permit, a Sunday Sales AM permit, and a Direct Connection permit.

Plaintiff Chateau Chantal has a Small Wine Maker license, a Brandy Manufacturer license, and a Small Distiller license from the State of Michigan. It includes an Outdoor Service Area permit, a Sunday Sales AM permit, a Sunday Sales PM permit, a Direct Connection permit, a Living Quarters permit, a Beer and Wine Tasting permit and a Dance-Entertainment permit.

Plaintiff Grape Harbor, Inc. ("Peninsula Cellars") has a Small Wine Maker license and an Off-Premises Tasting Room permit issued by the State of Michigan, which includes an Outdoor Service Area permit and a Sunday Sales AM permit.

Plaintiff Montague Development, LLC ("Hawthorne") previously operated through an agreement with Chateau Chantal and currently operates through an agreement with Hawthorne Vineyards, LLC. Hawthorne Vineyards, LLC has a Small Wine Maker license and On-Premises Tasting Room permit issued by the State of Michigan with an Outdoor Service Area permit and a Sunday Sales A.M. permit.

Plaintiff OV the Farm, LLC ("Bonobo") has a Wine Maker license, a Small Distiller license, and an On-Premises Tasting Room permit issued by the State of Michigan, which includes an Outdoor Service Area permit and a Sunday Sales AM and Sunday Sales PM permits.

Plaintiff Tabone has a Small Wine Maker license and On-Premises Tasting Room permit issued by the State of Michigan, which includes an Outdoor Service Area permit and a Sunday Sales AM permit.

Plaintiff Two Lads has a Small Wine Maker license and an On-Premises Tasting Room permit issued by the State of Michigan, which includes an Outdoor Service Area permit, a Sunday Sales AM permit, an Entertainment permit and an Off-Premises Storage permit.

Plaintiff Villa Mari has a Small Wine Maker license and an On-Premises Tasting Room permit issued by the State of Michigan, which includes an Outdoor Service Area permit and a Sunday Sales AM permit.

Plaintiff Black Star has a Small Wine Maker license, a Small Distiller license and an On-Premises Tasting Room permit issued by the State of Michigan which, includes two Outdoor Service Area permits and a Sunday Sales AM permit.

Ten of the non-WOMP Plaintiffs hold the Wine Maker or Small Wine Maker licenses for wineries in Peninsula Township, Michigan, and Plaintiff Montague Development, LLC, owns the land where Hawthorne's winery sits.

The Wineries' tasting rooms are all located within the A-1 Agricultural District established by the PTZO, which became effective June 5, 1972.

The PTZO has been amended from time to time, including through the addition of sections and subsections permitting new and expanded winery-related land uses in A-1. For

purposes of this lawsuit, the sections containing subsections that Plaintiffs challenge are (1) Section 6.7.2(19) Use Permitted by Right – Farm Processing Facility (the "Farm Processing Ordinance"); (2) Section 8.7.3(10) Winery-Chateau (the "Chateau Ordinance"); and (3) Section 8.7.3(12) Remote Winery Tasting Room (the "Remote Winery Tasting Room Ordinance").

Black Star and Two Lads have land use permits for Farm Processing Facilities under former Section 6.7.2(19) of the PTZO. Bonobo, Bowers Harbor, Brys, Chateau Chantal, Chateau Grand Traverse, Hawthorne, and Mari have special use permits ("SUPs") for Winery-Chateaus under former Section 8.7.3(10) of the PTZO. Peninsula Cellars has an SUP for a Remote Winery Tasting Room under former Section 8.7.3(12) of the PTZO.

A Farm Processing Facility was a "use by right" in the A-1 Agricultural District and did not require the Township's issuance of an SUP but did require a land use permit. Winery-Chateaus were special uses in the A-1 Agricultural District and required an SUP. Remote Winery Tasting Rooms are special uses in the A-1 Agricultural District and require an SUP.

Plaintiff Chateau Grand Traverse received SUP 66 authorizing a Winery-Chateau on a parcel in the A-1 District owned by Chateau Grand Traverse, which remains its operative SUP. Plaintiff Chateau Chantal received SUP 95 authorizing a Winery-Chateau on a parcel in the A-1 District owned by Chateau Chantal.

Plaintiff Bowers Harbor received SUP 132 authorizing a Winery-Chateau on parts of 3 parcels in the A-1 District that are owned by Schoenherr Vineyards LLC and Langley Vineyards LLC.

Plaintiff Peninsula Cellars received SUP 62 authorizing a Remote Winery Tasting Room on a parcel in the A-1 District owned by Kroupa Enterprises, LLC. Plaintiff Brys received SUP 115 authorizing a Winery-Chateau on a parcel in the A-1 District.

Plaintiff Black Star received a land use permit authorizing a Farm Processing Facility on a parcel in the A-1 District owned by the Robert N. Mampe Trust. Plaintiff Two Lads received a land use permit authorizing a Farm Processing Facility on a parcel in the A-1 District owned by BOQ, Inc. Plaintiff Hawthorne received SUP 135 authorizing a Winery-Chateau on a parcel in the A-1 District owned by Hawthorne.

Plaintiff Bonobo received SUP 118 authorizing a Winery-Chateau on a parcel in the A-1 District owned by Oosterhouse Vineyards LLC. Plaintiff Mari received SUP 126 authorizing a Winery-Chateau on a parcel in the A-1 District owned by Mari.

2. Adopted From Plaintiffs' Proposed Findings

Peninsula Township enforced the Winery Ordinances against all the Wineries. In particular, Black Star, Two Lads, and Tabone were treated as Farm Processing Facilities under former Section 6.7.2(19) of the PTZO. Bonobo, Bowers Harbor, Brys, Chateau Chantal, Chateau Grand Traverse, Hawthorne, and Mari had special use permits and were subject to the former Section 8.7.3(10) of the PTZO. They were considered Winery-

Chateaus. Peninsula Cellars had an SUP for a Remote Winery Tasting Room under former Section 8.7.3(12) of the PTZO.[6]

The Michigan Liquor Control Code and the Wineries' Wine Maker and Small Wine Maker licenses allow the Wineries to source grapes, juice, or finished wine from anywhere in the world.

The Wineries acquired their respective Wine Maker and Small Wine Maker licenses with the expectation that they would be able to use them to the full extent allowed by the law and have invested in those licenses accordingly.

Bowers Harbor also has an Extended Retail Food Establishment license issued by the Michigan Department of Agriculture and Rural Development ("MDARD").

Peninsula Township recommended that the Michigan Liquor Control Commission ("MLCC") approve the On-Premises Tasting Room permit for Brys. Brys also has an Extended Retail Food Establishment license issued by MDARD. Chateau Grand Traverse also has an Extended Retail Food Establishment license issued by MDARD.

Chateau Chantal also has an Extended Retail Food Establishment license issued by MDARD. Peninsula Township recommended that the MLCC approve the Off-Premises

---

[6] Defendants may quickly point to this court's sweeping standing ruling at summary judgment. (ECF No. 559 at PageID.21902). But on this record, that ruling was clearly erroneous. The court was wrong to conclude that "PTP prevails on its argument that Bonobo, Grand Traverse, Brys, Hawthorne, and Bowers lack standing to pursue their as-applied challenges stemming from 8.7.3(10)(u) and 8.7.3(10)(m)." *Id.* Rather, it was abundantly clear at trial that all the "Winery-Chateaus" were subject to the vague and confusing guest activity regulations in 8.7.3(10)(u) and 8.7.3(10)(m). The Wineries easily demonstrated that "the law has in fact been (or is sufficiently likely to be) unconstitutionally applied to [them]." *See McCullen v. Coakley*, 573 U.S. 464, 485 n.4 (2014).

Tasting Room permit for Peninsula Cellars. Peninsula Cellars also has an Extended Food Establishment license issued by MDARD.

Hawthorne also has an Extended Retail Food Establishment license issued by MDARD. Peninsula Township recommended that the MLCC approve the On-Premises Tasting Room permit for Bonobo. Bonobo also has an Extended Retail Food Establishment license from MDARD. Tabone also has a Retail Food Establishment license from MDARD.

Peninsula Township recommended that the MLCC approve the On-Premises Tasting Room permit for Two Lads. Two Lads also has an Extended Retail Food Establishment license issued by MDARD.

Peninsula Township recommended that the MLCC approve Villa Mari's On-Premises Tasting Room permit.

Peninsula Township recommended that the MLCC approve Black Star's On-Premises Tasting Room permit. Black Star also has an Extended Retail Food Establishment license issued by MDARD.

Tabone has operated as a "Farm Processing Facility" under Section 6.7.2(19) of the PTZO. The Farm Processing Facility Ordinance applies to Black Star, Tabone, and Two Lads. The Winery-Chateau Ordinance applied to Bonobo, Bowers Harbor, Brys, Chateau Chantal, Chateau Grand Traverse, Hawthorne, and Mari. The Remote Winery Tasting Room Ordinance applied to Peninsula Cellars.

Peninsula Township has required the Wineries to submit grape crush and/or tonnage reports to participate in Guest Activity Uses.

The Wineries' Wine Maker and Small Wine Maker licenses allow the Wineries to cater. Peninsula Township has limited the Wineries' ability to cater.

The Wineries are farms which grow and produce agricultural products. Many activities the Wineries wish to engage in are accessory uses at wineries and farms in Michigan.

The Michigan Department of Agriculture through its Generally Accepted Agricultural and Managerial Practices ("GAAMPs") discuss how Michigan farms, like the Wineries, are allowed to engage in "promotional and educational activities at the farm market incidental to farm products with the intention of selling more farm products. These activities include, but are not limited to, farm tours (walking or motorized), demonstrations, cooking and other classes utilizing farm products, and farm-to-table dinners."

Peninsula Township has not allowed the Wineries to serve food without restriction. Peninsula Township, through the PTZO, has not allowed Farm Processing Facilities and Remote Winery Tasting Rooms to sell all the merchandise they wish.

Peninsula Township, through its Winery Ordinances, has enforced a ban on small and large events at the Wineries, with limited exceptions depending on the type of group that wishes to attend the event.

Except for weddings where all the attendees spent the night at a bed and breakfast operated on the Winery property, Peninsula Township has precluded the Wineries from hosting weddings. Each of the Wineries has received requests to host weddings.

Private residences in the agricultural zone in Peninsula Township are allowed to host events, including weddings, without the need to receive approval from Peninsula Township. Peninsula Township, through its Winery Ordinances, has limited the groups who may have events or meetings at a Winery to groups that are related to agriculture or 501(c)(3) non-profits located within Grand Traverse County.

Peninsula Township has denied permission for a Winery to host a meeting or event because the group attending the meeting was not agriculturally related or was not a Grand Traverse County 501(c)(3).

Peninsula Township, through its Winery Ordinances, has required the Wineries to obtain Township approval before a Winery may host a small or large event. Peninsula Township, through its Winery Ordinances, has required the Wineries to promote Peninsula Township agriculture at small and large events.

Peninsula Township, through its Winery Ordinances, has dictated the source of grapes and produce the Wineries may purchase. It has also required that the Wineries use and purchase grapes grown in Peninsula Township.

Peninsula Township has required some of the Wineries to provide evidence to the Township that they have acquired 1.25 tons of grapes for each person the Winery wishes to qualify to have at a meeting or event for the following year. These grapes must be either (1)

17

grown by the Winery on land other than the land where the Winery is located (2) or purchased from another Peninsula Township grape grower.

Rob Manigold was the Peninsula Township Supervisor from 1988 to 2014, and then again from 2016 to 2022. Christina Deeren was hired as the Peninsula Township Zoning Administrator in December 2016. She was eventually promoted to Peninsula Township's Director of Zoning and Zoning Administrator and served in that role until February 2023. David Sanger has been the Peninsula Township Ordinance Enforcement Officer from April 2017 to the present.

Peninsula Township's proffered governmental interests for the Winery Ordinances include: (1) preserving the agricultural production industry and providing permanent land use for the same; (2) maintaining the Township's rural character; (3) providing economically feasible public sewer and water systems to serve a future population; (4) and establishing a complete buildout population scenario and permitting the vertical integration of agricultural production without changing the agriculturally zoned lands of the Township to commercial property inconsistent with the use of those respective districts.

### 3.  Adopted from Defendants' Proposed Findings

Peninsula Township enacted Amendment 201 of the PTZO on December 13, 2022, which had the effect of repealing the Winery-Chateau land use (former Section 8.7.3(10)).

Peninsula Township's enactment of Amendment 201 of the PTZO on December 13, 2022, replaced the former Farm Processing Facility land use (Subsection 6.7.2(19)) in its

entirety with a newly recognized land use in the A-1 Agricultural District, the Wholesale Farm Processing Facility, Section 6.7.2(19).

Peninsula Township's enactment of Amendment 201 of the PTZO on December 13, 2022, authorized new winery land uses in the A-1 District, including Retail Farm Processing Facilities (Section 6.7.3(22)), Retail Farm Processing Facility (Indoors Only) (Section 8.7.3(10)), and Retail Farm Processing Facility (With Outdoor Seating)) (Section 8.7.3(11)).

Peninsula Township's enactment of Amendment 201 of the PTZO on December 13, 2022, replaced the former Remote Winery Tasting Room land use (Section 8.7.3(12)) with the revised Remote Tasting Rooms land use.

Many subsections of former Sections 6.7.2(19), 8.7.3(10), and 8.7.2(12) challenged by Plaintiffs in this lawsuit were repealed or substantially revised by Amendment 201 of the PTZO.

Peninsula Township staff were unable to locate copies of Township Master Plans preceding the 2011 Master Plan. Peninsula Township has not revised its Master Plan since it adopted the 2011 Master Plan. The Peninsula Township Master Plan describes the Community Setting as follows:

> Peninsula Township has a strategic resource in its permanent agricultural base and high scenic quality of the views and shoreline. The Township's primary economic base is shared between its agricultural production, tourism and home based businesses. The long-term economic viability of the Township depends on maintaining its economic base and also providing a high quality of life for its residents.
>
> The Township Master Plan describes the Peninsula Character as follows:

The character of Peninsula Township is defined by its history and current land uses. For much of its history the predominant land use in Peninsula Township was fruit-based agriculture and shoreline residences. The deep waters surrounding the peninsula moderate temperatures creating microclimates especially suitable for growing fruits. Prime agricultural soils exist throughout the peninsula, making agriculture a productive and viable land base. There are extensive cherry and apple orchards and vineyards running the length of the peninsula. In addition, it has been designated as an American Viticultural Area (AVA), referred to as the Old Mission Peninsula Appellation, because of the ability to grow wine grapes.

The Old Mission Peninsula became an American Viticultural Area (AVA), or appellation, known for its distinctive wines in 1987. 27 C.F.R. § 9.114; 52 Fed. Reg. 21515, June 8, 1987.

The Township Master Plan describes Peninsula Township agriculture in part as follows:

In recent years a number of landowners planted grapes for wine production, a growing industry on the peninsula. Industries that support agriculture have also developed. While there has traditionally been little heavy industry on the peninsula, the Township is currently home to many agriculturally based businesses such as road side stands and wineries.

The Township Master Plan, which identifies each zoning district, describes the intent and purpose of the A-1 Agricultural district as follows:

The agricultural district identifies those parcels within the township where the land's unique ecological and physical attributes allow viable agricultural operations and farming practices to exist. The regulations of this district are designed to preserve, enhance, and stabilize existing areas within Peninsula Township where agriculture is the predominant use of the land. Additionally, this district recognizes that there are lands within the district which are not suited to agriculture, therefore allowing other limited uses deemed compatible with agricultural and open space uses to occur.

20

The Township Master Plan defines Agricultural Land Use in Peninsula Township as follows:

> Land found within the agricultural use category is both substantially undeveloped and devoted to the production of plants and animals useful to people. Items produced within said land use class may include but are not limited to fruits, flowers, nuts, vegetables, greenhouse plants, Christmas trees, forages, sod crops, grains and feed crops, dairy and dairy products, livestock including breeding and grazing and other similar uses and activities. Furthermore, migrant housing and sales of agricultural products are considered accessory uses permitted within the agricultural land use category. Other related activities such as greenhouses, nurseries, food processing plants, wineries, renewable energy generation and bed and breakfast establishments are also allowed in this land use category under special consideration by township officials. These related activities should generally be located in areas of the agricultural community where prime and unique soils are not prevalent. Residential densities within said category are historically limited to one (1) dwelling unit per five (5) acres of land.

The Township Master Plan establishes the following Agricultural Land Use Policy for Peninsula Township:

> It is the policy of Peninsula Township to protect, preserve and promote agricultural and open space lands. To promote policy within the agricultural land use category the Township has the option to divide the existing single agricultural designation into two (2) land use categories, each possessing more specific impacts upon the land. It is the intent of Peninsula Township to continue to preserve prime agricultural land while directing development to more suitable areas of the township. By promoting the use of Planned Unit Developments (PUD) and cluster developments on lands that are not subject to conservation easements, the township can facilitate development while maintaining primary agricultural lands. These policies and regulations can be effective in providing long- term protection of farmland and open space where agriculture takes precedence over residential uses.

The Township Master Plan presents the Future Land Use policies, including for Agricultural Land Uses, and describes the Rural Agricultural Land Use as follows:

> The primary objective of the Rural Agricultural land use category is to preserve the important natural resources of Peninsula Township, while allowing other

21

limited uses which are deemed to be compatible with agricultural and open space uses. These lands include, but are not limited to: steep slopes, primary ridgelines, wildlife corridors, wetlands, lakes, streams, riparian areas and rural areas not designated for Agricultural Preserve uses. The Rural Agricultural classification is also intended to serve as a buffer between the Agricultural Production and the Residential land use classifications. Since the inception of zoning in Peninsula Township, it was common practice to allow many uses not covered by other zoning districts to be allowed in the agriculture zoning district. With the adoption of the Purchase of Development Rights program and agricultural preserve areas, Peninsula Township has informally created a more strictly defined agricultural zoning district. There is a need to establish a rural agricultural district to accommodate rural land uses that have been allowed in the former multi-purpose agricultural zoning district.

The Township Master Plan identifies examples of acceptable uses for the rural agricultural land use as including public & private parks, recreational areas & facilities, hunting & fishing areas, nurseries, and farming. It identifies examples of related activities zx including microbreweries; family day care; group day care; warehousing; food processing plants; wineries; renewable energy conversion systems; and bed & breakfast establishments.

According to Dr. Daniels, the PTZO serves to implement the Township Master Plan and promote the public health, safety, and welfare by separating conflicting land uses, setting development standards, ensuring consistent application of standards across zoning districts, and creating dispute resolution and enforcement mechanisms.

According to Dr. Daniels, Peninsula Township zoning provisions limiting retail sales to logo merchandise and wine-related items allow wineries to be profitable without changing them to commercial uses on agricultural land, furthering the Township's governmental interests as stated in the PTZO and the Master Plan.

According to Dr. Daniels, Peninsula Township zoning provisions limiting activities or events to those that promote local agriculture, including the wine that Peninsula Township wineries produce onsite, offer wineries opportunities to increase sales and profitability without allowing accessory activity and event uses to overtake the principal winery use of wine production.

According to Dr. Daniels, Peninsula Township strives to balance agricultural production, agricultural processing, and the sale of agricultural products against purely commercial activity with no direct relationship to agriculture. The A-1 District contains a significant amount of farmland in active agricultural production while allowing for limited reasonable economic use of the property, as evidenced by some wineries operating their facilities as principally agricultural businesses in the A-1 District for decades.

Peninsula Township maintains records of meetings of the Township Board, Planning Commission, Zoning Board of Appeals, and Township committees and typically compiles and distributes packets of materials ahead of meetings of these Township bodies, which typically include drafts of zoning amendments under consideration, zoning applications, staff memos, correspondence, resources, and more. Peninsula Township staff located the minutes of some but not all meetings and some but not all packets of materials compiled ahead and distributed to members for meetings of the Township Board, Planning Commission, Zoning Board of Appeals, and Planning Commission committees where winery ordinances and winery land use permit applications and amendments were considered dating back to at least 1989.

23

The PTZO provided for Peninsula Township to be zoned into districts "defined and established as shown" on the Township's zoning map. The PTZO established 10 districts, including the C-1 Commercial district and A-1 Agricultural district.

The PTZO set forth "Uses Permitted by Right" (*i.e.*, uses by right) and "Uses Permitted by Special Use Permit" (*i.e.*, special uses) in the A-1 District. The PTZO defines a winery as a "state licensed facility where agricultural fruit production is maintained, juice is processed into wine, stored in bulk, packaged, and sold at retail or wholesale to the public with or without the use of a wine tasting facility. The site and buildings are used principally for the production of wine."

The PTZO defined a tasting room as:

A room in conjunction with a licensed winery premises, including a remote wine tasting room, where the following takes place; a) tasting of fresh and/or processed agricultural produce such as wine, fruit wines, and non-alcoholic fruit juices; b) retail sales of winery products by the bottle for off-premises consumption; and c) sales of wine by the glass for on-premises consumption.

The PTZO defined a Farm Processing Facility as:

[A] building or buildings containing an area for processing equipment where agricultural produce is processed or packaged and prepared for wholesale and/or retail sales. In addition to processing, the building(s) may also include a retail sales area for direct sales to customers and a tasting room for the tasting of fresh or processed agricultural produce including wine. The facility also includes necessary parking, lighting and access to a public road.

The Township's intent for the Farm Processing Facility use was "to promote a thriving local agricultural production industry and preservation of rural character." The PTZO provided for three winery-related special uses in the A-1 District: the Food Processing Plant, Winery-

24

Chateau, and Remote Winery Tasting Room. (PTZO §§ 6.7.3(4), 6.7.3(22), 8.5, 8.7.2(11), 8.7.2(13), 8.7.3(10), and 8.7.3(12).

The PTZO defined a Winery-Chateau as:

A state licensed facility where (1) commercial fruit production is maintained, juice is processed into wine, stored in bulk, packaged, and sold at retail or wholesale to the public with or without the use of a wine tasting facility and (2) a limited number of guest rooms with meals are offered to the public.

The Township's intent for the Winery-Chateaus use was "to permit construction and use of a winery, guest rooms, and single family residences as a part of a single site subject to the provisions of this ordinance" and that "[t]he developed site must maintain the agricultural environment, be harmonious with the character of the surrounding land and uses, and shall not create undue traffic congestion, noise, or other conflict with the surrounding properties."

The Township's intent for the Remote Winery Tasting Room was "to allow wine tasting in a tasting room that is not on the same property as the winery with which it is associated."

On November 21, 1989, following months of consideration, the Township Board established the Winery-Chateau as a special use permissible in the A-1 District by approving Amendment 79. Amendment 79 arose from a March 20, 1989, Planning Commission meeting during which Bob Begin, founder of Chateau Chantal, requested "a text amendment to the [PTZO] to allow Winery-Chateau sleeping rooms" as a special use in the A-1 District.

The Planning Commission designated a committee to draft Amendment 79 for Mr. Begin and held a special meeting to consider the amendment before holding a public hearing

on it. On June 26, 1989, the Planning Commission held a public hearing on Amendment 79, heard comments expressing support for the proposal as a way to keep land in agricultural production, heard concerns about the Township's capacity to accommodate large numbers of visitors, and voted to recommend that the Board approve the amendment.

At a special meeting on August 15, 1989, some Board members noted concerns about whether Amendment 79 was consistent with the Township's comprehensive plan. The Board returned Amendment 79 to the Planning Commission for further consideration. On August 21, 1989, the Planning Commission voted to refer Amendment 79 to a committee for review and preparation of a report. On October 16, 1989, the Planning Commission held another public hearing on Amendment 79, after which a motion to recommend approval failed. Despite the failed motion, the Planning Commission forwarded Amendment 79 to the Board for consideration at Mr. Begin's request.

On November 20, 1989, the Planning Commission discussed whether adoption of Amendment 79 should be preceded by a study and amendment of the Township's Master Plan "to get a handle on the number of potential wineries" on the Peninsula and identify suitable land for them. A motion to revise the Master Plan before adoption of Amendment 79 failed. On November 21, 1989, the Board voted to approve Amendment 79.

Following the enactment of Amendment 79, Mr. Begin applied for an SUP under it. On December 18, 1989, the Planning Commission held a public hearing at which Mr. Begin described his proposal, which included an owner's or manager's residence, 12 guest rooms, a winery, and six condominium lots for single-family residences.

The Planning Commission approved a motion to send Mr. Begin's proposal to its "SUP committee" for review and recommendations. On January 15, 1990, the Planning Commission discussed Mr. Begin's proposal and voted to recommend the Board approve it. On February 13, 1990, the Board discussed Mr. Begin's SUP application but did not reach a conclusion on it.

On March 13, 1990, the Board held a public hearing and voted to approve a revised version of the proposed SUP, designated SUP #21, that excluded requested accessory uses of a swimming pool and tennis courts. On July 10, 1990, the Board approved a slightly revised version of SUP #21. SUP #21 stated that Chateau Chantal could provide "[f]ood service (except wine tasting)" only to registered guests of its Inn.

The Township began considering additional zoning amendments to expand Winery-Chateau accessory uses to include events, meeting facilities, and food service for non-registered guests as early as 1996 and rejected proposals with an insufficient nexus to agricultural production.

On June 16, 1997, the Planning Commission held a public hearing on Mr. Begin's proposed amendment to SUP #21, designated SUP #56. The Planning Commission noted it had received 33 letters regarding the requested amendment. The Planning Commission heard comments from dozens of individuals. The Planning Commission noted unresolved concerns and returned the proposal to committee for revision and a recommendation.

By September of 1997, the Board voted to accept most of the Planning Commission's recommendations regarding the amendment and to form a committee to establish draft guidelines for special events.

At some point during the Township's consideration of Mr. Begin's requests for zoning and SUP amendments authorizing expanded accessory uses, Mr. Begin and Chateau Chantal sued the Township in Grand Traverse County Circuit Court, File No. 98-17195-CZ. The litigation resulted in a Consent Judgment. On February 9, 1999, the Board held a public hearing to establish guidelines for Chateau Chantal and adopted such guidelines pursuant to the Consent Judgment.

On July 16, 2001, the Planning Commission considered a request from Chateau Chantal for a zoning amendment to create "three new categories of uses at the Chateau: Contract Groups, Contract Events, and Community Events, in addition to current allowed uses," and noted that Mr. Hayward and Mr. Begin had met to start the drafting process. On October 15, 2001, the Planning Commission heard the committee report on Chateau Chantal's proposed zoning amendment and discussed it.

On November 26, 2001, the Planning Commission reviewed and discussed the draft amendment language. The Planning Commission agreed that the committee would "re-group" and return for the next Planning Commission meeting.

At a Planning Commission meeting on December 17, 2001, Mr. Hayward reviewed a new draft of the proposed amendment. Mr. Hayward informed the Planning Commission that the committee was "striving to document the direct relationship between additional uses

in the form of guest activities and the Winery-Chateau and the actual production of crops on the Peninsula," and that its "new formula" for the amendment was "based on acreage rather than production."

On January 9, 2002, the Board and Planning Commission held a special joint meeting to discuss the "Winery-Chateau Activities Amendment," as well as the recently introduced Farm Processing Facility amendment and its Open Space Conservation District Transfer of Development Rights program.

On February 19, 2002, the Planning Commission reviewed a draft of the proposed amendment, the "intent" of which was to allow some reasonable activities, in exchange for a guarantee of fruit production on the Peninsula, as well as Old Mission Peninsula wine being tasted and used in the activities. The Planning Commission held a "public information meeting" about the proposed amendment, then voted to "send issues and comments regarding [the] Winery-Chateau Activities Amendment back to committee to structure in ordinance form; then bring back for the Planning Commission to review."

On April 23, 2002, the Planning Commission held a public hearing on the proposed "Winery-Chateau Activities" amendment, designated Amendment 141. After a public hearing, the Planning Commission voted to recommend the Board approve Amendment 141. The Board did not approve Amendment 141.

At a meeting on June 16, 2003, the Planning Commission discussed Amendment 141 and voted to schedule a public hearing on it. The Planning Commission voted to

recommend the Board approve Amendment 141, "excluding 'wedding receptions' and 'family reunions.'"

On September 15, 2003, the Planning Commission received a report that "the Township Board had returned [Amendment 141] to the Planning Commission because of the [Grand Traverse] County Planning Commission's decision to recommend denial of this amendment." The Planning Commission discussed the County Planning Commission's opinion and voted to table Amendment 141.

On May 17, 2004, the Planning Commission heard a committee report on Amendment 141, which indicated that the committee had met "to clarify guest activity uses and make the language more consistent." The Planning Commission discussed "the definition of 'Peninsula' wine" and related language, noted changes to the draft language, and voted to set a public hearing on Amendment 141.

On June 21, 2004, the Planning Commission held a public hearing on Amendment 141. The Planning Commission voted to recommend the Board approve Amendment 141. On August 10, 2004, the Board held a public hearing on Amendment 141. Following discussions, the Board voted to approve Amendment 141. Amendment 141 added subsection (u) to the existing Winery-Chateau section at § 8.7.3(10), which had been added by Amendment 79.

Guest Activity Uses were support uses that the Board could approve in a Winery-Chateau's SUP, and which allowed Winery-Chateaus to host and serve food at wine and food seminars, cooking classes, meetings of Grand Traverse County 501(c)(3) nonprofit

organizations, and meetings of agricultural related groups notwithstanding the generally applicable limitation that accessory uses like meeting facilities and food service are for registered (*i.e.*, overnight) guests only.

Subsection 8.7.3(10)(u)(1)(b) expressed the Township's intent that Guest Activity Uses "help in the promotion of Peninsula agriculture by a) identifying 'Peninsula Produced' food or beverage for consumption by the attendees; b) providing 'Peninsula Agriculture' promotional brochures, maps and awards; and/or c) including tours through the winery and/or other Peninsula agriculture locations."

Subsection 8.7.3(10)(u)(1)(b) purportedly furthers both the Winery-Chateaus' interest in having additional opportunities to promote themselves, which was the purpose of the requests that prompted the Township's enactment of Amendment 141, and the Township's substantial governmental interest in promoting agriculture.

Subsection 8.7.3(10)(u)(1)(b) stated the Township's intent in allowing Guest Activity Uses. Subsection 8.7.3(10)(u)(5)(h) stated that "[n]o outdoor displays of merchandise, equipment or signs [we]re allowed" during Guest Activity Uses.

On January 19, 1998, the Planning Commission considered a request by Dave and Joan Kroupa and Lee Lutes on behalf of Peninsula Cellars, who "propos[ed] to move their current wine tasting from the store in Old Mission to the old schoolhouse on the corner of Center and Carroll Roads." Mr. Hayward noted that the proposal would require a zoning amendment or rezoning the parcel. The Planning Commission discussed the proposal and referred it to its "Ag/Commercial Committee."

31

On February 17, 1998, the Planning Commission heard a committee report on the proposal, designated Amendment 120; discussed concerns about property ownership and whether the proposal would allow a "commercial use on an agricultural parcel"; and voted to set a public hearing on it. On March 23, 1998, the Planning Commission discussed Amendment 120 and decided to hold a public information meeting on it.

On April 13, 1998, the Planning Commission held a public hearing on the proposed amendment relating to Peninsula Cellars' request, designated as Amendment 120. The Planning Commission voted to send the amendment to the Board with a recommendation for approval. On May 12, 1998, the Board held a public hearing on Amendment 120. The Board approved Amendment 120 with minor revisions.

At a Planning Commission meeting on May 18, 1998, Dave Kroupa presented a request for an SUP under newly enacted Amendment 120 to move his existing tasting room from Old Mission to the old Maple Grove School building. The Planning Commission voted to send the request to its "Ag Committee" and directed the committee to schedule a site visit with Mr. Kroupa. The Planning Commission also voted to set a public hearing on a necessary revision to Amendment 120, later designated Amendment 121. On June 15, 1998, the Planning Commission held a public hearing on Amendment 121 and voted to pass it on to the Board, which approved it on July 14, 1998.

At a Planning Commission meeting on July 20, 1998, Dave and Joan Kroupa presented their proposal to use the old Maple Grove School for their wine tasting room, designated SUP #62. The Planning Commission voted to schedule a public hearing on the

proposal pending receipt of certain requested information and scheduled a site visit to the property. On September 21, 1998, the Planning Commission held a public hearing on SUP #62. The Planning Commission voted to table the request until the committee could meet with the Kroupas to address the public's concerns.

On November 10, 1998, the Board held a public hearing on SUP #62. Following discussion, the Board voted to approve SUP #62 with certain conditions relating to property ownership requirements, licensing requirements, parking, and buffering.

Amendment 120 added Section 8.7.3(12) to the PTZO. Peninsula Cellars could sell its wine by the bottle for off-premises consumption and by the glass in accordance with state laws and regulations.

In addition to retail wine sales allowed by § 8.7.3(12)(h), challenged provision §8.7.3(12)(i) allowed limited retail sales of promotional merchandise as follows:

> Retail sale of non-food items which promote the winery or Peninsula agriculture and has the logo of the winery permanently affixed to the item by silk screening, embroidery, monogramming, decals or other means of permanence. Such logo shall be a least twice as large as any other advertising on the item. No generic or non-logo items may be sold. Promotional items allowed may include corkscrews, wine glasses, gift boxes, t-shirts, bumper stickers, etc.

Allowing retail sales of winery or agricultural promotional merchandise in the A-1 District is a reasonable way to promote agriculture and preserve farmland by helping farmers market themselves and their products and by creating an additional revenue stream for them.

Nothing in the text § 8.7.3(12)(i) prevents a Remote Winery Tasting Room from selling non-logo merchandise on property located outside the A-1 District, such as in the C-

1 commercial district or downtown Traverse City, or through the Remote Winery Tasting Room's website.

8.7.3(12)(k) also limits the promotion of items other than wine for sale at the Remote Winery Tasting Room as follows: "Signs and other advertising may not promote, list or in any way identify any of the food or non-food items allowed for sale in the tasting room."

At a Planning Commission meeting on December 17, 2001, the Farm Processing Facility Amendment was introduced and designated as Amendment 139. The Board and Planning Commission held a special joint meeting on January 9, 2002, to discuss Amendment 139, as well as Amendment 141 (Winery-Chateau Guest Activity Uses) and its Open Space Conservation District Transfer of Development Rights program.

Amendment 128 was an amendment that was less restrictive than Amendment 139 and would have created a new "Winery with Tasting Room" special use in the A-1 District, allowing a winery with tasting and retail sales on just 10 acres with a minimum of 5 acres in fruit production. The Board approved Amendment 128 by a 3-2 vote on February 8, 2000, but Amendment 128 was repealed by referendum a few months later.

On February 19, 2002, the Planning Commission held a public information meeting about Amendment 139. On June 17, 2002, the Planning Commission held a public hearing on Amendment 139. The Planning Commission voted to approve and forward Amendment 139 to the Board with recommendations and notations of "differences between this ordinance and Amendment 128 for informational purposes."

34

On July 9, 2002, the Board held a public hearing on Amendment 139. Many individuals supported the amendment because it permitted Wineries to sell what was grown on the land, which represented a tight nexus to agriculture. The Board engaged in a lengthy discussion and ultimately voted to approve Amendment 139 with minor revisions.

Amendment 139 added Section 6.7.2(19) to the PTZO. The underlying principle of the Farm Processing Facility is that a farm may sell what it grows and processes. Accordingly, Section 6.7.2(19) permitted farms to have tasting and retail sales of wine made from grapes or other fruit grown on the farm and processed in the farm's winery.

In addition to retail wine sales, challenged provision § 6.7.2(19)(b)(1)(v) allowed limited retail sales of winery logo merchandise. Allowing retail sales of winery promotional merchandise in the A-1 District is a way to promote agriculture and preserve farmland by helping farmers market themselves and their products and by creating an additional revenue stream for them. Limiting retail sales of merchandise other than wine to that which promotes the Farm Processing Facility by bearing its logo is a way to ensure that the Farm Processing Facility does not sell generic souvenirs and convenience store items. Nothing in § 6.7.2(19)(b)(1)(v) prevents a Farm Processing Facility from selling non-logo merchandise on property located outside the A-1 District, such as in the C-1 commercial district or downtown Traverse City, or through the Farm Processing Facility's website.

4.  Winery Specific Findings

a.  Chateau Chantal

On or about December 14, 2004, the Board approved Guest Activity Uses in Chateau Chantal's SUP, designated SUP #95. Chateau Chantal was represented by Marie Chantal Dalese, its president, CEO, and co-owner at trial. Chateau Chantal is a family business. It was classified as a Winery-Chateau and holds licenses and permits from the MLCC. Chateau Chantal's SUP encompasses 65 acres, of which 48 acres are grapevines, and owns another 10 acres outside of its SUP. It farms another 30 acres in Peninsula Township and purchases fruit from another 40 acre farm. Chateau Chantal processes 300 tons of grapes each year. The winery has one main building with numerous tasting areas, a 12-room bed and breakfast and an upstairs "manager's residence" for Ms. Dalese's father.

The Township suggested that Chateau Chantal was not harmed by Guest Activity Use restrictions because it had hosted some weddings. But all guests at these weddings must spend the night at its 12-room bed and breakfast which led to "minimal success" and maybe 3 weddings per year. The Township also asserted that Chateau Chantal can host corporate retreats; but it could do so only if all participants spent the night. Given Chateau Chantal's limited space, corporate retreats and normal sized weddings are more or less barred under the PTZO. Chateau Chantal has hosted food and wine pairing dinners, and it tried to host local 501(c)(3) and agricultural related groups; but these events represent a fraction of what Chateau Chantal would like to do with their property.

b.  Mari

On March 15, 2016, the Board approved a Winery-Chateau SUP, designated SUP #126, for Mari. SUP #126 included Board approval for Guest Activity Uses. Mari called its

36

Vice President and General Manager, Alexander Lagina. After a few years of preparation, Mari opened its doors to the public in 2016. Mari's winery sits on 50 acres, although Mari has 80 acres in Peninsula Township planted with grapes. Mari's principal owns approximately 500 acres of land in Peninsula Township. Mari harvests 80-150 tons of grapes annually. Mari's winery building has multiple tasting rooms and large caves available for tastings, spread over four levels. Mari was a Winery-Chateau and holds MLCC licenses and permits.

    c.   Chateau Grand Traverse

On July 10, 1990, the Board approved a Winery-Chateau SUP, designated SUP #24, for Chateau Grand Traverse. Chateau Grand Traverse obtained two subsequent SUPs—SUP #59 and SUP #64—before the Board approved its current operative SUP, designated SUP #66, on July 13, 1999. SUP #66 replaced SUP #24, SUP #59, and SUP #64. The Board approved a supplemental SUP for Chateau Grand Traverse, designated SUP #94, on September 14, 2004. SUP #94 permitted Chateau Grand Traverse to construct additions to its winery building for office space and storage. SUP #94 entailed a site plan amendment but there were "no changes in the use" and no changes to the findings for SUP #66; the new SUP number was solely for tracking purposes.

On June 12, 2007, the Board approved a request from Chateau Grand Traverse for another building addition as an amendment to the site plan under SUP #94. Chateau Grand Traverse did not appeal the Board's decision approving the June 12, 2007, amendment to

SUP #94 nor any prior SUP or amendment. Chateau Grand Traverse has not obtained another SUP or SUP amendment since June 12, 2007.

Chateau Grand Traverse called Edward O'Keefe, its President since the mid-1990s. Chateau Grand Traverse started in 1974 when Mr. O'Keefe's father decided to open a winery in northwest Michigan. The winery sits on around 84 acres of land. Chateau Grand Traverse, or the O'Keefe family, controls approximately 113 acres of planted grapes, which produce an average of 350 tons of grapes. Chateau Grand Traverse also buys 200-400 tons of grapes annually from other Township farmers, including 80-100 tons of grapes from former Township Supervisor Rob Manigold. It has MLCC licenses and permits.

Chateau Grand Traverse predates the Winery-Chateau Ordinance, its SUP refers to it as a "winery chateau," which creates confusion whether it is subject to the Winery-Chateau Ordinance. The SUP is further confusing in that it allows "outdoor functions such as wine tasting parties, festivals, etc.," but requires a special permit if these are likely to involve more than 75 people. Chateau Grand Traverse would like to be able to host more than 75 people. The "etc." has always confused Mr. O'Keefe, and he has no idea if the SUP allows him to hold indoor functions. It also allows "low-level mood music" but Mr. O'Keefe does not know what that means.

d. Brys

On February 8, 2011, the Board approved a Winery-Chateau SUP, designated SUP #115, for Brys. SUP #115 included Board approval for Guest Activity Uses. Brys Estate called Patrick Brys, its President and CEO, who also owns the winery with his mother. His parents started the winery in 2000 when they purchased an abandoned cherry orchard, and

they opened the winery to the public in 2005. Brys Estate leases its property from Brys Realty, LLC, which the Brys family also owns. Brys Estate is the largest contiguous winery on the OMP at 155 acres, with approximately 44 acres planted with grapes. It harvests approximately 120 tons of grapes annually. The property also features 900 apple trees and a "secret garden" on the property on which lavender is grown. Brys Estate has another 30-40 acres that are suitable for planting grapes, but it needs to sell more wine to make planting more grapes a worthwhile investment. Brys Estate started as a Farm Processing Facility but became a Winery-Chateau in roughly 2011. Brys Estate holds MLCC licenses and permits.

e. Bonobo

On May 14, 2013, the Board approved a Winery-Chateau SUP, designated SUP #118, for Bonobo. SUP #118 included Board approval for Guest Activity Uses. Bonobo called Todd Oosterhouse, its owner and General Manager. Bonobo planted its first vines in 2010 and opened to the public in 2014. Bonobo's winery property consists of 50 acres, with 23 acres of vines. Bonobo harvests 45-80 tons of grapes annually. Bonobo leases its property from a related entity, Oosterhouse Vineyards, LLC. Bonobo was a Winery-Chateau and holds licenses and permits from the MLCC.

At trial, the Township focused on whether Bonobo qualified for "Guest Activity Uses." The Township questioned whether Bonobo planted sufficient acreage to comply with the Winery-Chateau Ordinance. There initially was a dispute between the parties on this issue, but it was resolved by a settlement agreement requiring Bonobo to plant an additional 5.95 acres of vines. Bonobo then planted a further 7.95 acres

With this issue resolved, David Sanger, the Township's enforcement officer, told Bonobo it could have Guest Activity Uses if Bonobo submitted grape tonnage reports. Bonobo provided its tonnage reports, (ECF No. 611-34 at PageID.25836); (ECF No. 600 at PageID.23025), and was told it was approved for Guest Activity Uses.

f.   Bowers Harbor

On July 23, 2019, the Board approved a Winery-Chateau SUP, designated SUP #132, for Bowers Harbor. SUP #132 included Board approval for Guest Activity Uses. Bowers Harbor called Spencer Stegenga, its owner. The Bowers Harbor property has a primary tasting room, an old horse barn. Mr. Stegenga and his mother each own a house on the property. Bowers Harbor sits on roughly 48 acres, and it leases its property from two entities owned by Mr. Stegenga's family members. Bowers Harbor has approximately 15 acres of vines on its property, all of which it planted. It has contracted for another 65-80 acres of Peninsula Township grapes. Bowers Harbor harvests around 200 tons of grapes annually. Bowers Harbor contracts with other wineries to process most of its wine off site. When it started as a winery, Bowers Harbor's initial SUP classified it as a "roadside stand" but the Township pushed it to become a Winery-Chateau in 2019. Bowers Harbor has MLCC licenses and permits.

g.   Hawthorne

On July 14, 2020, the Board approved a Winery-Chateau, designated SUP #135, for Hawthorne. SUP #115 included Board approval for Guest Activity Uses. Montague Development, LLC owns HV Holdings, LLC, which owns Hawthorne Vineyards, LLC.

Montague Development, LLC also owns the winery's land, buildings, grapes and equipment. Hawthorne called Bill Maier, who works for Montague Development, LLC and also is the COO for the winery. From 2013 until 2020, the winery was classified as a Farm Processing Facility. It became a Winery-Chateau to host events, but Mr. Maier's confusion regarding the term "guest activities" ended those plans. (ECF No. 605 at PageID.24231).

Hawthorne's building is a two-level walkout built into a hill, and it has around 30 acres of grapes. Hawthorne would like to expand its acreage if growing more grapes becomes financially viable by having events. Hawthorne lacks an MLCC license or permits upon which to base any claim for relief under its preemption theory.

h.  Peninsula Cellars

Peninsula Cellars has not obtained another SUP or SUP amendment since November 10, 1998. Peninsula Cellars, the only winery governed by the Remote Winery Tasting Room Ordinance, called its owner and General Manager, John Kroupa, a sixth-generation Peninsula Township farmer. Peninsula Cellars received an SUP to operate a remote tasting room in 1998 and opened its doors in 1999. It has licenses and permits issued by the MLCC. The remote tasting room is located on Center Road, but its wine production facility is several miles to the north, on Kroupa Road. This facility sits on over 300 acres, of which 40 acres are grapevines, and it harvests around 150 tons of grapes annually; it also grows apples and cherries. Mr. Kroupa planted the majority of those acres. The winery is an old schoolhouse on a five-acre parcel, where some grapes are also grown.

Mr. Kroupa testified that he wants his children to maintain his farm in the future, but he is unsure whether that is a viable prospect given the Township's PTZO.

i.  Black Star

On September 27, 2007, the Township issued Final Farm Processing Facility Permit #2 to Black Star authorizing "[t]he processing of agricultural produce" but not "Retail sales / Tasting." Black Star called Sherri Fenton and Lee Lutes. Ms. Fenton is the managing owner and oversees its hospitality programs. Mr. Lutes is the managing member and its director for winery operations. Mr. Lutes has been in the wine industry for over 30 years and helped found Peninsula Cellars in 1994. Black Star was created because its farming partners realized that growing grapes was insufficient to sustain a farming operation on the OMP. In order to maintain their land in agriculture, Lutes explained that the Wineries have to engage in value-added production and find alternate sources of revenue.

Black Star was classified as a Farm Processing Facility. The Peninsula Township property consists of 72 acres, of which Black Star leases 5 from one of its members for its production facility and tasting room. Black Star obtains grapes from another 50 acres in Peninsula Township.

j.  Two Lads

On October 18, 2007, the Township issued Two Lads Final Farm Processing Facility Permit #3 authorizing "[t]he processing of agricultural produce" but no "Retail sales / Tasting." Two Lads called Chris Baldyga, its co-founder and co-owner. Two Lads leases its property from BOQ, LLC, which Mr. Baldyga and his wife own. Two Lads was formed in

2007 before opening its doors to the public in 2008. When the land was purchased, it had 12.5 acres of grapes and Two Lads planted another 10.5 acres. Two Lads harvests 60-70 tons of grapes annually and purchases another 40-50 tons from other farmers. Two Lads was classified as a Farm Processing Facility. It holds MLCC license and permits. Mr. Baldyga has been the president of WOMP since 2020. Mr. Baldyga explained that if he were unable to farm and maintain his winery, he would explore selling his property for housing development.

### k.  Tabone

Tabone has been operating as a Farm Processing Facility and was regulated by the Farm Processing Facility Ordinance, despite the Township's insistence that Tabone is a Food Processing Plant. (ECF No. 559 at PageID.21902). Tabone's primary location is approximately 30 acres, of which roughly 20 are vines. Tabone harvests approximately 15 tons of grapes each year.

## III. Issues Left for Trial

The parties disagreed on the scope of trial. Following the second round of summary judgment, Plaintiffs' commercial speech claims, damages, and injunctive relief request remained for trial.

Plaintiffs announced a new theory of liability on the second day of trial. (ECF No. 601 at PageID.23312). The court had previously ruled against Plaintiffs' preemption theory of liability regarding closing times. When Plaintiffs' counsel began questioning winery witness on closing times, Defendants objected on relevance grounds. (ECF No. 601 at

PageID.23311). Plaintiffs argued that the Township had admitted the PTZO does not contain an actual closing time, but the Township enforced a closing time anyway. (ECF No. 601 at PageID.23312). The Wineries insisted that they have a constitutional right to engage in their business under life and liberty interests. *Id.*

Plaintiffs cited at trial, for the first time, *Sanderson v. Village of Greenhills*, 726 F.2d 284, 285 (6th Cir. 1984). There, a district court denied a preliminary injunction for a plaintiff seeking a section 1983 claim against his village, reasoning that "there is no federal right to be free from simply erroneous applications of otherwise valid state laws." *Id.* at 285. The circuit reversed and held that section 1983 did provide a cause of action when someone is subject to "erroneous enforcement of local ordinances." *Id.* Plaintiffs insist that the facts here mirror those in *Sanderson*; the erroneous enforcement of an nonexistent closing time ordinance constitutes a substantive due process violation.

Despite the close factual similarities between *Sanderson* and this case, the court will sidestep *Sanderson's* viability for now and turn to whether it is fair to consider Plaintiffs' new theory of liability, which was announced during trial.

A "plaintiff may obtain relief on an unpleaded theory of recovery only if he proves that theory, he bases it on the wrongful act alleged in the complaint, and the defendant receives fair notice of the theory." *Yoder v. Univ. of Louisville*, 417 F. App'x 529, 530 (6th Cir. 2011) (citations omitted). Unpleaded claim recovery is authorized under Federal Rule 54(c), which provides that a "judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." Thus, for any unpleaded

closing time claim to form a recoverable, triable theory, the factual predicates for such a claim must be fairly traceable to the complaint allegations. *Bluegrass Ctr., LLC v. U.S. Intec, Inc.*, 49 F. App'x 25, 32 (6th Cir. 2002) ("The essence of a claim is its factual elements."); *see also Huang v. Univ. of Pikeville*, No. 7:18-CV-11-REW, 2019 WL 5929260, at *6 (E.D. Ky. Nov. 12, 2019).

In the court's judgment, Plaintiffs' *Sanderson* theory would permit a third bite at the apple after two rounds of summary judgment. And it would be extremely prejudicial to Defendants. Plaintiffs did not cite *Sanderson* until trial, so the court will foreclose Plaintiffs' reliance on *Sanderson*. Without the *Sanderson* theory, there is no legal hook for Plaintiffs' damages associated with the Township's alleged erroneous enforcement of closing times.

## IV. Commercial Speech Claims

Plaintiffs challenge several sections of the PTZO as unlawful regulations of commercial speech. "Commercial speech" is defined as "expression related solely to the economic interests of the speaker and its audience," and as "speech proposing a commercial transaction." *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 493 (1995) (Stevens, J., concurring). When laws restrict commercial speech, they "need only be tailored in a reasonable manner to serve a substantial state interest in order to survive First Amendment scrutiny." *Edenfield v. Fane*, 507 U.S. 761, 767 (1993). Courts evaluate commercial speech claims under the *Central Hudson* test. *See generally Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557 (1980). Under *Central Hudson*, if the speech concerns lawful activity and is not misleading, then the burden is on the government to (1) identify a substantial

governmental interest, (2) show that the regulation directly advances that interest, and (3) show that the regulation "is not more extensive than necessary to serve that interest." *Id.* at 566.

After summary judgment, five **PTZO** provisions remained at issue. The court indicated that Sections 6.7.2(19)(b)(1)(v) (regulating logos and merchandise), 8.7.3(10)(u)(1)(b) (promotion of Peninsula Township), 8.7.3(10)(u)(5)(h) (outdoor displays), 8.7.3(12)(i) (regulating logo size), and 8.7.3(12)(k) (promotion of food on signs) related to and regulated speech on their face—generally through limits on advertising. Those provisions are here:

- Section 6.7.2(19)(b)(1)(v) – applies to Farm Processing Facilities
  - Ordinance text: "Logo merchandise may be sold provided:
    1. The logo merchandise is directly related to the consumption and use of the fresh and/or processed agricultural produce sold at retail;
    2. The logo is prominently displayed and permanently affixed to the merchandise;
    3. Specifically allowed are: a) gift boxes/packaging containing the approved products for the specific farm operation; b) Wine Glasses; c) Corkscrews; d) Cherry Pitter; and e) Apple Peeler; and
    4. Specifically not allowed are unrelated ancillary merchandise such as: a) Clothing; b) Coffee Cups; c) Bumper Stickers."

- Section 8.7.3(10)(u)(1)(b) – applies to Winery-Chateaus
  - Ordinance text: "Guest Activity Uses are intended to help in the promotion of Peninsula agriculture by: a) identifying 'Peninsula Produced' food or beverage for consumption by the attendees; b) providing 'Peninsula Agriculture' promotional brochures, maps and awards; and/or c) including tours through the winery and/or other Peninsula agriculture locations."

- Section 8.7.3(10)(u)(5)(h) – applies to Winery-Chateaus
  - Ordinance text: "No outdoor displays of merchandise, equipment or signs are allowed."

- Section 8.7.3(12)(i) – applies to Remote Winery Tasting Rooms

- o Ordinance text: "Retail sale of non-food items which promote the winery or Peninsula agriculture and has the logo of the winery permanently affixed to the item by silk screening, embroidery, monogramming, decals or other means of permanence. Such logo shall be at least twice as large as any other advertising on the item. No generic or non-logo items may be sold. Promotional items allowed may include corkscrews, wine glasses, gift boxes, t-shirts, bumper stickers, etc."

- Section 8.7.3(12)(k) – applies to Remote Winery Tasting Rooms
  - o Ordinance text: "Signs and other advertising may not promote, list or in any way identify any of the food or non-food items allowed for sale in the tasting room."

After working through the *Central Hudson* inquiry at summary judgment, the court concluded that questions of fact precluded summary judgment regarding whether the regulation is not more extensive than necessary to serve the Township's interests. Accordingly, the remaining issues for trial were whether §§6.7.2(19)(b)(1)(v), 8.7.3(10)(u)(1)(b), 8.7.3(10)(u)(5)(h), 8.7.3(12)(k), 8.7.3(12)(i) advanced the Township's stated interests.

A. The Township's Interest in PTZO Enforcement

The PTZO has the express purpose of, among other things: (1) protecting "the public health, safety, morals and general welfare" of the Township's inhabitants; (2) encouraging "the use of lands and resources of the Township in accordance with their character and adaptability"; (3) "to provide for safety in traffic, adequacy of parking and reduce hazards to life and property; and (4) "to conserve life, property, natural resources and the use of public funds to public services and improvements to conform with the most advantageous use of lands, resources and properties." (ECF No. 29-1 at PageID.1142); (§ 2.1). The general gist is that the Township wants to preserve agriculture and conserve the serenity of the OMP. At summary judgment, this court decided that Peninsula Township's proffered governmental

interests were sufficient for the first step of *Central Hudson*. (ECF No. 559 at PageID.21919). The same is true after trial.

### B. Advancement of the Township's Interests

A "commercial speech regulation 'may not be sustained if it provides only ineffective or remote support for the government's purpose.'" *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 505 (1996) (quoting *Cent. Hudson*, 447 U.S. at 564). The issue becomes whether Sections 6.7.2(19)(b)(1)(v) (regulating logos and merchandise), 8.7.3(10)(u)(1)(b) (promotion of Peninsula Township), 8.7.3(10)(u)(5)(h) (outdoor displays), 8.7.3(12)(i) (regulating logo size), and 8.7.3(12)(k) (promotion of food on signs) advance the Township's interests. At trial, the Township had to show how these PTZO provisions "directly and materially advance[d]" the governmental interests and that the regulations were "narrowly drawn." *Fla. Bar v. Went for It, Inc.*, 515 U.S. 618, 625-626 (1995). It could not do so.

Beginning with Supervisor Manigold's deposition, he explained that these challenged sections of the PTZO do not advance the stated interests:

> Q. Okay. So if we're talking about logoed items, how does limiting the sale of merchandise to logoed items that relate to fresh or processed agriculture, how does that further one of these four governmental interests?
>
> A. I don't know.
>
> Q. Okay. And if you don't know how it furthers it, I mean, do you know what the harm is the government was trying to prevent by having this ordinance?
>
> A. No.
>
> Q. Okay. And do you know if the government considered less-restrictive means?

A. Whatever we considered is in that document.

Q. In the ordinance?

A. Mmm-hmm.

Q. So there's nothing else that says, "We considered these four other ordinances and we rejected those?"

A. I'm unaware of that.

Q. Okay. Is the Township still enforcing this ordinance?

A. Yes.

Q. And at the end it says: Specifically not allowed are unrelated ancillary merchandise such as clothing, coffee cups, bumper stickers.

Okay, how does prohibiting clothing, coffee cups, and bumper stickers, how does that further a governmental interest?

A. I can tell you, at the time there was a concern if we were going to get this passed that it not turn agricultural into commercial uses. So I'm guessing, my guess is that's what that's in there for.

Q. Okay, but that wasn't one of the four governmental interests the Township has identified, right? So how does it fit into one of these four governmental interest that you—

A. Don't know.

Q. And what is the harm, what is the harm if a farm processing facility sells a logoed T-shirt? What's the harm to the governmental interest?

A. Don't know.

Q. I'm assuming you don't know if there were any less-restrictive means considered?

A. Not that I recall.

(ECF No. 136-1 at PageID.4770). Much of Mr. Manigold's deposition stated the same. (ECF No. 611-154 at PageID.27957, PageID.27965, PageID.27937-38). Not even the Township Supervisor understood the regulations. The Township could not muster a single fact witness to testify regarding the supposed reasonableness of the PTZO, and the Township did not even attempt to call the previously deposed Township officials.

Instead, the Township relied on expert testimony from a land use expert, Dr. Daniels. At summary judgment, the court had to rely on Dr. Daniels' testimony to some degree. It was not reconcilable with Plaintiffs' evidence. But after trial, the court is free to disregard his testimony because he was not credible. He opined in a report that several of the relevant provisions served to promote the Township's interests.  When discussing 6.7.2(19)(b)(1)(v) and 8.7.3(12)(i), he opined that the provisions "advance the goal of encouraging growers to produce, process, and market agricultural products and thus maintain land in agricultural use." (ECF No. 488-3 at PageID.19078). Further, he opined that "[m]erchandise not related to wine or the agricultural product grown on the farm property is a commercial activity, and that merchandise can and should be sold in a commercial zoning district." *Id.* At summary judgment, PTP also put forth testimony from the Zoning Administrator and PTZO co-drafter, which contradicted the testimony of Robert Manigold. (ECF Nos. 488-5, 488-7). All of it was conclusory, and none of it was credible.

Dr. Daniels reviewed the Township Master Plan. He noted that the Township sought to preserve agriculture, maintain rural character, and work to minimize effects on infrastructure.

> Q: And you looked at the Peninsula Township master plan?
>
> A: I did.
>
> Q: Does anything -- Did anything stick out at you as relevant to your opinion in this case?
>
> A: Yes. It's very clear that the Township puts a lot of emphasis on maintaining productive agricultural land, on agricultural preservation, protection of rural character and the spectacular scenery that the Township provides, as well as wanting to minimize the expansion of community facilities.

> Q: What do you mean by "minimize the expansion of community facilities"?
>
> A: Well, if you – if you look at the location of public or central sewer and water, it stops at McKinley Road on M37 Center Road, at the very southern portion of the Township. So the vast majority of the Township does not have access to central sewer and water. Central sewer and water is essential if you are going to have intensive land development.

(ECF No. 604 at PageID.23880). The PTZO predates the current version of the Master Plan by several decades, so this testimony does not make much sense.  It is also unclear to the court how the lack of central sewer and water access relates to preserving agriculture. Farms and wineries require water and sewer as well.

The Master Plan also contemplates that the Township's primary economic base is shared between its agricultural production, tourism, and home based businesses. The long-term economic viability of the Township depends on maintaining its economic base and also providing a high quality of life for its residents.

Like the Master Plan, the Township's Future Land Use Map identifies that the Township's land-use goal is to keep land in agriculture:

> Q: What does the Future Land Use Map reflect about Peninsula Township, the Master Plan Future Land Use Map?
>
> A: Future Land Use Map is an indication of how the community would want land uses to change over time. And again, it's the basis for the Township zoning ordinance.
>
> Q: And what is the future land use plan of Peninsula Township? And I would refer you to Page 48 of the same document. Nope. Yep. What does the future land use map of Peninsula Township indicate about the Township's land use goals and policies?
>
> MR. INFANTE: What page?
>
> MS. ANDREWS: 48.

> THE WITNESS: That they want to see the majority of the Township in agricultural use.

(*Id.* at PageID.23882-83). The problem is that every one of the remaining PTZO provisions makes operating a farm or winery more difficult. As the Wineries' representatives testified, in conjunction with farming expert Gary McDowell, farms and wineries need alternate revenue streams to survive. And as Mr. Baldyga described, the alternative to operating a failing business is selling the farmland for residential development. The PTZO provisions do not advance the Township's interest in maintaining rural character or keeping land in agriculture.

In their trial brief, the Township and PTP largely point to historical documents from years of committee minutes, zoning ordinance amendments, and land use applications. (ECF No. 617 at PageID.30889-91); (ECF No. 619 at PageID.31209-20. As discussed, the substance of these materials constitutes hearsay. So the court can conclude that the Township has contemplated these issues for decades. That fact, however, does not explain whether the Township was reasonable throughout that process or whether the challenged PTZO provision actually advanced the Township's interests. Regardless of the evidentiary medium, the witnesses for the Plaintiffs were persuasive, and the court would credit their testimony over a recorded statement from twenty years ago.

The court does not find the Township's other witnesses credible. For example, Gordon Hayward, the Township's former Zoning Administrator and Planner, was deposed at length regarding how allowing certain limited uses (e.g., the sale of logo'd merchandise) allows wineries to market themselves while restricting commercial uses (e.g., retail sales

unrelated to agriculture) in the A-1 District. Mr. Hayward testified that the Township's governmental interests are harmed by the sale of non-logo'd merchandise because it degrades the agricultural industry and that, over time, through that degradation, the agricultural industry will tend toward commercial uses. In other words, Defendants rely on a slippery slope fallacy—any inch toward a hybrid agricultural and commercial use will inevitably degrade the OMP's rural character.

Mr. Hayward also testified that the Township engaged in long-standing and reasonable efforts to carefully tailor the zoning ordinances such that they would support agriculture and agricultural production. That view is not reconcilable with this record.

In blatant contrast, the Wineries offered live testimony from twelve witnesses who explained how the PTZO hindered their agricultural operations and caused some of the Wineries to cancel investments in additional agricultural operations or to consider converting their farms to residential housing developments. The overwhelming proofs at trial indicated that the Township's purported interests in preserving agriculture would lead to situations where farms could not exist on the OMP.

The Wineries also called Gary McDowell, who was received as an expert in rural development, agricultural preservation, and agricultural tourism. He largely rebutted Dr. Daniels and explained how the PTZO contradicts the Farm Market GAAMPs. Regarding Dr. Daniels' assertion that the Township had an interest in keeping land prices down, he explained:

> And the one part I was really surprised at is when [Dr. Daniels] talked about trying to reduce the price of farmland. I've just never heard of that before. That was just something with all my years of development, economic development commissions, I did serve over 20 years on the Chippewa County's economic development commission working with the townships, we're always trying to increase land values, that's so important for a farmer, of course, when you retire, that's your retirement. You don't have 401Ks or pension plans. And farmers have to borrow money all the time to operate, to buy equipment. And it's always the bank wants to see your net worth. And the biggest part of that, almost the whole part, is your farm.

(ECF No. 609 at PageID.25231-32). This testimony put the PTZO provisions in perspective: it was never about preserving farmland or rural character. These provisions were designed to keep land prices lower, so the Township could purchase more development rights, which would again, protect NIMBY landowners. Mr. McDowell testified that to preserve agriculture, farms need to be profitable and have the opportunity to engage in typical accessory uses and marketing. (*Id.* at PageID.25240).

The record does not show that the regulations directly advance the Township's purported interests.

C.  Narrow Tailoring

"[I]f the governmental interest could be served as well by a more limited restriction on commercial speech, the excessive restrictions cannot survive." *Central Hudson*, 447 U.S. at 564.

Even assuming that the Township showed that the challenged sections of the PTZO advanced the stated interests in some way, it was even clearer to the court that the provisions were not sufficiently tailored. Perhaps the easiest way to support agriculture on the OMP would be to support the farms there, and the PTZO does not do that.

Here, the PTZO restrictions limit the Wineries' ability to merchandise their goods and advertise brands. The restrictions limit advertising and make it more difficult for the Wineries to succeed. In theory, if the restrictions in the PTZO were lifted—or the Township imposed a workable zoning scheme—the Wineries would be able to preserve more agricultural land, as many have plans to plant additional acres and expand their farms. On this point, to the extent the OMP locals are concerned about a large influx of traffic and noise, which *could* precipitate after more development, a simple noise ordinance could be a narrowly tailored solution to serve many of the same interests in protecting the quiet enjoyment of the Township. *See, e.g., Gaughan v. City of Cleveland*, 212 F. App'x 405, 407 (6th Cir. 2007) (finding that two noise ordinances were constitutional).

On this point, the court notes that the Wineries have a similar interest in keeping the OMP's rural character intact. The Wineries also benefit tremendously from its scenic views and unique growing climate. Holding more events, advertising, or more retail space does not unilaterally convert the typical Winery accessory uses (based in agriculture) into purely commercial activity. Terry Quimby also explained how the MLCC limits and regulates the Wineries through their permits:

> Q. All right. Dr. Daniels testified that in reaching his opinion, he was concerned that the wineries would become wine shops and bars, selling alcohol made by other businesses. Do you take issue with that opinion of his?
>
> A. Yes.
>
> Q. Why do you take issue with that opinion?
>
> A. It's not possible.
>
> Q. How is it not possible?

A. With the three-tier system and the different licensing categories, the prohibitions of holding licenses in different categories, the wineries could not possibly become that.

Q. I guess we need to explain. What are the different licensing categories in the three-tier system?

[Quimby explained Michigan's three-tier system]

Okay. And is a Class C liquor license necessary to be a bar as described by Dr. Daniels?

A. Yes.

Q. So [the Wineries] cannot be a bar as described by Dr. Daniels?

A. No.

Q. You mentioned a -- like a -- in the retail tier, there is also grocery stores and Costco and Meijer, correct, right?

A. Yes.

Q. Okay. Those are also in the retail tier?

A. Yes, selling to consumers.

Q. Okay. Is it possible for the wineries to get the same type of license that a Meijer or a Costco has to sell alcohol made by somebody else?

A. No.

Q. So they cannot become a wine shop as Dr. Daniels opined?

A. No.

(ECF No. 607 at PageID.24766-70). Quimby's testimony illustrates how many of the regulations—designed to stifle commercial activity—are redundant as applied to the Wineries.

The court finds that the Township could offer government interests in the enforcement of the PTZO. However, the Township could not show that the PTZO advances those interests or that the PTZO was narrowly tailored to achieve those interests. The Wineries prevail on their commercial speech claims regarding Section 6.7.2(19)(b)(1)(v),

Section 8.7.3(10)(u)(1)(b), Section 8.7.3(10)(u)(5)(h), Section 8.7.3(12)(i), and Section 8.7.3(12)(k).

## V. Damages

Liability is certain. While the court has previously concluded that the Township has repeatedly and pervasively violated the Wineries' constitutional rights, damages remain an open question.

The original complaint was filed on October 21, 2020. The damages period began three years prior to Plaintiffs filing their complaint, which was October 21, 2017. The damages period ran until December 13, 2022, which was the date the Township repealed the operative PTZO and replaced it with Amendment 201.[7] Plaintiffs assert that Amendment 201 resembles the challenged provisions, but there has not been a judicial determination made on that issue. Plaintiffs did not and could not plead their complaint with reference to Amendment 201. Therefore, the damages period is 1,879 days, or 5.14 years—three years before the date of the complaint's filing until the PTZO's amendment and repeal. For calculation purposes, most of the Wineries' yearly damages will be multiplied by a figure of 5.14 years. As discussed below, however, not all of the Wineries were regulated by the Winery-Chateau ordinance during that entire period.

### A. Damages Standard

---

[7] Plaintiffs sought damages from three years before the complaint was filed until the date of judgment. When Plaintiffs filed their post-trial brief, that was a period of 2,504 days or 6.86 years.

For plaintiffs, 42 U.S.C. § 1983 serves as a vehicle to obtain damages for violations of both the Constitution and federal statutes. *Comtys. for Equity v. Michigan High Sch. Athletic Ass'n*, 459 F.3d 676, 681 (6th Cir. 2006). "Doubtless 'the basic purpose of a § 1983 damages award should be to compensate persons for injuries caused by the deprivation of constitutional rights.'" *Farrar v. Hobby*, 506 U.S. 103, 112 (1992) (quoting *Carey v. Piphus*, 435 U.S. 247, 254 (1978)). Damages sought under Section 1983 can include lost profits. *Chalmers v. City of Los Angeles*, 762 F.2d 753, 760 (9th Cir. 1985). "Damages must be established to a reasonable certainty, but the existence of some uncertainty as to the amount of damages does not foreclose recovery." *Benson v. City of Wellston*, 201 F. App'x 350, 353 (6th Cir. 2006).

Due process violations can account for damages beyond nominal damages. *Tri Cnty. Indus., Inc. v. D.C.*, 200 F.3d 836, 842 (D.C. Cir. 2000). The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment. *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982). Civil laws are held to a less strict vagueness standard than criminal laws "because the consequences of imprecision are qualitatively less severe." *Id.* at 498-99. "Even when speech is not at issue, the void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). *See also Columbia Nat. Res., Inc. v. Tatum*, 58 F.3d 1101, 1104–1105 (6th Cir. 1995). "[I]t

remains true to the principle that substantial damages should be awarded only to compensate actual injury." *Carey*, 435 U.S. at 266. Plaintiffs suffered actual injuries—lost profits—stemming from an impossible to understand ordinance and arbitrary enforcement of the same.

This case presents an unusual scenario. Three things make these damages calculations more difficult than in a typical case. First, only the Plaintiffs retained a damages expert. So naturally, the proofs are lopsided in their favor. When it comes to damages, the Township is limited to attempts at impeachment on cross examination and attorney argument. Second, the sheer size of this case, coupled with a long procedural history adds another layer of complexity. And third, the Wineries' financial data is not in the record.

### B.  Larson's Report

At trial, the Wineries called a damages expert, Mr. Larson. He issued two expert reports outlining the Wineries' damages. In Mr. Larson's first report, he opined that there were $203 million in damages, based on gross profit figures. (ECF No. 199-2). In his second report, the total damages number was reduced to $135 million. (ECF No. 199-4); (ECF No. 609 at PageID.25094). He clarified at trial that the two reports should be read together, but his "ultimate conclusions are in the supplemental report." (*Id.* at PageID.25050).

As explained below, the court will grant damages related to Larson's Schedules 6 (small events) and 7 (large events). A brief explanation of his calculations is warranted. For each Winery, Larson collected the following information from each Winery: (1) on-season events per week; (2) rate per person for on-season events; (3) the typical number of people

at a typical event; (4) off-season events per week; (5) rate per person for off-season events; (6) the typical number of people at a typical event; (6) and the estimated gross profit percentage. He applied a 65% estimated gross profit percentage from RMA data. RMA is a group called the Risk Management Association. RMA is regularly used by experts in Mr. Larson's industry. Larson also relied on his "accumulated skill, knowledge, training, experience, professional judgment" and the like when calculating. (*Id.*).

Larson testified that there is an "inherent difficulty in determining lost profits." (*Id.* at PageID.25056). Even so, this is how he did it, in his words:

> Q. All right. Can you walk us through the calculations in Schedule 7 and how you reached your opinion?
>
> A. Sure. Again, I'll pick on Bonobo again, because they're at the top of the list. Similar to [schedule 6], there's an on-season and an off-season time period, similar calculations. So for Bonobo and on see, the assumption was three events per week, a rate per person for that time period $250 multiplied by the number of people at that event would be 75 and then essentially that's multiplied by 26, because we've got half a year, multiplied by the profit percentage. So that's the on-season calculation. For off-season it's, again, one event per week now, multiplied by $250 per person, multiplied by 75 people at that event, multiplied by the 26 weeks, multiplied by the gross profit percentage. You multiply and add all those numbers up and get to the lost profits calculation that's in that column to the far right.
>
> Q. And the estimated gross profit percentage. Where did that come from?
>
> A. Again, that's from the RMA data.

(*Id.* at PageID.25085).

The Winery business in Northern Michigan is cyclical and slower during the off-season. Larson's calculations accounted for that. Larson's calculations reflect the revenue the

Wineries would have generated if they were permitted to hold small and large events in a manner consistent with a workable zoning system and market demand.

The Township attempted to impeach Larson's testimony. First, the Township asserted that Mr. Larson made no attempt to plan or supervise the data that was given to him by the Winery representatives. The Township also complains that Mr. Larson did not review current or historic financial documents, profit and loss statements, tax returns, or any other documents that could support a request for money damages. According to the Township, he could not have properly calculated damages.

The court disagrees. All the Winery representatives ascended the witness stand, took an oath to tell the truth, and testified that the figures they gave to Mr. Larson were accurate. On this record, there is no basis to disagree, and the court found the Winery representatives credible. *See, e.g.*, *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1142 (9th Cir. 1997) (explaining that it is "immaterial" that opinions are based on information collected by other individuals).

Second, the Township asserts that Dr. Larson's calculations were too simple. From trial:

> Q: The only study you did was you took the damage matrix, multiplied it by the RMA data and got the gross profit, right?
>
> A: The revenues multiplied by the RMA data gives you the profit amount, that's correct.
>
> Q: And that's the only study you did?
>
> A: As far as gathering that additional third-party data, that's correct.

(ECF No. 609 at PageID.25153). The Township cites no case requiring that an expert's calculations must be complex. To the contrary, "reasonable certainty" is the standard. *Fera v. Vill. Plaza, Inc.*, 242 N.W.2d 372, 374 (Mich. 1976); *Fredonia Farms, LLC v. Enbridge Energy Partners, L.P.*, 1:12-cv-1005, 2014 WL 3573723, at *5 (W.D. Mich., July 18, 2014). What the Township casts as a negative is actually a positive because the calculations are easily replicated and scrutinized.

Third, the Township argues that the Wineries made no effort to utilize any objective facts or data to support any claims for lost profits. Not so. Each of the Winery representatives discussed the demand for group services. Every Winery representative explained that the figures provided to Mr. Larson reflect their usual business practices. The court does not require market studies and feasibility analyses when the proofs are overwhelmingly clear that the Wineries shared a thorough demand to host large and small events.

Fourth, the Township also criticized the large (nearly $70 million) discrepancy between Larson's first and second reports. Rightfully so. But Mr. Larson took the stand, explained his discrepancies, and updated his analysis to reflect more accurate figures. Ultimately, these mistakes—early in the litigation—do impugn Mr. Larson's credibility somewhat. The court does not have another damages expert to credit, however. The proofs, which were subject to rigorous cross examination, are the proofs.

C. Award

The court will decline to award damages under Schedules 1, 3, and 5. The court will award the Wineries damages under Schedules 6 and 7.

1.  Schedule 3 (Closing Times)

As previously discussed, there is no constitutional violation to serve as a basis for damages under Schedule 3. The court will not permit the Wineries to rely on their unpled *Sanderson* theory of liability, which was not announced until the start of the trial. Moreover, there is conflicting testimony in the record as to whether the Wineries did or would stay open beyond 9:30. The Wineries are entitled to no damages from their closing time claim.

2.  Schedule 1 (Increased Grape Costs) and Schedule 5 (Merchandise Sales)

The Township's first, and perhaps best, critique of Larson's report is that he calculated net revenue and not net profits for his damages determination. The Wineries assert that it was not an issue and using gross revenue was proper. The difference between the two calculations can be substantial

"It is not clear whether gross or net profits are the proper measure of recovery in a section 1983 suit." *Chalmers*, 762 F.2d at 760. As the Township points out, Michigan courts routinely hold that net profits are the proper measure of damages. *See, e.g., Lawton v. Gorman Furniture Corp.*, 282 N.W.2d 797, 801 (Mich. Ct. App. 1979) (explaining that failure to account for costs results in a much higher damage award when considering furniture production); *Getman v. Matthews*, 125 N.W.2d 671, 673 (Mich. Ct. App. 1983) ("The court failed to define the term 'lost profits,' neglecting to distinguish between 'gross profits' and 'net profits.'").

But *Lawton* and *Getman* involved claims for breach of contract. In those cases, using a net profit calculation made sense. For example, in *Lawton*, the court of appeals explained

that "gross sales" did not consider the costs of the furniture and the aggrieved party's overhead costs. 282 N.W.2d at 801. The court also noted that the "measure of damages in a breach of contract suit is to place the injured party in as good a position as he would have been in if the promised performance had been rendered." *Id.*

For the instant case, net profits are a more accurate way to calculate the Wineries' damages based on Schedule 1 (increased grape costs) and Schedule 5 (merchandising). Like in *Lawton,* the record before the court does not consider the Wineries' overhead costs associated with the increased grape costs or merchandise. Because Mr. Larson's calculations are not a proper fit or reasonable under Schedules 1 and 5, the court declines to award damages for those violations.[8] These calculations should have been based upon net profits rather than gross revenue.

Larson testified and explained the damages associated with the Wineries being forced to use OMP grapes:

> So there was a discussion and, generally speaking, my understanding was that grapes on the peninsula, generally, are more expensive than grapes off the peninsula. *All other things being equal* and that's what the wineries told me as well and they testified as much.

(ECF No. 609 at PageID.25058). But all things would not be equal. For example, if the Wineries sourced grape products from beyond the OMP, shipping costs could diminish the purported savings. Larson testified that the Wineries would likely purchase grapes from

---

[8] If Larson had used net profits instead of revenue, there is some substance in the record to support the notion that the damages under Schedules 1 and 5 would be 1/13 of what was proffered. (ECF No. 609 at PageID.30926). The court declines to award damages on that basis alone, however. If that were enough, the Wineries would in theory be entitled to 1/13 the damages proposed under Schedules 1 and 5.

64

"southern Michigan, Washington, Oregon maybe, California." (*Id.* at PageID.25059). The court does not need a Township damages expert to come to that conclusion, especially considering the general preference for net profit calculations under Michigan law. This is a common sense inference, one the court believes a jury could and would make. This example illustrates how the failure to account for overhead costs undercuts the reasonableness of a damages calculation.

The court will also note the nexus between the merchandising damages and the commercial speech and due process violations are more attenuated than the damages discussed below. As the Township was able to elicit at trial, the Wineries were able to sell merchandise. The Wineries were also entirely permitted to sell merchandise online. And perhaps the Wineries would be less willing to turn an aesthetic wine tasting parlor into a gift shop beyond the extent already allotted. The court declines to award the damages sought under Schedules 1 and 5.

### 3.   Schedules 6 (Small Events) and 7 (Large Events)

The Wineries would like to host activities or events to demonstrate their products. As explained throughout this litigation, the Township's restrictions violate the Due Process Clause, the First Amendment, and the Dormant Commerce Clause. (ECF No. 162 at PageID.6016-19). Each Winery receives requests to host small and large events, such as business meetings, corporate retreats, anniversary parties, birthday parties, and weddings. The only barrier was the now repealed PTZO. Each Winery called a witness to verify the

information it provided to Eric Larson for Schedules 6 and 7 in his supplemental report. (ECF No. 611-144 at PageID.27697-98).

Schedules 6 and 7 estimate damages stemming from the Wineries' inability to properly host small and large events. Given the unworkable PTZO provisions and Guest Activity Uses provisions, the Wineries were unable to host events in a manner consistent with reasonable business expectations. The Township enforced the PTZO against the Wineries. Additionally, given the insular nature of the community, as well as WOMP, all the Wineries were familiar with the Township's enforcement. The Wineries' damages extend from the vagueness of the Guest Activity Uses provision of the PTZO. It was abundantly clear at trial that the confusion stemming from the PTZO caused a great many issues for the Wineries.

Trial included an abundance of testimony regarding this issue. Winery-Chateau witnesses testified that the vagueness of the PTZO, coupled with the Township's varying interpretations, caused them to refrain from hosting events for fear of Township enforcement. *See, e.g.*, (ECF No. 600 at PageID.23032) (Bonobo uncertainty); (*Id.* at PageID.23038-42); (ECF No. 611-35 at PageID.25837) (Bonobo event); (ECF No. 600 at PageID.23045-48); (ECF No. 611-37 at PageID.25842) (Bonobo event); (ECF 601 at PageID.23286-90, PageID.23291-93, PageID.23301-02), (Mari uncertainty); (ECF No. 611-117 at PageID.27220) (Mari canceling events for fear of Township enforcement); (ECF No. 603 at PageID.23749, PageID.23774, PageID.23801) (Brys uncertainty); (ECF No. 611-78 at PageID.26585) (Brys forced to cancel event for the Governor); (ECF No. 603 at

PageID.23769-71); (ECF No. 611-78 at PageID.26592) (Brys forced to cancel Big Brothers/Big Sisters event); (ECF No. 605 at PageID.24225-26) (Bowers Harbor uncertainty); (*Id.* at PageID.24091-94); (ECF No. 611-52 at PageID.26270) (Bowers Harbor enforcement); (ECF No. 605 at PageID.24252-54); (ECF No. 606 at PageID.24331-32) (Hawthorne refraining from events based on knowledge of what happened at Bowers Harbor); (ECF No. 606 at PageID.24517-18, PageID.24522-23) (Chateau Chantal uncertainty), PageID.24496 (Chateau Chantal restrictions); (ECF No. 607 at PageID.24701-03) (threats to Chateau Grand Traverse). It was abundantly clear at trial that all the "Winery-Chateaus" were subject to the vague and confusing guest activity regulations in 8.7.3(10)(u) and 8.7.3(10)(m). The Wineries easily demonstrated that "the law has in fact been (or is sufficiently likely to be) unconstitutionally applied to [them]." *McCullen v. Coakley*, 573 U.S. 464, 485 n.4 (2014).

Larson used gross revenue to calculate these damages as well. Unlike the grape costs and merchandising damages discussed above, the Wineries testified that there would be no increase in overhead costs associated with hosting small and large events. And if there were, those expenses would be "baked into" the costs of the events. (ECF No. 609 at PageID.25080). Many of the Winery properties consist of several individualized areas beyond just their tasting rooms. Therefore, it is easily conceivable that the Wineries could host small and large events without an increase in overhead costs. But even if there was an increase in costs, the court found credible the Wineries' representatives, many of whom testified in a business-savvy manner. Given the incredible demand for group services on the

OMP, it is reasonably certain that the Wineries would be able to bake other associated costs into the calculus.

The Sixth Circuit explained how "gross profit" figures can serve as a reasonable basis for damages calculations instead of net profit. *See Cont. Design Grp., Inc. v. Wayne State Univ.*, 635 F. App'x 222, 236 (6th Cir. 2015). In what the circuit described as "a close call," an expert opined on a business's damages using a "gross profit"[9] calculation. *Id.* On cross examination, the damages expert explained that he relied on the plaintiff's business figures as well as their overhead calculations. *Id.* Still, the expert's "reliance on gross profits [was] most troubling, but [the expert] addressed the reasons for his methodology on cross examination, and Defendants' own expert offered a persuasive counterargument." *Id.* at 237. The court held that the district judge did not abuse its discretion in admitting the evidence, but did plainly acknowledge that the "use of gross rather than net profits has also been found to be an inappropriate way of calculating lost profits." *Id.* at 235 (collecting cases).

Larson's calculations for Schedules 6 and 7 are like the expert's calculations in *Contract Design.* Larson calculated his client's damages using a gross profit methodology. His testimony was subject to cross examination and pretrial scrutiny. Larson and the Winery representatives explained at trial why the gross profit figures make sense: there would be no change in overhead costs, or the costs would be baked into the event pricing. And crucially,

---

[9] "Gross profit" is really a misnomer. It can be better thought of as "revenue." Generally, revenue is income earned before expenses. Profit is generally revenue less expenses.

the court does not have the benefit of proofs to the contrary. The Township did not retain a damages expert.

With all that in mind, the court finds that the Wineries are entitled to the damages sought in Larson's report, as modified at trial for Schedule 6. But only those Wineries classified as Winery-Chateaus are entitled to the damages sought in Larson's report, as modified at trial for Schedule 7. That's because the Winery-Chateaus were subject to the vague Guest Activity Uses provisions. The difference is that large events used to require compliance with the unconstitutional requirements in the PTZO governing Winery-Chateaus.

Not all the Wineries are entitled to damages under Schedule 7 because they were not subject to the vague Guest Activity Uses Provisions. Black Star and Two Lads have land use permits for Farm Processing Facilities under former Section 6.7.2(19) of the PTZO and were not subject to the Guest Activity Uses provisions. This court previously concluded that Tabone operated as a Farm Processing Facilities under former Section 6.7.2(19) as well. Peninsula Cellars has an SUP for a Remote Winery Tasting Room under former Section 8.7.3(12) of the PTZO, so it was not subject to the Guest Activity Uses provisions. Bonobo, Bowers Harbor, Brys, Chateau Chantal, Chateau Grand Traverse, Hawthorne, and Mari have special use permits for Winery-Chateaus under former Section 8.7.3(10) of the PTZO.

After determining the annual lost profits, Larson multiplied their yearly number by the total damages period. As previously discussed, however, the figures need to be reduced for the correct damages period. For calculation purposes, most of the Wineries' yearly

damages will be multiplied by a figure of 5.14 years. Bowers Harbor and Montague Development (Hawthorne), however, did not become Winery-Chateaus until 2019 and 2020 respectively. Bowers Harbor and Montague Development are not entitled to damages dating back to before their classification as Winery-Chateaus.

| Winery | Annual Lost Profits for Small Events | Schedule 6 Total (X 5.14) |
|---|---|---|
| OV The Farm, LLC | $108,160 | $555,942.40 |
| Winery at Black Star Farms, LLC | $54,080 | $277,971.20 |
| Bowers Harbor Vineyards & Winery, Inc. | $208,208 | $1,070,189.12 |
| Brys Winery, LLC | $163,592 | $840,862.88 |
| Chateau Operations, Ltd. | $106,470 | $547,255.80 |
| Grape Harbor, Inc. | $53,525 | $275,118.50 |
| Montague Development, LLC | $54,080 | $277,971.20 |
| Tabone Vineyards, LLC | $182,182 | $936,415.48 |
| Two Lads, LLC | $260,260 | $1,337,736.40 |
| Villa Mari, LLC | $218,855 | $1,124,914.70 |

| Winery | Annual Lost Profits for Large Events | Schedule 7 Total (X 5.14)* |
|---|---|---|
| OV The Farm, LLC[10] | $1,267,500 (October 2020 through June 2022); $887,250 (July 22-Dec 22) | $6,393,837.50 |
| Winery at Black Star Farms, LLC | $0 | Section 6.7.2(19) |

---

[10] Bonobo's damages are reduced by 30% after June 2022 because Bonobo began to host events after this court's original summary judgment opinion. Bonobo has two damages periods: one from October 21, 2017 through July 1, 2022, and one from July 1, 2022 through December 13, 2022. Bonobo was restricted for 1714 days (4.69 years) under the first figure ($1,267,500 annual lost profits). Bonobo was restricted for 165 days (.45 years) under the second figure ($887,250 annual lost profits).

| Bowers Harbor[11] Vineyards & Winery, Inc. | $2,184,000 | $7,403,760* |
| Brys Winery, LLC | $1,384,250 | $7,115,045 |
| Chateau Operations, Ltd. | $2,281,500 | $11,726,910 |
| Chateau Grand Traverse, Ltd. | $612,625 | $3,148,892.50 |
| Grape Harbor, Inc. | $0 | Section 8.7.3(12) |
| Montague Development, LLC[12] | $422,500 | $1,018,225* |
| Tabone Vineyards, LLC | $0 | Section 6.7.2(19) |
| Two Lads, LLC | $0 | Section 6.7.2(19) |
| Villa Mari, LLC | $1,014,000 | $5,211,960 |

# VI. Injunctive Relief

The court declines to issue an injunction under Federal Rule of Civil Procedure 65. An injunction "must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document— the act or acts restrained or required." Fed. R. Civ. P. 65(d). These "are no mere technical requirements." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). The requirements serve the "'important' functions" of "prevent[ing] uncertainty and confusion" on those enjoined and enabling reviewing courts to determine the scope of its review. *Union Home Mortg. Corp. v. Cromer*, 31 F.4th 356, 362 (6th Cir. 2022) (quoting *Schmidt*, 414 U.S. at 476).

---

[11] Bowers Harbor did not receive its SUP to become a Winery-Chateau until July 23, 2019. Therefore, its damages period is from that date until the PTZO was repealed by Amendment 201.  Bowers Harbor was subject to the Winery-Chateau PTZO for 1,239 days, or 3.39 years.

[12] Montague Development (Hawthorne) did not receive its SUP to become a Winery-Chateau until July 14, 2020. Prior to that date, it was regulated under Section 6.7.2(19). Therefore, its damages period is from that date until the PTZO was repealed.  Hawthorne was subject to the Winery-Chateau PTZO for 882 days, or 2.41 years.

It is well established that a plaintiff seeking injunctive relief must generally demonstrate "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). On this record, Plaintiffs could make a strong showing on these factors.

But the Township repealed the operative PTZO. The current version of the PTZO, Amendment 201, is not the subject of this action. *See Brandywine, Inc. v. City of Richmond*, 359 F.3d 830, 835 (6th Cir. 2004) ("We can neither declare unconstitutional nor enjoin the enforcement of a provision that is no longer in effect."); (ECF No. 518 at PageID.20738-29).

## VII. Miscellaneous Issues

First, the Wineries' post-trial brief requests attorneys' fees under 42 U.S.C. § 1988. The court will withhold ruling on this issue, as well as PTP's potential liability for the Wineries' fees, until after reviewing the Wineries' forthcoming fee petition. Given the costs associated with this protracted litigation and the potential for yet another appeal, the court anticipates that this matter may require more formal briefing.

Second, the Wineries sought to debunk all the remaining affirmative defenses available to the Township and PTP after summary judgment. Based upon the Defendants' joint pretrial brief, it seemed that the they might present a laches defense. (ECF No. 581 at PageID.22683). Neither the Township nor PTP presented any witnesses related to laches or any of those remaining potential defenses. Defendants' post-trial briefs do not assert any

affirmative defenses. Accordingly, the court will deem the remaining affirmative defenses waived.

Third, the Wineries request that this court revoke PTP's intervenor status because PTP "misled the Sixth Circuit" regarding its supposed interests in this matter. (ECF No. 618 at PageID.31110). This court remains bound by the Sixth Circuit's decision.

## VIII. Conclusions of Law

Sections  6.7.2(19)(a),  6.7.2(19)(b)(1)(ii),  6.7.2(19)(b)(1)(iii),  6.7.2(19)(b)(2)(i), 6.7.2(19)(b)(2)(v),  8.7.3(10)(u)(2)(e),  8.7.3(10)(u)(3),  8.7.3(10)(u)(5)(c),  and 8.7.3(10)(u)(5)(d) of the Peninsula Township Zoning Ordinance are unconstitutional violations of the Dormant Commerce Clause. (ECF No. 162 at PageID.6001).

The term "Guest Activity" is unconstitutionally vague in violation of the Due Process Clause. Sections  8.7.3(10)(u);  8.7.3(10)(u)(1)(a);  8.7.3(10)(u)(1)(b);  8.7.3(10)(u)(1)(c); 8.7.3(10)(u)(1)(d);  8.7.3(10)(u)(1)(e);  8.7.3(10)(u)(1)(f);  8.7.3(10)(u)(1)(g);  8.7.3(10)(u)(2); 8.7.3(10)(u)(2)(a);        8.7.3(10)(u)(2)(b);        8.7.3(10)(u)(2)(c);        8.7.3(10)(u)(2)(c)(i); 8.7.3(10)(u)(2)(c)(ii);    8.7.3(10)(u)(2)(c)(iii);    8.7.3(10)(u)(2)(c)(iv);    8.7.3(10)(u)(2)(d); 8.7.3(10)(u)(2)(e); 8.7.3(10)(u)(3); 8.7.3(10)(u)(4); 8.7.3(10)(u)(4)(a)(i); 8.7.3(10)(u)(4)(a)(ii); 8.7.3(10)(u)(4)(a)(iii);        8.7.3(10)(u)(5);        8.7.3(10)(u)(5)(a);        8.7.3(10)(u)(5)(a)(i); 8.7.3(10)(u)(5)(a)(ii);      8.7.3(10)(u)(5)(a)(iii);      8.7.3(10)(u)(5)(b);      8.7.3(10)(u)(5)(c); 8.7.3(10)(u)(5)(d); 8.7.3(10)(u)(5)(e); 8.7.3(10)(u)(5)(f); 8.7.3(10)(u)(5)(g); 8.7.3(10)(u)(5)(h); 8.7.3(10)(u)(5)(i);  8.7.3(10)(u)(5)(j);  8.7.3(10)(u)(5)(k);  8.7.3(10)(u)(6);  8.7.3(10)(u)(7); 8.7.3(10)(u)(7)(a); 8.7.3(10)(u)(7)(b); 8.7.3(10)(u)(8); 8.7.3(10)(u)(8)(a); 8.7.3(10)(u)(8)(b);

8.7.3(10)(u)(8)(c); and 8.7.3(10)(u)(8)(d) of the Peninsula Township Zoning Ordinance use that phrase and are therefore unconstitutional and unenforceable.

Sections 8.7.3(10)(u)(1)(b) and 8.7.3(10)(5)(a) unconstitutionally "compel speech because they require a Winery-Chateau to promote Township agriculture at all Guest Activities by doing one of the following: (1) identifying 'Peninsula Produced' food or beverages, (2) providing 'Peninsula Agriculture' promotional materials, or (3) including tours through the Wineries or other agricultural locations." (ECF No. 559 at PageID.21911). Sections 8.7.3(10)(u)(2)(b) and 8.7.3(10)(u)(2)(c) are unconstitutional prior restraints on speech because the Township required the Wineries to seek township approval before hosting a meeting of a 501(c)(3) non-profit group or agricultural related groups while lacking definite criteria to make an approval determination. (ECF No. 559 at PageID.21910).

Sections 6.7.2(19)(b)(1)(v), 8.7.3(10)(u)(1)(b), 8.7.3(10)(u)(5)(h), 8.7.3(12)(k), 8.7.3(12)(i) unconstitutionally restrain commercial speech in violation of the First Amendment.

Mich. Comp. Laws § 436.1547 preempts Section 8.7.3(10)(u)(5)(i), which says "Kitchen facilities may be used for on-site food service related to Guest Activity Uses but not for off site catering." (ECF No. 525 at PageID.21134). Mich. Comp. Laws § 436.1916(11) preempts the "No amplified instrumental music is allowed" language in Section 8.7.3(10)(u)(5)(g). (ECF No. 525 at PageID.21133).

Judgment to follow.

**IT IS SO ORDERED.**

Date:  July 7, 2025                                    /s/ Paul L. Maloney
                                                       Paul L. Maloney
                                                       United States District Judge